UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Steward Health Care System, LLC, et al Plaintiff, | ) | CASE NO: 26-03094 |
| | ) | Houston, Texas |
| v. | ) | |
| Tenet Healthcare Corporation Defendant. | ) | Thursday, May 14, 2026 |
| ------------------------------ | ) | |

FULL TRIAL

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ

UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Tenet Healthcare Corporation
RICHARD U.S. HOWELL
Kirkland & Ellis LLP
333 W. Wolf Street Plaza
Chicago, IL 60654

For Trustee Mark Kronfeld
JOHN BENJAMIN KING
Reid Collins & Tsai LLP
1601 Elm St.
Suite 4200
Dallas, TX 75201

For Trustee Mark Kronfeld
JEREMY HUBNER WELLS
Reid Collins et al
1301 S Capital of Texas Hwy
Ste C-300
Austin, TX 78746

Court Reporter:

Courtroom Deputy:

Transcribed by: Veritext Legal Solutions
330 Old Country Road, Suite 300
Mineola, NY 11501
Tel: 800-727-6396

ECRO: Yesenia Lila

Proceedings recorded by electronic sound recording; Transcript produced by transcription service.

HOUSTON, TEXAS; THURSDAY, MAY 14, 2026

(Call to Order)

THE COURT: Okay, good afternoon. This is Judge Lopez. Today is May 14th. I'm going to call the 1 p.m. case 26-03094. We're going to take appearances in the courtroom.

MR. HOWELL: Your Honor, Rush Howell from Kirkland & Ellis on behalf of Tenet Healthcare Corporation.

THE COURT: Okay, good afternoon.

MR. HOWELL: Good afternoon.

THE COURT: Anyone else?

MR. KING: I'm Ben King. I represent the trustee, Mark Kronfeld.

THE COURT: Good afternoon, Mr. King. Anyone on the line wish to make an appearance? Please hit 5, star. I think 917 number.

MR. LEMONS: Robert Lemons on behalf of Fifth Wall and Durrell.

THE COURT: Okay. Mr. Lemons, are you here for the Steward matter?

MR. LEMONS: Oh, no, I'm sorry. I apologize. I think --

THE COURT: No, no worries. We're going to start back up on that one at 2:30.

MR. LEMONS: Got it.

THE COURT: Oh, 2:30 Central, okay?

MR. LEMONS: Thank you, sir.

THE COURT: Thank you. Anyone else? Okay. Counsel, maybe I'll turn it over to you.

MR. HOWELL: Thank you, Your Honor. Your Honor, as I said, Rush Howell from Kirkland & Ellis on behalf of Tenet Healthcare Corporation. Good afternoon.

THE COURT: Good afternoon.

MR. HOWELL: A couple of logistical points. One, I have some slides to assist with my presentation today, and I was hoping Mr. Delaney could get control to be able to publish those slides.

THE COURT: Yep, absolutely.

MR. HOWELL: Thank you. And the second logistical issue is I thought that we were on for 90 minutes, and we had discussed 45 minutes per side. The schedule suggests something.

THE COURT: Yeah. My understanding is that it was an hour. Do you all need more time? We can --

MR. HOWELL: I will try my best. I just want to be fair, of course, to just the--

THE COURT: No, okay. My understanding is that everybody understood it was an hour. Did you all? If you need more time, I'll give you more time. I just don't -- I don't want to rush anyone. I think it's a really important

issue, so --

MR. HOWELL: Yeah, I will do my best to try to keep closer to, you know, 35-ish minutes, Your Honor. Hopefully, I can move along relatively quickly.

THE COURT: Okay.

MR. HOWELL: And if Your Honor would prefer, I have a hard copy of slides as well if you --

THE COURT: Okay, I'll take them. Hold on a second. Give me -- why don't you give me -- give me two minutes. I'm going to step off. I'm going to come back on. I'm going to see if I can do something.

MR. HOWELL: Thank you.

(recess begins at 1:05:24 p.m.)

(recess ends at 1:07:20 p.m.)

THE COURT: I'm trying to buy back some time, and if I can get it, I'll give it to you.

MR. HOWELL: Thank you very much, Your Honor.

THE COURT: Okay. Please proceed.

MR. HOWELL: So, Your Honor, I'd like to start by thanking the Court and the Court staff for making this time for us. Looks like it's already been a busy day, so we appreciate the time very much. I also want to make a quick introduction. We have a couple of people from Tenet here. We have one of the members of the senior leadership team there, Vice President of Enterprise Strategy, Mr. Steven

Schaefer, and along with him is Mr. Tim Doyle, who's one of the in-house counsel at Tenet.

THE COURT: Welcome.

MR. HOWELL: And we're here today, Your Honor, as you know, originally, the first amendment complaint, it was against a great number of entities, including primarily Dr. De La Torre for a wide-ranging number of issues, and we have since been severed. So, there's just one claim we're here talking about today. We appreciate Counsel from the trustee's cooperation on that, and appreciate, Your Honor, approving that severance.

And so, we are here on one account, really, a constructive fraudulent transfer account. And, Your Honor, this is a remarkable, a strange type of constructive fraudulent transfer account. This isn't your typical payment on the eve of bankruptcy to an insider. This isn't moving assets from one company to another within the same structure. This isn't an exorbitant bonus. This is not even a failed LBO. This is an arms-length transaction that was a carve-out transaction from a public company selling assets to another large company.

We think that's a very unusual fact pattern. And we think it's remarkable that we have a $1.1 billion constructive fraudulent transfer claim on an arms-length transaction. I think it's remarkable that we have a $1.1

billion constructive fraudulent transfer claim where, on the face of the complaint, over a billion dollars of value went to Steward, who made the acquisition. And we think it's remarkable that you have a $1.1 billion fraudulent transfer claim where the trustee ignores that objective value to focus entirely on the subjective value of projections made by Steward's management team about the future of the business, a management team that throughout the complaint is described as inept and as self-dealing.

If pleading unrealistic internal projections were all it took to survive dismissal, then every insolvent entity would have free rein to haul sellers from arms-length transactions into court on fraudulent conveyance claims as a form of non-consensual and non-contractual guarantee of business success. And that's not the law.

And if that weren't strange enough, we also have what I think is an unpled kind of shift in theory to say that the trustee is going to essentially Trojan-horse in a recharacterization claim related to NPT and the real estate deal that I'll talk about in a moment, and Trojan-horse that claim that it's released against NPT into a fraudulent transfer claim against my client.

So how did we get here? I know Your Honor has seen the papers. I'll be brief. But back in the fall of 2020, it was Citigroup, as a representative of Steward, that

came to Tenet about the potential to acquire five hospitals in the Miami area. Over the course of several months, the parties negotiated, and eventually, in July 31st of 2021, going effective August 1st, Tenet sold five hospitals in the Miami area, including real estate, including net working capital, leasehold improvements, tangible personal property, and the operations of those hospitals to Steward for $1.1 billion.

As you can see on the slide, it was a little more complex than that in as much as NPT bought as was permitted under the APA that governed this transaction. NPT put in $925 million, $900 million plus $25 million to pay closing costs, and NPT, for that, got the real estate in the transaction. The other $209 million that went towards the purchase price was debt that Steward raised. All of that went to Citi, and the $1.1 billion was paid in this carve-out deal documented through an asset purchase agreement.

As Your Honor is very well aware, Steward ended up filing for bankruptcy a little bit less than three years later, and Tenet is a creditor in that bankruptcy with a stipulated claim amount of $94 million and change, as is laid out in the trustee's amended complaint.

In our confirmation, we learned that there was an investigation ongoing into Dr. De La Torre and many other things, and on the next day, a complaint was filed that

named Tenet with respect to this constructive fraudulent transfer act, and then any number of other claims against the other defendants. Needless to say, Tenet was not happy about being named alongside folks that we had been litigating against, as I think Your Honor is generally aware, for years leading up to that.

As we were preparing to file our motion to dismiss, we got a reach out from new Counsel to the trustee asking for an extension to file a new amended complaint, and while we would have preferred just to move forward, we agreed with that, and the operative complaint here is the first amended complaint filed in November of last year, and we moved to dismiss in January, and it's fully briefed before you.

As I said a moment ago, this is a very unusual case, not the sort of constructive fraudulent transfer we would normally see. We couldn't find any cases where a public company engaging in a carve-out sale was found liable as a fraudulent transferee. We couldn't find any cases in which an APA was deemed a bad face sale such that the purchaser could subsequently seek to unwind it through a CFT. We didn't find cases on similar facts. I don't think the trustee did either. It's not in their pleadings. And Your Honor, we think that's for very good reason, and because this type of arm's-length transaction is the

paradigmatic example of where you are getting reasonably equivalent value.

And you certainly don't have to take my word for it. That is from TUFTA. And I'm going to read from the Texas Supreme Court in Janvey v. Golf Channel, Incorporated, 487 Southwest 3rd, 560 at 573, where the Texas Supreme Court said, "TUFTA is unique among fraudulent transfer laws because it provides a specific market value definition of reasonably equivalent value." And Texas courts speak with some pride on this point as the TUFTA specifically says, as it says right here, "Reasonably equivalent value includes, without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's-length transaction."

And as the Court went on to say in Janvey, "Use of the term includes and without limitation to define this term is significant, revealing the legislature intended to provide a paradigmatic but non-exclusive example of an exchange that conclusively satisfies, conclusively satisfies the reasonably equivalent value requirement found in various provisions of this statute." And that is the language in 24 OOD of the Texas Business and Commerce Code.

But here, the trustee ignores that it's an arm's-length transaction, which they don't plead that it's not. We asserted that it is one. They didn't argue that it's not

in their opposition, and talks about value in a way that essentially, they're trying to have their cake and eat it too. On the one hand, when measuring what Steward paid, the trustee counts all of the value that Tenet received, including the $925 million paid by NPT that went to Citi that ultimately goes to Steward. Whereas, on the other hand, when measuring the value that Tenet conveyed that Steward actually received, the trustee ignores all the objective value, ignores the real estate, ignores the net working capital, ignores the equipment, ignores everything except the goodwill of the business, which we talk about in our papers. So, a quick roadmap of what I'd like to cover here, time permitting, is --

THE COURT: No, take your time.

MR. HOWELL: I'm going to talk a little bit about why, on the face of the pleadings, and I know that there's an argument from the trustee that said, "Hey, you guys attached a bunch of stuff that you shouldn't have, asking for judicial notice." I'm happy to talk about any of those particular documents. But to be clear, on the APA and the first amended complaint alone, which are both -- there's no dispute that those are properly before the Court. On those two documents alone, the Court can and should find that reasonably equivalent value is already pled, and the case should be dismissed. So, I don't need to go to the other

documents I can talk about, and I will talk about a couple of them as to why we include.

Second, and that will demonstrate, through very simple math, why we think reasonably equivalent value has already been pled. Then I'm going to talk about why it is that the plaintiffs faced with that problem, they got over a billion dollars or $1.1 billion, so under ASARCO, we've already crossed the hurdle, why their rationale to try to get around that fails. I'll talk a little bit more about the arm's-length nature of the transaction, briefly talk about the judicial estoppel point on insolvency, because I know that's a bit of a unique one that we're raising, and then talk about why we think dismissal here should be with prejudice rather than without.

So, turning to this first point, and this is really about kind of simple math, and as I said, we need only look at the APA and the first amended complaint alone to get to this point. I'll start with another quote from Janvey, but this is in many of the cases that we cited, I think it's non-controversial. We look at reasonably equivalent value from the perspective of a reasonable creditor at the time of exchange. We don't care about the subjective value of a particular debtor, and we also don't care about hindsight. We're looking objectively, reasonable creditor at the time of the transfer.

And so, I'm going to focus on two things. The sale of the real estate and the net working capital. First, with respect to the real estate, as the APA lays out, and the trustee doesn't dispute, MPT was part of the transaction and ultimately bought the real estate. They were allowed to do that through the APA, where it says that "All or a portion of the owned real property could go to MPT, but that would be agreed upon by the buyers, Steward, and MPT." So, Tenet's got nothing to do with how Steward decides to set up what they're going to do with the real estate that they're getting, but does allow for MPT to buy it directly. So, the real estate didn't go to Steward and then get transferred over. Instead, it all went as part of that transaction.

And that's exactly what the trustee has pledged. Steward paid over $1.1 billion to Tenet, $209 million of which was raised by taking on expensive debt, and $925 million of which was funded by MPT. What did MPT get for that? In return, MPT purchased the hospital's real estate and leased it back to Steward. So, Steward gets -- and if we're looking at this from the perspective of a reasonable creditor, there's $925 million that comes in the door right away to pay for the real estate.

Now I want to talk about net working capital. So, under the APA, the purchase price was $1.1 billion, but it had a little toggle related to net working capital. And the

target net working capital is defined as $100 million. So, it was pretty simple. The parties had to, between signing and closing, prepare a projection of the net working capital. And then there was a period of time, this is all laid out in the APA, afterwards, where they could dispute net working capital.

And the point was, if Steward got less than $100 million of net working capital, then the purchase price would be reduced. So, if instead of $100 million, the net working capital is actually $70 million, you reduce by $30 million. And alternatively, if there's more value than $100 million in the net working capital, mostly in the form of account receivable, but in other forms as well, then you go above the $1.1 billion. So, it's assumed under the APA that $100 million of net working capital value will be transferred at the time. And there's nothing in the pleading that suggests that the purchase price was ever downward adjusted below that $100 million, suggesting that indeed Steward did get $100 million of net working capital.

And in fact, one of the things we asked the Court to take judicial notice of was an arbitration award, because Tenet fought with Steward about this, and the arbitration award showing that an arbitrator found, regardless of whether that was right or wrong, an arbitrator found that there was more than $100 million of net working capital.

And the Chancery Court in Delaware recognized that arbitral award. And so, we think on the face of the pleading and on the APA, you can see there's $100 million of net working capital as well.

So, when I say there's simple math, when we look at the MPT payment, payment for the real estate, and we look at the net working capital, that adds up to $1.025 billion when compared with the $1.1 billion that went out across. And we're already at above 93% of the purchase price. And that it's not 100%, as Your Honor is well aware, need not be dollar-for-dollar exactly when we're talking about reasonably equivalent value. This is the in re Louisiana Pellets's case. Debtor must receive value that is substantially comparable to the worth of the transferred property. Or ASARCO and multiple other cases, following Texas law in Texas, looking at the same issue.

Originally, I think from the Durant case, there was the 70% rule, but in ASARCO, between 85%, 90% of value, in that case, is deemed sufficient. So, already, without looking at anything else whatsoever, Your Honor, our contention is there is reasonably equivalent value that was provided to Steward from the perspective of the reasonable creditor that should dismiss the case in and of itself.

Now, we did ask the Court to take judicial notice of another point that would add to that, which is the

equipment and improvements. And here we asked judicial notice to be taken of tax filings that admittedly were from Tenet, not Steward, but under the APA Section 2.5(e) of the APA, the parties had to get together and agree upon a tax evaluation of all of the assets that were -- the non-real estate assets that were being acquired, and present consistent statements about that to the IRS. There's no allegation, or no argument that Steward didn't provide the same amount of value there. And so, again, if you're looking at that number that was represented to the IRS of $131 million for equipment and improvements, now we're up over the 1.1 billion before we get to personal property or operations, etc.

But again, Your Honor, let's say that you don't think it's appropriate to look at the tax filings. It doesn't matter, in our view, on the real estate payment, the $925 million that certainly came in the door and the $100 million in net working capital were already clearing the hurdle that we would need for reasonably equivalent value. So, on this alone, Your Honor, we think the case should be dismissed. We think this is a big problem for the plaintiff here. And the plaintiff has responded with a couple ways to try to get around this kind of simple math, as I've laid out. And the primary way that they did that in their pleadings, and I'll talk about another way that is not pled

that they've done in their briefing, is to say, "No, no, no. There's no value. What was conveyed was entirely worthless."

Paragraph 465 says, "The Miami hospitals were worth far less than the Tenet payment." And in fact, had no value or negative value. And in fact, when we got the complaint, we looked to see, what value are they going to say? What are they going to say that's lower than 1.1, but not as high enough to clear ASARCO? And they went with zero, that this entire thing was worthless. And they say it again and again. Complaint paragraph 20 says, "The hospital operations were worthless." So, everything relating to the operations were worthless. And by the way, note that they say they kind of use that in the same paragraph where they're talking about the $200 million in debt, which we think implies, consistent with what we've been talking about, that MPT got the real estate at $900 million.

But then, in paragraph 21, the trustee goes on to say that the entire -- everything, the Tenet hospitals altogether are worthless. So that would now include not just the operations, but the real estate, the net working capital, etc., etc. Those are remarkable allegations given clear objective value that was paid for those very things. And it's belied by the complaint itself. Now, admittedly, this is talking about some transactions before the Miami

hospital transaction. But in the complaint, the trustee is talking about actions by Dr. De La Torre and Cerberus and saying that that led Steward to sell or mortgage its most valuable assets, its real estate. So here we're saying it's the most valuable asset, it's the crown jewel, which, of course, it is. I can't imagine a real estate appraiser would come in and say the real estate for these hospitals is worth zero. But that's what they're saying, worthless.

So, how do they go about that? In the complaint, they plead four different arguments, I would say, across a few paragraphs. I'm going to start with A and D, because I think I can handle those quickly. They haven't been raised in the opposition papers.

THE COURT: You said A and D?

MR. HOWELL: I'm sorry. A and D, as in document.

THE COURT: Okay.

MR. HOWELL: Because I think those may have been abandoned. They're not argued in the opposition papers. I'll do those quickly, and then I'll talk a little bit about the financial projections at the time, and then the post-sale performance. But I'll start with what we call the purchase price increase.

So, essentially here, the trustee is saying, Citigroup, when they originally went on behalf, they were financial advisor to Steward, and when they originally went

to Tenet, they said, "Here's an indication of interest for $850 million." And that later, ultimately, it sells for $1.1 billion. So, the value can't be $1.1 billion because the initial offer was $850 million. So, query how that suggests that the value is worthless. Seems like that would suggest it was at least $850 million. But in any case, that doesn't lay out a plausible argument for why there's no reasonably equivalent value here.

That's akin to me giving a lowball offer on a home, negotiating with the seller, eventually coming to their listing price, and then bringing constructive fraudulent transfer claims, saying the value must have been what I offered initially, and it can't be what I ultimately paid. So, we don't think that that's plausible.

Secondly, this is D, as in dog, the bankruptcy sale process. So, the argument there is that because Steward was able to get virtually nothing, a paltry $0 million to $10 million in bids, in the bankruptcy sale, that that means these properties weren't actually worth the $1.1 billion back in August of 2021 when they were sold. And Your Honor, as we said in our papers, we don't think that's apples-to-oranges. We think that's apples-to-apple peels. We think the core of the value had already been stripped out at that point.

When Tenet sold to Steward, that included real

estate, included $100 million in net working capital, it included equipment, leasehold upgrades, it included personal property, and it had excluded liabilities that wouldn't be going forward to Steward. Whereas when Steward sold in bankruptcy, none of those things were true. Not to mention, I certainly don't have to bore Your Honor with discussion about why the conditions are different in a bankruptcy sale process than they would have been in an arm's-length transaction, where fair market value went across in August of 2021. So again, we don't think that's a plausible explanation for why there wasn't $1.1 billion of reasonably equivalent value.

So, let's turn to the other two. So, the first is Steward's subjective financial projections. And again, Your Honor, I find this one remarkable because what they're saying is not even relating to Tenet's financial projections, or financial statements, I should say, which were represented and warranted to in the APA, but rather that the subjective view of Steward as to how the business was going to perform going forward at the time of the acquisition, that that demonstrates the objective value as opposed to the value that we actually saw from things like the real estate and the working capital.

And we think that doesn't make sense for a number of reasons. First, and this is probably the least

important, but as a matter of simple math, they said that the price was based on a 7.7 multiple of forecasted 2021 EBITDA. That's the Steward forecast. And 7.7 times $156 million is $1.2 billion. So, that doesn't even arrive at the purchase price. But regardless, this is the sort of subjective valuation, it's projections that the trustee likes to say, "These were fanciful projections." So, they want to say that to say they aren't tethered to reality.

And we say, "Well, exactly." I mean, when we're looking -- we're here to talk about actual value, and that value better be tethered to reality, not -- you can't come in and say, "Oh, because Steward's management team thought that this performance was going to happen, we get to ignore all of the actual value that came in and just focus on that." So, we think that that, again, doesn't support their position.

Lastly, the post-sale performance. And Your Honor, I think it's well-established, as I've already talked about. We look at this from the perspective of a reasonable creditor at the time. We don't look at hindsight. We don't use hindsight. We don't make post hoc justifications for why performance is lower than we subjectively projected. And again, all jurisdictions agree. Courts measured the value of the property transferred and the consideration received at the time of the transfer. We don't use

hindsight.

So, kind of summing up these four points I talked about to try to explain why the simple math is wrong, and instead, these properties, these five hospitals, were totally worthless. I have maybe a bit of a silly example. Obviously, we're not talking about a dog grooming business here, but I like dogs. So, I use this example. But this is -- so take a situation where somebody is running a dog grooming business out of their home, and they decide somebody else wants to buy that business, and they buy not only the dog grooming business, but also, they get the home along with it.

And under the trustee's view of value in this case, it would make no difference whether they had bought the dog grooming business and got along with it a $10 million mansion or bought the dog grooming business and got along with it a $0 shack. It just wouldn't matter that they got that value, that objective value, because all that matters is that they projected the dog grooming business to do much better than it did, and when it didn't, then they get to bring a CFT claim.

And I think that reads out reasonably equivalent value altogether and just turns it into essentially an insolvency test. Because any insolvent entity could later say, "Well, the business didn't perform to the degree that I

thought it did. I'm going to ignore all of the other things that I got along with the business." And so, if you pay $10 million and you get a dog grooming business and a $10 million house, that has to be different, Your Honor, than if you pay $10 million and you get a dog grooming business, the same dog grooming business, and a shack that's worth $0.

Okay. So, as I said earlier, that's kind of what they had pled. I think they've introduced a new argument in their opposition to our motion to dismiss, where I think they're, as I said, essentially trying to kind of Trojan-horse in what is ultimately a re-characterization, an unpled re-characterization claim against MPT into the complaint. And they say, "Look, Tenet, you guys just don't get it. You have omitted a huge piece of the puzzle," their words, "and that's Steward's undertaking of overpriced lease obligations to MPT through sale-leaseback transactions designed to achieve MPT's core goal, securing long-term lease streams." And they say, "Look at paragraphs 7, 18, 254, and 264."

And I'm not going to belabor the point by going through each of those four paragraphs, Your Honor. But I think if you look through those paragraphs, you will not find any allegations in there that the rent prices were overpriced rent, that there were overpriced lease obligations, that there were above-market rents, etc. Nowhere in 7, nowhere in 18, 7 is not even about this

transaction, nowhere in 18, nowhere in 254, nowhere in 264. We don't think that they've pled that. We don't think that they can rely on that to defeat a motion to dismiss.

But it goes much beyond that, Your Honor, because what they're essentially saying -- and I'll say, when you look through the complaint, I don't think there's any value you could assign to the real estate other than the $925 million that MPT paid for it. They didn't plead some other value that the real estate is actually worth. They didn't plead what the rents were. They didn't plead what the rent should have been. They didn't plead what the cap rate was. They don't have anything like that in there.

I think it's probably not surprising that they didn't, because again, this is a claim that has been released as to MPT. And to suggest that the sale-lease back, that the price has nothing to do with the value of the real estate, is obviously calling into question a lot of issues, including MPT's REIT status, the accounting and tax treatment by both Steward and MPT, etc., etc., when you start to add those allegations. And beyond that, we're talking about looking at this from the position of a reasonable creditor. And the reasonable creditor is going to say $1.1 billion went out. MPT put $925 million in. There was another $100 million from working capital. That's sufficient.

And they certainly can't say as they try to, this is the have their cake and eat it too point, Your Honor, that we just are going to ignore that MPT payment of $925 million and say, "We never even really got that. That was worthless." This is the in re Senior Care Centers case. It's well settled that reasonably equivalent value, including satisfaction of an antecedent debt, can come from someone other than the trustee, as it did here with respect to MPT. And as I say, have their cake and eat it too, maybe I could call it double dipping. I feel like the trustee -- like, Steward already got paid $925 million. And now they'd like to get paid that again from CFT claim against Tenet.

This argument is also inconsistent with the alternative claim that was raised in the first amended complaint, looking at just separating out and kind of saying, "Well, there's a $209 million amount that Steward came out of pocket that covers everything except the real estate." So, when you plead that, then again, the obvious inference is that the other value from MPT was value for the real estate. Again, paragraph 18 makes it clear what they got for their $925 million.

If we looked at this claim, which I don't really think we should look at, the alternative claim, because what Tenet did was provide $1.1 billion of -- well, I should say, Tenet provided a bundle of sticks, right? A bundle of

different assets. Some were excluded, some were included, and ultimately sold that for $1.1 billion. And I don't think they should get to slice and dice it and say, "Well, I'm going to come back and say, 'I want a fraudulent transfer on this 209,'" because of a decision that we made as to how to monetize the real estate.

And again, I think the Janvey case, when talking about kind of interpreting the TUFTA, gets into that at great length. And I think if there's one case that I think is relatively close here in terms of how instructive it is, I do think it's that Janvey case. But looking at, if I do take them on that front and say, "Let's look at the $209 million," well, then I think you have to take into account they've even pled that there was $121 million of EBITDA that were generated by the hospitals in 2022 and 2023.

Again, if you take judicial notice of the equipment and improvement, whether you do or don't, you get over that $209 million hurdle if we were to entertain this alternative claim. One thing that I do think is interesting about this is when you look at the overall value, this goes to the non-real estate assets, essentially. And when you look at that value, either in this number or as is combined in the tax filings, the number comes in around $340 million, $350 million. And their pleading at paragraph 273 talks about how liquidity actually went up from May of 2021

through August of 2021, which, of course, is when this deal had closed at the end of July. And the amount that it went up is $110 million, which is roughly equivalent to the value that we would see here, less the $209 million that they got in debt to fund the purchase. So, that may be neither here nor there, but I think is an interesting point.

Turning back to a little bit more on the arm's-length nature of this transaction, Your Honor, as I already spent some time on, the TUFTA definition is very clear. And it's interesting to me that it says, "A transfer or obligation that is within the range of values for which the transfer would have sold the assets in an arm's-length transaction," saying very directly that if you have an arm's-length transaction, that's the gold standard. That's why we have a presumption of fair market value from arm's-length transactions.

And I don't think there's any serious dispute that this would be an arm's-length transaction. We argued that it was in our motion. They didn't argue to the opposite in their opposition. I think they've tacitly admitted to that. And I think that that's important. Beyond that, though, we can look at the number of people that at least just on the pleadings are involved. I'll note that omitted from the pleadings are quite a bit about the various advisors for all of the parties here. So, I won't get into that. It's not

on the pleadings, but just what we have on the pleadings.

We see, first of all, a negotiation that took place from November to January when the letter of intent is signed, that the APA is signed. We have the APA in front of the Court. No dispute about that. Hundreds of pages with many paragraphs, obviously extensively negotiated document. You have not only Tenets involved, a publicly traded company, you have MPT, a publicly traded company. You have Steward. And I recognize there are quite a lot of allegations about the incompetence and self-dealing of Dr. De La Torre that don't have anything to do with us. But even in the face of those allegations, it's certainly a sophisticated company.

And we also see under here, November, 2020, that Steward had a financial advisor in Citigroup. I think it defies belief that there wouldn't be quite a lot of other professionals involved in a transaction of this size. But we have on the pleadings a financial advisor of Citigroup. So, that's another group that would have been involved in vetting this transaction. And beyond all of those folks, two public companies, another large company, Citigroup, obviously, very well-regarded advisors, there's also the lenders for Steward's $209 million portion of the purchase price.

And under the APA, those lenders conducted

diligence and collateral evaluation per the APA. So, even if they're not pleading all of the specific professionals involved, we know that these lenders who gave the $209 million dollars, that they would have done diligence and collateral evaluation as well. I just don't think it would survive scrutiny to suggest it wasn't an arm's-length transaction. And so why does it matter? Again, the definition, I think, makes very clear why it matters. I think when you go back, I will just briefly, to the definition.

I think when you take the approach that the trustee has here, when I was talking about the dog grooming, where you just say, "I don't care about all of this other value. All I care about is what happened with my projections." I think you read out the arm's-length transaction concept from this definition of reasonably equivalent value altogether. And as I said earlier, really just turned it into a proxy for insolvency.

And so that's why I think, Your Honor, when I think of CFT claims and when I was talking about the beginning, the type of CFT claims that we see usually, they're kind of a surrogate for an actual fraudulent transfer. And we're thinking about, well, we can't actually demonstrate exactly what would have happened in a fair market value transaction because we didn't have one. So, we

have to kind of look and see, would this consideration make sense? And this consideration is just somebody paying their son and saying that that makes them feel really good. So, that's subjective and wouldn't count. Or this bonus is excessive, or what have you, or whatnot.

And so that's why I do think that the arm's-length transaction matters so much because it's a way to stop these sorts of claims from otherwise cluttering the Court. Because, as I said, anytime you're insolvent and you bought any set of assets, you could just say, "I thought that they would do better than they did. I have a CFT claim."

Let me talk a little bit about the insolvency with respect to our judicial estoppel argument. I'll rest on the papers with respect to our other arguments on insolvency. But I think the context is important here, Your Honor. I recognize this is an unusual argument to make. Judicial estoppel is rarely applied. And so, I want to talk a little bit about that.

And for the context, I think it is important. I'm not going to go into all the details around, but there was a dispute between Tenet and Steward related to the DPP funds that were going to be distributed and who would get receipts of those over the stub period of the time when Tenet owned and then sold to Steward, how that would get divided up.

And in late 2023, Tenet won partial summary

judgment, it doesn't matter the specifics of that, but won partial summary judgment on about $27 million. And at that time was concerned that Steward wouldn't be able to pay that $27 million, were concerned about insolvency. And it's interesting, that same $27 million, that is part of what the trustee is now seeking to disallow as part of the stipulated claim, the $94 million claim. That $27 million is in there. And so, we went to court and said to Vice Chancellor Glasscock, "We're concerned about ability to pay. We have a partial judgment on this amount. Can we please get a partial final judgment?" And the Court said, "Well, we would prefer generally to get everything together. So, there's only one appeal."

And we said, "Yeah, but we're concerned about insolvency." And Counsel to Steward at the time said, "Your Honor, Steward is not on the verge of bankruptcy. Bankruptcy wasn't considered. It's not being considered." And this is where I think it's important is that Vice Chancellor Glasscock then said, "Well, if your client," meaning Steward, "is willing to tell me that it contemplates going forward for six months without any liquidation, receivership, bankruptcy, any of those creative horribles that would make a judgment nugatory, then I don't think that I need to give a partial final judgment right here."

And Steward did just that. They put together an

affidavit, says, "Do not currently intend to take any action in the next six months or otherwise involving liquidation, receivership, or bankruptcy." The Court, in direct reliance on that affidavit, declined to grant that motion. That $27 million ended up never going to Tenet and is now part of our claim. And Steward, of course, filed for bankruptcy, not within that 6 months, but about 15 days or so after that.

So, how can we get judicial estoppel from that? The trustee raises reasonably, "Hold on, Mr. Howell, we're not Steward at that point in time. We represent the trustee. It's a different entity. Trustee is here for the benefit of the creditors." And so, we think largely, the challenge, I'm not going to speak for them, but I think elements two and three for judicial estoppel aren't all that controversial here, but they focused on element one, the party against whom judicial estoppel is sought. Here, the trustee has asserted a legal position which is plainly inconsistent with the prior position. And they very fairly point out it's a different party in that it's the trustee as opposed to Steward at the time.

But we think that judicial estoppel generally is designed to protect the integrity of the process. And there's not a categorical rule that you can't have privity between a trustee and a former debtor or that entity prior to becoming a debtor. Instead, the Court's going to look to

the circumstances of each case. This is Mason, which we cited. And we recognize that in many cases, the trustee doesn't have an identity of interest with a debtor. We've seen many cases where, for instance, the debtor left something off intentionally or otherwise from a schedule. The trustee would like to reopen the bankruptcy. There, they clearly don't have an entirely overlapping identity of interest.

But where you do have an identity of interest in the basic legal right that is the subject of litigation, there you can be in privity, even trustee with a putative debtor. And here, we think that's exactly what the case was. When Steward was arguing to Vice Chancellor Glasscock in October of 2023, there's no need to worry. There's no evidence that we're insolvent, and we're not going to file bankruptcy. Don't worry about it. To directly frustrate our recovery of that $27 million, their goal was to keep that money inside the estate for Steward.

And when the bankruptcy trustee is arguing now, it's the same goal, to preserve that $27 million. It's the same money on the same issue. And whether they were in the zone of insolvency at the time or now being brought by the trustee, we think that the identity of interest overlaps such that we can make that argument.

Finally, Your Honor, and I do appreciate the time.

I know I've gone over the 30 minutes, so I appreciate it. We think the dismissal should be with prejudice. As the Court is, of course, well aware, when an amendment would be futile, then it should not be granted. They can't do an amendment as of right. They already had that one amendment. We've already been going at this for a long time. I understand that litigants are always burdened with the cost and time associated with dealing with multiple complaints when there are amendments. That's one issue here.

But I think the far more important issue is we believe that amendment would be futile. They can't get around that simple math that I talked about at the beginning. They can't get around the $925 million plus $100 million being enough to satisfy REV already. And we know that they had a few months, and they added into their opposition on pages 29 and 30, five arguments that they say, "Look, if you decide to dismiss, it ought to be without prejudice because we can plead all of these other things as well." And Your Honor, these are certainly just quick summaries of those paragraphs, but we think none of those cure any of the deficiencies that I've been talking about today for 40 minutes.

The first one relates to insolvency. It's a substantive point, doesn't go to our judicial estoppel argument. And regardless, the Court certainly doesn't have

to find in our favor on insolvency to dismiss this case on REV. And obviously, I've spent most of my time talking about REV here.

The next three issues kind of all relate to -- it's kind of more of the same, whereby the trustee is saying, "Well, we could add other indicia to suggest that the overall value here was worthless." Again, remarkable to say that the value here is worthless in the face of the real estate, in the face of the net working capital, in the face even of those EBITDA numbers that we looked at to say all of that was actually worthless. And they use a book value amount, a $683 million amount in a 10-Q from Tenet, which is inconsistent with the rest of their papers, where it says it doesn't matter what Tenet or Steward represented, what matters is the actual value. We agree what matters is the actual value, and value is value, and you have to look at the objective value. So, we don't think that that would move the needle.

The next two talk about things involving KPMG, which is interesting that KPMG, another advisor, isn't otherwise in the pleadings. Certainly, that would have been another point we would have raised. But again, none of these points, points two, three, or four, none of them go to the objective value of the real estate. None of them go to the objective value of the net working capital. So, if they

made all of these arguments, I would be right back here making the same arguments on another motion to dismiss.

And the last one is they say, "Well, sale-leaseback price is inherently unrelated to the market value of the real estate." And there, I've already covered that a bit, Your Honor. But again, to me, that is a disguised recharacterization claim. I don't think there's -- I also say, I suspect they're going to get up and say, "We've already pled this," but the fact that they included it in one of the five things that they say they could add to the complaint demonstrates that they didn't plead this concept earlier. It's not in their pleadings, and you can look backwards and forwards for it.

But again, I think this goes into this Janvey conversation once again, where how it is that Steward ultimately decided to monetize that real estate that they got is looking at how they operated the business. And similar to the facts of Janvey, you would say it doesn't matter. You're looking at it from a reasonable creditor's perspective, and they know they got $925 million, and they know they had the other $100 million. So, whether even -- I'm not sure they even could plead this, given the release of the claims against NPT. They haven't pled it.

But I think if they came back and talked about that, then we would do a much deeper dive into Janvey, where

we're talking about, oh, well, there's a Ponzi scheme, and a Ponzi scheme doesn't have any value. And so, can you really be a legitimate -- can you have given reasonably equivalent value when you give money to a Ponzi scheme where they just don't use it well? And they're the Court, looking at this in great depth, saying there's something special about the TUFTA definition that we have to look at, said, "Absolutely, you can."

And so, Your Honor, I kind of end where I started by saying this is a remarkable, a very unusual CFT claim, and one where we think that you cannot just jettison all this objective value for a subjective projection. And for those reasons, we ask that you dismiss the complaint and do so with prejudice. Thank you very much.

THE COURT: Thank you very much. Counsel, why don't we take five minutes, and then we'll get started? Thank you.

(recess begins at 1:54:21 p.m.)

(recess ends/back on the record at 1:59:19 p.m.)

THE COURT: Okay, we're back on the record in Steward, 26-03094. Counsel, whenever you're ready.

MR. KING: Thank you, Your Honor. We also have a short presentation. I'll sort of give the column over to Mr. Wells.

THE COURT: Mr. Wells, are you on the video, or

are you on the kind of hard line then?

MR. WELLS: I'm on the hard line.

THE COURT: Okay, I think we can -- let me see.

MR. WELLS: Great.

MR. WELLS: Thank you.

THE COURT: Perfect. Thank you.

MR. KING: So, we've heard a lot from Counsel for Tenet as to what their view of our claim is, but I'd like to tell you what we believe that our view of our claim is. I represent Mark Kronfeld, trustee of the SHC Creditor Litigation Trust, who is the plaintiff in this case.

The trustee bought a single claim against Tenet to recover for the benefit of Steward's creditors, the massive $1.1 billion transfer that Steward made to Tenet to acquire a hospital business in Miami that lost money. Under the control of Ralph De La Torre, who was driven by vanity and self-aggrandizement, Steward purchased the Miami business from Tenet for $1.1 billion when it was worth far less and perhaps worth nothing. The business's historical financial performance did not justify the $1.1 billion price tag. Dr. De La Torre and Steward internally justified the enormous price based on their fanciful projections of the business's future performance, but those projections were unreasonable when they were made.

Counsel for Tenet spoke a lot about whether or not

this transaction was arm's-length, and there's no allegation in our complaint that the transaction was arm's-length, so they're kind of importing that and, to some extent, making it up. But we do talk about who was there to protect Steward in this transaction, and we explain that Mr. De La Torre, who was in charge of Steward, did not protect Steward. The first amended complaint alleges that the Tenet transaction was a vanity project, apparently motivated by De La Torre's interest in the South Florida market, paragraph 19.

Dr. De La Torre coveted the Miami area as a location for hospitals. That's in paragraph 249. The first amended complaint alleges that Dr. De La Torre's negotiations of the deal, in which he acceded to every price increase demanded by Tenet, reveals his stubbornness and intent to proceed with the deal, no matter what the cost. And then at 272, we take on this issue of whether Steward was being protected by Dr. De La Torre, who, at this point, was basically the sole control of Steward.

And we write at paragraph 272, "De La Torre breaches fiduciary duties to Steward through his recklessness, which prevented Steward from having a responsible negotiator, looking out for Steward's best interests. As a result, the price Steward and SHC system paid for the Miami Hospital did not reflect the price

reached through an arm's-length negotiation." So, that's what we allege. That's in our complaint. Whether or not they agree that that's a true thing or not, we're hearing a motion to dismiss, and what we allege is that it was not an arm's-length transaction because not in the true sense.

We're not alleging that Dr. De La Torre was in the pocket of Tenet, so to speak, but he was not looking out and protecting the interests of Steward, which I believe is kind of the fundamental aspect of arm's-length transactions. You have two negotiators, both looking out for the interests of the parties that they represent or of themselves. But Steward didn't have that. Perhaps Tenet had it, but Steward didn't. In fact, Steward hired financial advisors to provide advice to help protect Steward in this transaction, but Dr. De La Torre ignored their advice because he wanted to buy this hospital business no matter what the cost.

After Steward bought the business, it found what the historical earnings of the Miami business should have made clear to them before they bought it. The business was not worth $1.1 billion. In fact, it lost money on an EBITDA basis. It lost $100 million in the 3 years after they purchased it. It made far less of the projected EBITDA. They supposedly justified the $1.1 billion price tag also.

Shortly before Steward's bankruptcy, Steward tried to sell the business, but it failed to do so. Steward found

almost no interest from potential buyers. During the bankruptcy, Steward had to essentially give the business away to another hospital operator. Now, the Steward bankruptcy estate owes hundreds of millions of dollars to creditors. Part of the reason why is because it paid so much money to Tenet.

Tenet likes this Court to see this case as a contest between Tenet and Steward. This is more particular to their opening brief, where I think -- I'm not even sure they mentioned my client's name. That's the trustee. They always refer to Steward. We're Steward. We're not Steward. We're the trustee. We're brought in to clean up the mess that Steward and Dr. De La Torre left behind. So, whenever they try to tag us as Steward -- and to make this a complaint, a case between Steward and Tenet. I hope that you resist that.

What we have alleged, and we'll prove at trial, is that Tenet sold Steward, its Miami hospital business, for $1.1 billion, but the business was worth far less than that and was actually a drain on Steward's resources. Steward was insolvent at the time, and under the Texas Uniform Transfer Act, Tenet must return the money Steward transferred to it.

So, we're hearing a motion to dismiss, and I'd like to address the standard review to you. Listening to

Counsel's presentation earlier, it sounded more like a summary judgment argument than a motion to dismiss argument. Most of Tenet's arguments are based on a misconception of the standard of review here. Tenet has tried to persuade the Court that it is right, as a matter of fact, on the issues of reasonably equivalent value, based primarily on out-of-court documents.

Tenet asked the Court to find, based on the evidence not referenced in our complaint, and based on statements Steward representatives made years ago, that, as a matter of fact, Steward received reasonably equivalent value in return for the $1.1 billion it paid for the Miami hospital business. But that's the wrong question. The right question is whether the first amended complaint plausibly alleges that Steward did not receive reasonably equivalent value for its $1.1 billion, and whether the first amended complaint plausibly alleges that Steward was insolvent at the time of the transfers.

We don't need to convince the Court that we will be able to prove this claim at trial. We just need to establish more than a sheer possibility that we can do so. Also, the Court must construe all reasonable inferences in the complaint in the light most favorable to the plaintiff. So, if there's something in the complaint that a reasonable inference can be drawn from, the Court's supposed to do it

in our favor, not in Tenet's. We have alleged much more than just a sheer possibility, and we will establish the facts supporting our claims at trial. But at this early stage, all we need to establish is the sheer possibility, and we've certainly done that.

Let's talk about reasonably equivalent value. It took up most of Counsel of Tenet's time. The trustee has plausibly alleged that Steward did not receive reasonably equivalent value in exchange for the $1.1 billion Steward paid for the Miami hospital business. The allegations of a lack of reasonable equivalent value fall under the following headings. The historical performance of the business, the projected performance of the business, the actual performance of the business, and the value later realized from the sale of the business during the bankruptcy.

What Steward was buying was a going-concern hospital business. Steward priced the business as would any buyer, based on his projections of his earnings that he would enjoy from operating the business. In Counsel's dog grooming example, the dog groomer, whether he's working out of his house or whether he's working out of the fancier house, is going to estimate, what is the value of this business? What is the value of the -- what is the cost of the home to put the business in? That won't be an aspect. But what the dog groomer will consider most is will they be

able to make a profit? Is this business going to make money? Will I be able to make enough money to cover my rent, to cover my mortgage payments? They're buying a business. They're just not buying a house or a shack. They're buying a business. And that's what Steward was doing here with the Miami hospital business.

So, Steward priced the Miami hospitals as would any buyer based on his projections of the EBITDA and EBITDAR he would enjoy from operating the hospitals. These projections, on which Steward based his pricing, were unreasonable at the time. They were not justified by the Miami hospital's historical operations.

Let's go to the next slide, please. So, because the focus on reasonably equivalent value, I want to draw the Court's attention to the exact things that we pled on reasonably equivalent value. Paragraph 260, we allege that Steward internally and to lenders justified the $1.1 billion price based on an EBITDAR multiple. In one presentation, Steward told lenders the multiple was 7.7x. And another Steward told lenders the anticipated EBITDAR for the business in 2021 was $156 million. So, they're projecting that Steward will earn $156 million in EBITDAR in 2021.

Paragraph 261, this is a full quote from our complaint. "But Steward's estimate for the 2021 EBITDAR of $156 million was at best wildly optimistic, but more

accurately entirely fanciful. In the years leading up to the acquisition, according to the information Tenet provided, the Miami hospitals achieved $60.3 million in EBITDAR in 2020, less than $105 million in 2019, and $92.1 million in 2018. Thus, it appears that the $156 million estimate was designed to justify, and designed by Dr. De La Torre, to justify Tenet's price rather than reflective of De La Torre's good faith belief that the Miami hospitals would generate those returns.

So, I think this paragraph here goes not just to reasonably equivalent value, but also to whether or not this was an arm's-length transaction. Again, we're showing that Dr. De La Torre, who controlled Steward, was not looking out for the best interests of Steward.

Continuing on. SHC system. Let me take a second. So, SHC system was the actual entity that actually paid the money. And so, in some of our allegations, we refer to SHC system, but for ease of reference here, I'm just going to talk about Steward. Steward dramatically overpaid for the Miami hospitals. As discussed above, Steward internally justified Tenet's price based on a large multiple and an inflated estimate of 2021 EBITDAR. There was a vast disparity between the pre-acquisition projections and the actual performance.

So, in millions of dollars, we show the amount of

projected, $156 million, then $202 million, then $254 million in '21, '22, and '23. But they didn't come close to that. So, these are the numbers that they're looking at, and they're saying, "How much money can we pay for this hospital?" Dr. De La Torre, of course, he'll pay whatever Tenet wants, probably, but he calculates based on projected EBITDAR. But their EBITDAR wasn't even close. They didn't come close to making that much money. Their actual results show that the price was never justified.

The underperformance for the calendar year 2021, now in paragraph 266, is stunning given the Tenet transaction not closed until August 2nd, 2021. The change in management for the last 5 months of the year cannot explain the $112.8 million underperformance. The hospital's performance was so bad that Steward calculated that for 2021 to 2023, they had negative $103.1 million in EBITDA. That's from an EBITDA perspective. You know, there's many ways that you can value a company, but one of the most useful and most common ones is to look at their EBITDA. That's from an EBITDA perspective that Miami hospitals had negative value.

Can I add something? So, Counsel for Tenet, trying to convince the Court that post-acquisition performance is irrelevant. That's just not true. At the end of the day, you do have to prove what was the value of the transfer, the products transferred, the consideration

transferred, on the date of the transfer. But that doesn't mean that whatever happened after the transfer is completely irrelevant, and you can't consider it. Take a kind of obvious example. If I buy a car and then the engine falls out a week later, it's not like I can't tell people that the car was probably not any good when I bought it because the engine fell out a week later. You know, clearly you can look at what happens later to kind of decide if the value that you exchanged on the exchange date is fair, is reasonable.

And the Third Circuit, in this case we cite here, VFB LLC v. Campbell Soup, 482 F. 3rd 624, page 631, says, "A company's actual subsequent performance is something to consider when determining ex post the reasonableness of a valuation, but is not by definition the basis for a substitute benchmark." And that's all we're doing with this. The allegations regarding subsequent performance. We're giving reason why to be suspicious of the values of the transfers.

In footnote 24 of its opening brief, the Tenet cites numerous cases holding that the determination of value must be made as of the time of the transfer at issue. We do not disagree with that controversial proposition. But all those cases that they cite in footnote 24, those are not motion to dismiss cases. Those are summary judgment or

after-trial cases. And those cases say, that they cite in their brief, that you can't look at what happened after the transfer to figure out if you got fair value. And I'm not sure that's true or not, but none of those cases are motion to dismiss cases. All we're trying to do is raise a reasonable inference that Steward did not receive reasonably equivalent value for the $1.1 billion it paid.

In paragraphs 267 and 268, Steward fought to sell the Miami hospital business in April 2024 before filing for bankruptcy. So, before filing for bankruptcy, they tried to sell the business. Steward received only 4 bids, ranging from $0 to $10 million. Not even close to what they paid. During the bankruptcy, Steward was unable to sell the Miami business at all. Instead, it was just turned over to another operator as part of the deal with NPT. According to Mark Rich, the CFO at the time, the Miami hospitals were a -- this is his words, ravenous drain on liquidity, causing the company between $200 million and $300 million. That's paragraph 264 on our complaint.

On a motion to dismiss, the Court must construe all reasonable inferences in the complaint in the light most favorable to the plaintiff. A reasonable inference one can draw from the Miami hospitals drastically underperforming Steward's projections, and in fact, earning over negative $100 million EBITDA after the acquisition, is that Steward's

projections were drastically overstated and that Steward overpaid for the hospitals, because those projections is what Steward used to justify the price it paid for the Miami Hospitals.

All right. Let's talk about Tenet's attack on our reasonably equivalent value argument. Tenet has kind of a three-layered argument, although today they kind of gave up on one of the layers. They do two primary layers. First, Tenet tries to build up a stack of value, Your Honor. And if you add up those values, well, gosh, there you go. You've got over $1.1 billion or thereabouts. And so, Steward got a reasonably equivalent value. It says the real estate must have been worth $925 million, because that's what Tenet paid Steward.

The net working capital must have been worth at least $100 million because the APA said it would be, and because Tenet supposedly won a lawsuit with Steward in which net working capital was at issue. And third, this one seems to have gone by the wayside today, but Tenet says look at our tax filings, in which the tax filings say that $131 million was attributed to equipment and improvements. If you add those up, you get a reasonably equivalent value.

I'll address each of those layers, but there's a fundamental problem with this whole approach of adding up these layers, and that's Steward wasn't buying layers. It

was buying a business, right? And so, all Steward was interested in, and any buyer of a business is going to be interested in, is whether or not you're going to make enough money that's going to cover your expenses so that you'll have a profit left. Taking these little components isn't how businesses are valued. It's at least a going-concern business.

I suppose if it's a dead company and you're just selling off the pieces of the company, well, then you would look at, well, how much is the building worth? How much is the land worth? How much is the AR worth? Those little components. With a going-concern business, you look at how much is the business going to earn, and can I count on that? So, Tenet's whole approach of -- I'll take a term out of their brief. They talk about a bundle of sticks. They're trying to value these individual bundles of sticks. We believe that's the wrong way entirely to look at this valuation of the Miami hospital business. But let's do it anyway.

So, let's go to the first layer. Slide nine. All right. This is the most significant one. Tenet's position is that Steward necessarily received $925 million in value from Tenet because MPT paid Steward $925 million to fund the purchase of the real estate, okay? They're looking at the transaction between Steward and MPT to value what it was

that Steward got from Tenet. But they leave out a very important part of the equation. Steward didn't just give up real estate to MPT. Steward gave up MPT and gave an obligation to pay lease payments to MPT. MPT is not really in the business of collecting properties and selling them. It's in the business of having lessors that will pay its lease obligations. It had a long history, as we describe in our complaint, with Steward in doing this very thing.

So, when you look at what value did Tenet -- what value did Steward get from MPT? It did get $925 million, and it gave up hospitals. But it also gave up its ability to take its lease payments somewhere else. It gave a lot of value to MPT beyond just the properties. So, when you look at what value was the properties that Steward got from Tenet, you can't say that it was $925 million based on the payment that came from MPT.

MPT points out that we didn't directly allege that the lease payments were overpaid. The lease payments were too high in our complaint. But Tenet brought this up in its original motion on page 24. Tenet claims that the MPT leases were above market, and we agree. Also, the reason why the lease payments were overpriced is because MPT paid too much for the real estate. The lease basis is based on what MPT paid. And because MPT paid too much, the leases were too high. So, MPT's $925 million contribution wasn't

some great benefit to Steward. In fact, it was the albatross around Steward's neck, because MPT's overpayment necessarily led to overpriced leases.

Let's talk about the second layer in Tenet's stack of value. Tenet argues that Steward received at least $100 million in net working capital because an arbitrator determined that Steward received more than that amount in litigation between Tenet and Steward prior to the bankruptcy. And now today they seem to have kind of adjusted course a bit. And they're not really talking so much about what happened in Delaware. Instead, they say, "Well, Steward must have received $100 million he was supposed to receive in net working capital under the APA." Because the APA said they were going to get it, and the trustee doesn't allege that they didn't get it. So, they must have gotten it. But just because we don't allege that they didn't receive it, doesn't mean that Steward did receive that net working capital value.

But more importantly, net working capital is just one financial metric. It's generally the excess of current assets over current liabilities. There's a very particular definition for net working capital in the APA. But it doesn't say anything about the value of the business's ongoing operations. It also doesn't say anything about long-term debt and long-term liabilities, which the Miami

hospital certainly came with because they came with the leases that Steward owed to MPT.

The ruling of the Delaware court is not binding on the trustee. At least not in this lawsuit where the trustee asserts the fraudulent transfer claims of Steward creditors under 11 U.S.C. 544(b). The trustee is not a party to that prior action between Tenet and Steward, and neither were the creditors whose rights the trustee can assert here. Tenet argues in his reply brief that the trustee is in privity with Steward because they share an identity of interest in establishing that Steward did not receive $100 million in net working capital.

But the first amended complaint doesn't say anything about how much net working capital Steward received or did not receive. As discussed, our argument of value regards the whole going-concern business that Tenet sold, not the value of any one stick in the bundle, like net working capital. And the dispute between Steward and Tenet did not regard the value of the business Steward acquired. So, there's no identity of interest between the trustee or the creditors whose rights they represent and Steward in the Delaware proceedings. So, the trustee is not bound by the arbitrator's finding, and he's certainly not bound by the Delaware court's decision in the case he wasn't a party to.

So, the third layer. Let's talk about the tax

forms. Steward argues that his own tax forms established the total amount of equipment and improvements purchased from Tenet exceeded $131 million. Of course, this argument is riddled with flaws. First, the only tax forms before the Court are Tenet's, which says it must be the same as the tax form Steward filed because of a provision in the APA. But Steward's tax forms are not before the Court, and therefore, there is no proof that Steward actually filed tax forms identical to Tenet's.

Second, even if the Court, as Tenet requests, took judicial notice of Tenet's tax forms, taking judicial notice does not mean that the statements in the forms are determined to be true. Taking judicial notice would just establish that Tenet made these statements in the tax forms, and perhaps that Steward said he would make these statements in the tax forms. Taking judicial notice does not establish what is said in the forms as true.

I believe we cited this case in our papers, but it's an important one for what is the role of judicial notice? It's the Petrobras case, 9 F. 4th 247 at 255 to 56. It's a Fifth Circuit case from 2021. In a footnote to its reply brief, Tenet claims that the trustee should be precluded by tax estoppel from challenging Steward's assertions in Steward's tax files. But even the cases Tenet cites demonstrate that tax estoppel does not apply here.

Tenet cites a case called Platt for the proposition that courts cannot, as a matter of policy, permit parties to assert positions in legal proceedings that are contrary to tax filings submitted to the IRS. And that's the kind of estoppel that Tenet's trying to impose upon the trustee here. But Platt goes on to note the limits on tax estoppel. So, this is from the case they cite. Platt reads, "However, the doctrine of tax estoppel is only applicable when the party seeking to contradict the factual statements as to ownership in the tax returns sign the tax returns and has failed to assert any basis for not crediting the statements." So, obviously, the trustee or the creditors he represents sign the tax forms, and obviously, the trustee asserts a basis for not crediting the statements in the tax forms.

All right. Let's talk some about insolvency. Tenet does not challenge the insufficiency of the trustee's allegation as to balance sheet insolvency. Instead, it argues that the trustee is judicially estopped from arguing balance sheet insolvency because Steward represented the Delaware Chancery Court in October 2023 that it was not on the verge of bankruptcy.

Let's be clear about what it was that Steward said. Steward didn't say, "We're insolvent," or "Not insolvent." They said, "We're not going to file bankruptcy

in the next six months." So, there's many problems with Tenet's argument. First, of course, the trustee is not Steward, and the trustee is not asserting Steward's rights. Tenet argues in his reply that Steward and the trustee have the same interest in preserving funds for the estate and so they are in privity.

So, they say that when Steward was before the Delaware Chancery Court, they were interested in keeping their 20-something million dollars. And I suppose my client is also interested in increasing the estate for the creditors, and so we also don't want to give Tenet his 20-something million dollars. The problem with this argument is that both the trustee and the creditors would have a much different interest from Steward in October 2023. If Steward's October 12, 2023 statements in Delaware have any bearing at all on Steward's insolvency in August 2021, the trustee and the creditors whose claims he asserts has a strong competing interest in October 2023 to establish Steward's insolvency, one of the elements of their claims against Tenet here.

If the creditors' interests had been represented in October 2023, Steward would have loudly proclaimed that he was indeed insolvent and had long been since at least August of 2021, when the Tenet transaction occurred. Maybe we do want to keep the $20 million away from Tenet, but way

more than that, we'd like to establish our constructive fraud claim against Tenet. So, we have a huge incentive to take a completely different statement than Steward had back in October 2023.

Second, courts do not impose judicial estoppel if it is legally possible for the party to be estopped and to hold two positions simultaneously. The inconsistency between the two statements at issue must be clear and express, and not just implied. It's got to be like, "I ran the red light." No, I didn't run the red light. It's got to be absolutely stark.

Here, there's really no inconsistency between the trustee's claim that Steward was insolvent in August of 2021 and Steward's statement in October of 2023 that he was not on the verge of bankruptcy and that bankruptcy wasn't considered. Obviously, Steward could have been balance sheet insolvent and not considering bankruptcy. Indeed, the first amended complaint alleges that Steward had been insolvent for years but took increasingly desperate steps to stave off having to file for bankruptcy.

All right. Let's talk about capital inadequacy and inability to pay debts. Counsel today didn't talk about this at all, I don't think. But it's in our briefs. I think we should cover it. The trustee states a claim under TUFTA section 24.005(a)(2) if the first amended complaint

plausibly alleges either capital inadequacy or inability to pay debts as they come due, okay? So, you got to do one of the two financial vulnerability prongs.

The first amended complaint contains detailed allegations that Steward was unable to pay his debts as they come due before and after the transaction. If you look at paragraphs 275 to 277 of the first amended complaint, there's lots of allegations about how in August --

(Proceedings adjourned.)

CERTIFICATION

I, Nathan Kiprotich Too, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



Nathan Kiprotich Too

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: May 19, 2026