**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **STEWARD HEALTH CARE SYSTEM LLC, et al.,** | § | **Case No. 24-90213 (CML)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| **MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,** | § | **Adv. Pro. No. 26-03094 (CML)** |
| **Plaintiff,** | § | |
| **vs.** | § | |
| **TENET HEALTHCARE CORPORATION,** | § | |
| **Defendant.** | § | |

**AMENDED COMPLAINT**
**[REDACTED]**

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these Chapter 11 Cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

## SUMMARY OF ACTION

1. Steward Health Care System, LLC ("**SHC System**") and many of its subsidiaries (collectively, "**Steward**") filed bankruptcy in May 2024, marking the collapse of the nation's largest privately owned, for-profit hospital chain. A significant cause of SHC System's failure was the ravenous drain on its liquidity resulting from its 2021 acquisition of five Miami-area hospitals (the "**Miami Hospitals**") from Tenet Healthcare Corporation ("**Tenet**"). SHC System paid $1.1 billion for the Miami Hospitals and their operations (the "**Tenet Transaction**"), which was more than twice as much as their fair market value. Worse still, SHC System financed the Tenet Transaction by immediately selling and leasing back the Miami Hospitals, which saddled SHC System with above-market lease obligations. And once in SHC System's hands, the business lost money, and the Miami Hospitals were ultimately worth less than nothing.

2. At the time of the Tenet Transaction, SHC System was controlled by its CEO and Board Chairman, Ralph de la Torre. SHC System's liabilities exceeded its assets by well over a billion dollars leading up to the Tenet Transaction, yet de la Torre was determined to grow the footprint of his hospital empire even when doing so made no economic sense. Despite facing mounting liquidity struggles and crumbling infrastructure at the system's existing hospitals, de la Torre abandoned SHC System's interests in his negotiations with Tenet and caused SHC System to acquire the Miami Hospitals at an extravagant price.

3. De la Torre ostensibly based his pricing of the Miami Hospitals on their ability to generate future earnings, but de la Torre's projections were fanciful. Even his own paid advisors demonstrated to de la Torre in black and white that the Miami Hospitals would generate far less earnings than he projected. But desperate to close the deal, de la Torre ignored this information and caused SHC System to acquire the Miami Hospitals for far more than they were worth.

4. Tenet knew or should have known that the $1.1 billion purchase price was a sweetheart deal. Tenet's own contemporaneous filings with the SEC—including a 10-Q filed only a month after Tenet had reached terms with SHC System—stated that the Miami Hospitals (including the operations and the real estate) had a value of only $683 million.

5. In fact, despite being far lower than the consideration paid by Steward, Tenet's 10-Q dramatically ***overstated*** the value of the Miami Hospitals. Indeed, any reasonable calculation of the fair market value of the Miami Hospitals based on contemporaneous information shows that they were worth significantly less than Tenet's valuation. The Miami Hospitals' normalized earnings, as calculated by SHC System's financial advisor, KPMG, supported a fair market valuation of only $612 million. KPMG advised SHC System of the true state of the Miami Hospitals' earnings, but de la Torre caused SHC System to overpay for the Miami Hospitals, anyway.

6. Worse yet, KPMG determined that the Miami Hospitals would earn much less when operated by SHC System than when they were operated by Tenet. SHC System's contracts with health insurers were significantly less lucrative than Tenet's, resulting in health insurers paying SHC System less for the same medical procedure than they would pay Tenet. Because of this, the value of the Miami Hospitals when operated by SHC System was only about $365 million. Indeed, because Tenet's insurance contracts were particularly strong, virtually any operator of the Miami Hospitals would earn less from their operations than Tenet.

7. In sum, de la Torre spent $1.1 billion on hospitals that Tenet itself booked at $683 million, with historical earnings suggesting they had a fair market value of at most $612 million, and that were only worth $365 million in the hands of SHC System and most other potential buyers. If that were not bad enough, de la Torre also caused SHC System to fund the purchase through a

complicated "sale-leaseback" transaction with Medical Properties Trust, Inc. ("**MPT**") that saddled the hospital system with above-market lease obligations, further contributing to SHC System's inevitable collapse. SHC System ultimately received a pittance for its remaining interest in the Miami Hospitals, which did not even begin to pay down the liabilities the company incurred as a result of the Tenet Transaction. This result only serves to confirm data contemporaneous to the sale suggesting that SHC System was vastly overpaying for the Miami Hospitals.

8. SHC System now faces billions of dollars in outstanding creditor claims. By this action, the Trustee seeks to recover for the benefit of SHC System's creditors the $1.1 billion SHC System paid to Tenet, while insolvent, for the Miami Hospitals.

## PARTIES

9. Plaintiff is Mark Kronfeld in his role as Trustee for the SHC Creditor Litigation Trust. The SHC Creditor Litigation Trust is the successor to the litigation rights asserted here by the Trustee.

10. Tenet is a Nevada corporation with its principal place of business in Texas.

## JURISDICTION AND VENUE

11. The United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**" or the "**Court**") has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and the *Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012) (Hinojosa, C.J.).

12. This adversary proceeding contains core claims under 28 U.S.C. § 157(b). This Court has constitutional authority to enter final orders and judgments in this case. *Stern v. Marshall,* 564 U.S. 462, 486-87 (2011). The Court also has jurisdiction over this dispute under the

Confirmation Order entered in the bankruptcy case. *See Order on Tenet Healthcare Corporation's Motion to Dismiss*, at 3 (Docket No. 157).

13. Plaintiff consents to entry of final orders and judgments by this Court in this adversary proceeding under Rule 7008 and Local Rule 7008-1. Plaintiff also consents to entry of final orders or judgments by this Court if it determines it cannot enter final orders or judgments consistent with Article III of the United States Constitution without the parties' consent.

14. Venue is proper under 28 U.S.C. § 1409 because the action arises under the Bankruptcy Code (the "**Code**") or arises in or is related to the Debtors' pending bankruptcy cases. Defendant is subject to personal jurisdiction under Federal Rule of Bankruptcy Procedure 7004 because it has minimum contacts with the United States. Defendant is domiciled in, organized under the laws of, and has its principal place of business in a State of the United States and is therefore subject to general jurisdiction within the United States. Defendant also has minimum contacts with the United States by conducting business within the United States.

## FACTUAL ALLEGATIONS

### I. Steward struggled for years prior to the Tenet Transaction.

15. In 2008, de la Torre became the CEO of Caritas, which at the time was a charitable Catholic health network serving a disproportionately low-income population in Massachusetts. De la Torre needed a financial lifeline for Caritas, and he ultimately convinced Cerberus Capital Management ("**Cerberus**") to acquire the Caritas hospitals—which were renamed Steward Health Care—and operate them as a for-profit enterprise with de la Torre remaining as CEO.

16. De la Torre sought to turn a non-profit hospital system serving a disproportionately low-income population into a for-profit company that would become financially attractive enough that it could be sold for a price that would both give Cerberus its desired return on investment and support hefty payouts to de la Torre and other executives.

17. SHC System never lived up to de la Torre's aspirations. According to the company's audited financial statements, it had negative net income almost every year between 2011 and 2022. Indeed, at the time of the Tenet Transaction, the company had ***negative*** net equity (*i.e.*, its debts exceeded its assets) of over $1.5 ***billion***.

18. Steward stayed afloat by borrowing money and liquidating assets. Most of the money Steward used to stay afloat originated with MPT. Beginning in 2016, Steward entered multiple mortgaging and sale/leaseback transactions with MPT. In some transactions, Steward sold MPT the real estate it already owned; in others, Steward bought properties (largely with money contributed by MPT) and immediately sold them to MPT, which leased them back to Steward.

## II. De la Torre takes undivided control of Steward in January 2021.

19. As the ultimate majority owner of Steward, Cerberus Capital Management, L.P. ("**Cerberus**") controlled SHC System's Board of Managers. De la Torre was CEO and controlled the company's operations and growth strategy, but he chafed under Cerberus's control of the Board. At the earliest opportunity, de la Torre arranged for Cerberus to cash out its equity stake so he could take full control of the company.

20. In May 2020, de la Torre orchestrated an exchange of Cerberus's equity stake in Steward for a $350 million promissory note owed to a Cerberus-controlled entity by SHC System's parent, Steward Health Care Investors, LLC ("**Steward Investors**"). De la Torre became the majority owner of Steward Investors, and MPT owned nine percent of Steward Investors' equity. Although the May 2020 transaction took Cerberus out of equity ownership, it still had contractual control over certain Steward decisions, including whether Steward could make further distributions to equity owners (now, primarily de la Torre).

21. In January 2021, de la Torre arranged for the payoff of Cerberus's note, giving him unilateral control over Steward, which he exercised immediately. On January 7, 2021, de la Torre

caused Steward to adopt Amendment No. 1 to the Sixth Amended and Restated Limited Liability Company Agreement (the "**SHC System LLC Amendment**"). The SHC System LLC Amendment gave him unilateral power to authorize actions that previously required approval from the SHC System Board. The SHC System LLC Amendment authorized "any determination, decision or other action requiring the consent or approval of the Management Board" to be approved instead "by the written consent of the Members holding a majority of the Membership Interests."

22. After the SHC System LLC Amendment and the payoff of Cerberus's note, de la Torre had actual and de facto control over SHC System through his control of the corporate family tree. First, SHC System was majority owned by SHC Holdings, which held 100% of the common (and over 90% of all) membership interests in SHC System. Second, SHC Holdings had, among other powers, the right to appoint the members of the SHC System Board. Third, SHC Holdings was controlled by its managing member, Steward Investors, which held 100% of the membership interests in SHC Holdings. Fourth, Steward Investors was controlled by its Manager, RDLT-SHC Manager. Fifth, RDLT-SHC Manager was controlled by de la Torre, who also served as RDLT-SHC Manager's President, Secretary, and Treasurer. And, of course, de la Torre was SHC System's CEO and Chairman of its Board of Managers.

## III. De la Torre causes Steward to dramatically overpay Tenet for five Miami-area hospitals and their operations.

### A. De la Torre's pursuit of the Miami Hospitals was reckless and damaging to SHC System.

23. In December 2020, despite the flagging health of the system, Steward boasted about the ostensible expansion of de la Torre's empire: "[o]ver the past decade, we've perfected a business model that keeps patients healthy, keeps costs down, and succeeds in today's complicated marketplace" and that it had facilities in Massachusetts, "Arizona, Arkansas, Florida, Louisiana,

New Hampshire, New Jersey, Ohio, Pennsylvania, Texas, Utah, and the country of Malta." While Steward owned a few hospitals in Florida as of late 2020, none were near Miami, a location that de la Torre coveted.

24. In the fall of 2020, de la Torre ignored his company's ongoing financial struggles and started a reckless effort to cause SHC System to acquire the Miami Hospitals from Tenet. The history leading up to the acquisition reveals de la Torre's stubbornness and intent to proceed with the deal no matter the cost. Far from protecting SHC System's interests, de la Torre abandoned them. As discussed herein, de la Torre ignored critical information regarding the likely earnings the Miami Hospitals would generate under SHC System's ownership.

25. Back in late November 2020, SHC System (via its financial advisor, Citigroup) sent Tenet a proposed term sheet to buy the hospitals for $850 million. The next month, de la Torre and Steward's Jeff Morales (EVP of Corporate Development) told the Board that the price had jumped to around $895 million.

26. When Tenet pressed for an even higher price, de la Torre gave in. On or about January 25, 2021, de la Torre approved a non-binding Letter of Intent to buy the Miami Hospitals for the excessive price of $1 billion.

27. The parties could not then, however, agree to terms of an asset purchase agreement. In May 2021 they went "pencils down." But Tenet likely knew de la Torre would break. On June 1, 2021, de la Torre came crawling back, emailing Tenet and asking to reengage negotiations. Worse than entering a formal agreement at the original excessive price, de la Torre agreed to purchase the Miami Hospitals for the even higher price of $1.1 billion, subject to certain adjustments.

28. Notably, there was no bidding war for the Miami Hospitals. In fact, SHC System's documents do not indicate any concern by de la Torre or others at SHC System that a competitor would acquire the Miami Hospitals. Tenet simply appeared to seize an opportunity to extract more from a desperate buyer.

29. De la Torre and SHC System tried to rationalize internally the $1.1 billion price as a multiple of forecasted 2021 EBITDAR of $156 million. But SHC System's estimate for 2021 EBITDAR of $156 million was entirely fanciful. In the years leading up to the acquisition, according to the information Tenet provided, the Miami Hospitals achieved approximately $60 million in EBITDAR in 2020 (after excluding government payments), less than $105 million in 2019, and $92 million in 2018. It was unreasonable to assume that the hospitals would increase their EBITDAR to anything close to $156 million. Instead, the $156 million estimate appears designed to justify the purchase price that Tenet demanded rather than reflect de la Torre's good-faith belief that the Miami Hospitals would generate those returns.

**B. SHC System buys the Miami Hospitals for $1.1 billion.**

30. To prepare for the acquisition, on or about March 11, 2021, Steward formed four new subsidiaries: Steward CGH, Inc., Steward NSMC, Inc., Steward HH, Inc., and Steward PGH, Inc. (the "**Miami Hospital Subsidiaries**"). The Miami Hospital Subsidiaries were Delaware corporations fully owned by another Steward subsidiary, Steward Florida Holdings LLC. SHC System managed Steward Florida Holdings LLC.

31. On or about June 16, 2021, SHC System, the Miami Hospital Subsidiaries, and Steward Medical Group Inc. ("**Steward Medical**"), on the one hand, and Tenet and various of its affiliates on the other hand, entered into the final Asset Purchase Agreement (the "**Miami APA**").

32. Under the Miami APA, the Miami Hospital Subsidiaries and Steward Medical would acquire certain of Tenet's assets associated with the Miami Hospitals. The Miami Hospital

Subsidiaries agreed to pay about $1.1 billion, subject to certain adjustments. De la Torre signed for each relevant entity. He was then the CEO and Chair of SHC System and each of the Miami Hospital Subsidiaries.

33. As it had in the past, SHC System financed a significant portion of the $1.1 billion purchase price through MPT, whose subsidiaries would own the land and other real estate for the Miami Hospitals. SHC System, the Miami Hospital Subsidiaries, and Steward Medical acquired the real estate as part of their purchase of the Miami Hospital business (the operations and the real estate), sold the real estate to MPT for $900 million, then leased the real estate from MPT at rates keyed off of the $900 million contributed to the purchase price. In other words, the sale of the real estate to MPT was akin to bank financing, with the lease rate set to pay off the principal.

34. On or about July 31, 2021, MPT funded $925 million (including approximately $25 million to pay for various transaction fees) into an escrow account established by SHC System, and SHC System deposited $208.9 million that it raised by taking on additional debt. MPT had no control over that money after it sent it because it became SHC System's money, just as if it came from a bank or other lender. And also, just as if it came from a bank or other lender, this cash came with corresponding liabilities to SHC System including in the form of lease obligations.

35. On August 2, 2021, at the direction of SHC System and Tenet, the escrow agent transferred $1.1 billion to Tenet (the "**Tenet Payment**") to satisfy SHC System's payment obligations under the Miami APA. The escrow agent also transferred $10.2 million to the title company and $16.2 million to SHC System.

## IV. SHC System did not receive reasonably equivalent value from Tenet.

36. Publicly available information confirms that SHC System dramatically overpaid for the Miami Hospitals. Tenet issued a 10-Q dated July 30, 2021—nearly contemporaneous with the Tenet Transaction—in which it provided a valuation of the Miami Hospitals, including the real

estate and associated operations. Tenet provided this valuation because it had entered into a definitive agreement to sell the assets to SHC System in June 2021, and the assets had to be isolated from the rest of Tenet's balance sheet. According to Tenet, the Miami Hospitals, including real estate and operations, were worth $683 million—over $400 million less than the $1.1 billion SHC System paid.

37. Although this number may be subject to a caveat—including whether Tenet's book valuation differs from a fair market value, or whether the book value nets out certain liabilities that were not passed along to SHC System—the fact is that even Tenet's book value in the 10-Q vastly overstates the fair market value of the Miami Hospitals. The information and analyses SHC System had available to it and to de la Torre at the time of the transaction demonstrate that the fair market value of the Miami Hospitals was a fraction of what SHC System paid.

**A. Even assuming that a prudent buyer could generate the same revenue from the Miami Hospitals as Tenet, the value of the Miami Hospitals was hundreds of millions of dollars less than SHC System paid.**

38. SHC System purchased an operating business from Tenet, not a collection of physical assets and book accounts. The fair market value of an ongoing business like the Miami Hospitals is commonly determined using the "Comparable Public Company Method." This accepted methodology of valuing a business is based on the principle of substitution: a prudent buyer will pay no more for a business than it would cost to acquire a substitute business with the same utility. The Comparable Public Company Method estimates the value of a business by comparing it to the market value of selected reasonably similar publicly traded companies ("**Guideline Companies**"). This approach of determining fair market value captures the value of the business, which includes all the components of the business that are necessary to operate it, including the real property, net working capital, accounts receivable, inventories, equipment, leasehold improvements, and goodwill.

39. Valuation multiples, typically of earnings before interest, taxes, depreciation and amortization ("**EBITDA**"), are derived from the operating data of Guideline Companies and are evaluated based on the strengths and weaknesses of the business being valued. From such review appropriate multiples are applied to the operating data of the business to estimate an indication of fair market value.

40. SHC System obtained historical earnings data from Tenet, and it retained KPMG as a financial advisor to analyze and normalize the Miami Hospitals' historical earnings. KPMG determined that the 2020 EBITDA for the Miami Hospitals was $59.98 million.[2] However, adjustments to that reported EBITDA were necessary so that the number could be predictive of future earnings, particularly because Tenet's business (like the business of many health care providers, and others) had been negatively impacted by the COVID pandemic. These adjustments increased the Miami Hospitals' 2020 EBITDA to $82.69 million under KPMG's analysis. Tenet argued to SHC System during negotiations that potential revenues that might be paid by a different governmental support program beginning in late 2021, the "Florida Directed Payment Program," should be included in the EBITDA calculation, but as of the close of the Tenet Transaction, that program had not yet paid any funds to hospitals and was still uncertain.

41. The fair and appropriate EBITDA multiple to value the Miami Hospitals in 2021 was 7.4x. First, on August 1, 2021, Tenet Healthcare's enterprise value showed an EBITDA multiple of 7.4x, per data available on S&P Capital IQ, a research platform providing analytics and research on public companies. While the 2020 Miami Hospital business EBITDA margin of

[2] Tenet claimed in its 8-K announcing the transaction that the Miami Hospitals had generated $122 million in EBITDA over the twelve months ending March 31, 2021. *See* https://www.sec.gov/Archives/edgar/data/70318/000007031821000020/thc-20210616.htm. It represented similar amounts of 2020 EBITDA in the APA. *See* APA at 230. However, these EBITDAs include $60 million in one-time COVID grant money from the federal government.

9.4% was significantly below Tenet's overall EBITDA margin of 13.8% (meaning the Miami Hospital business was less profitable than Tenet's business overall), a 7.4x EBITDA multiple could be used to determine the upper range of value for the Miami Hospital business.

42. Second, as of August 1, 2021, the four major hospital competitors were trading in a narrow enterprise value/EBITDA band of 7.4x–9.7x, with HCA at the high end (9.7x), Tenet at the low end (7.4x), and the group overall clustering around an 8.6x mean multiple. The Miami Hospitals' EBITDA margins were materially below most industry participants, including those of Tenet itself. Thus, a 7.4x multiple provides a generous estimate of value. In addition, 7.4x is close to the multiples SHC System used internally when valuing the Miami Hospitals.

43. Using this 7.4x multiple and the normalized 2020 EBITDA determined by KPMG, the fair market value of the Miami Hospitals (including the business and the real estate) in August 2021 was $611.9 million, or approximately 55% of the purchase price paid by SHC System. But even this valuation is misleadingly high because it assumes that a reasonable purchaser of the Miami Hospitals could operate them and generate the same earnings as Tenet. As discussed below, Tenet had a huge advantage over most market participants, and a reasonably prudent third-party buyer without that advantage would earn far less operating the Miami Hospitals than would Tenet, and a valuation based on Tenet's earnings vastly overstates the Miami Hospitals' fair market value.

**B. The fair market value of the Miami Hospitals was actually less than $400 million.**

44. The analysis in the preceding section assumes that a buyer of the Miami Hospitals would be able to generate the same or similar earnings from the operations of the business as had Tenet. However, de la Torre and SHC System knew for a fact that SHC System would not be able to achieve the same earnings. Moreover, few potential buyers of the Miami Hospitals would have

been able to generate the same or similar earnings from the operations of the business as Tenet had.

45. Medical care providers are predominantly paid by insurers (governmental or private) rather than patients. Private insurers do not pay the providers for the care received by patients at the same rates. For example, a private insurer may reimburse one provider $150 and another provider $125 for providing the same procedure for the same patient.

46. Antitrust law places restrictions on providers' ability to share information regarding the rates they receive from particular insurers, even when the providers are contemplating a business combination or sale, as were Tenet and SHC System. To circumvent this issue, SHC System retained KPMG to perform a "black box" analysis. Under this approach, KPMG would receive information regarding Tenet's and SHC System's reimbursement rates from insurers and information regarding the percentage of revenues received from different insurers and government payors. KPMG could provide summary level analysis regarding the impact of the differing reimbursement rates on the earnings SHC System could expect from operating the Miami Hospitals.

47. KPMG determined that SHC System's reimbursement rates were substantially lower than Tenet's. KPMG projected that SHC System would have generated $22.9 million to $43.9 million ***less*** in 2020 EBITDA from operating the Miami Hospitals than Tenet had generated because of the difference in reimbursement rates. When this average estimated reduction of $33.4 million is applied to the $82.69 million in normalized 2020 EBITDA that KPMG calculated for the Miami Hospitals, the 2020 EBITDA for the Miami Hospitals drops to $49.29 million. Using the same 7.4x multiple, the Miami Hospitals (including the business and the real estate) had a value of $364.75 million.

48. Typically, the fair market value of a business includes the level of net working capital needed to operate the business. The Miami APA targeted a transfer of $100 million in "Net Working Capital" (as defined in the Miami APA) to SHC System, subject to a post-transaction true-up. This $100 million in Net Working Capital is included in the fair market value of the Miami Hospitals' pre-transaction business, which is determined using the EBITDA/multiple methodology described above. Litigation between Tenet and SHC System subsequently determined that the actual amount of Net Working Capital delivered to SHC System was $129,282,415, meaning that SHC System received $29 million more than the $100 million target Net Working Capital. Adding the excess Net Working Capital to the value calculation above demonstrates that the value of the Miami Hospital business (including the real estate and the operations) that Tenet transferred to SHC System was $394 million ***or roughly 36% of the $1.1 billion SHC System paid to Tenet***.

49. The KPMG "black box" analysis compared only Tenet's reimbursement rates for the Miami Hospitals with SHC System's rates, although one KPMG analyst told SHC System personnel that Tenet's inpatient claims were "higher than we have experienced in other black box analyses." [redacted] But desperate to consummate the deal at any price, de la Torre ignored the information, did not kill the deal, and proceeded to vastly overpay for the hospitals.

50. Notably, public data indicates that virtually any buyer of the Miami Hospitals would have realized less earnings than Tenet in their operations of the Miami Hospitals because Tenet enjoyed unusually high private insurance reimbursement rates in Florida. The RAND Corporation ("**RAND**") has collected extensive data regarding the commercial reimbursement rates of hospital operators in the United States by year and by state, for 2018 and later, and it has publicly released

this data. The RAND data is consistent with KPMG's finding that Steward's commercial reimbursement rates were far inferior to Tenet's and KPMG's conclusion that Tenet's reimbursement rates were unusually high.

51. RAND expressed the rates operators received from insurers as a percentage of the Medicare prices for the same services because Medicare prices are relatively standardized. According to the RAND data, in 2019 (the last full pre-COVID year) in Florida, Tenet's reimbursement rate from private insurers was 347% of the Medicare rate. According to the RAND data, Tenet's reimbursement rates were amongst the highest in Florida in 2019 and above the Florida average of 327% of the Medicare rate.

52. Tenet's relative strength in commercial reimbursement rates continued in 2020. According to RAND's observations of commercial reimbursements in Florida, Tenet's commercial reimbursement rates were 376% of Medicare rates and far above Florida's overall average of 310% of Medicare. The same held true in 2021 with Tenet enjoying commercial reimbursement rates of 444% of Medicare rates, again one of the highest in Florida with the overall average rate for hospital operators being 317%.

53. In 2022 (the first year after COVID and the sale of the Miami Hospitals), per the RAND data, Tenet's Florida reimbursement rates were 434% of the Medicare rate, which was again one of the highest reimbursement rates of any hospital operator in Florida. The average reimbursement rate in Florida in 2022 was 346%.

54. Thus, based on KPMG's "black box" analysis, de la Torre and SHC System knew the Miami Hospitals would generate earnings substantially below their historical earnings because SHC System's private insurance contracts were substantially worse than Tenet's. Moreover, the Miami Hospitals in almost any other hospital operators' hands would generate earnings

substantially below Tenet's historical earnings because Tenet's reimbursement rates in Florida were much better than other operators' rates.

### C. MPT financed $900 million of the purchase price only because of its misunderstanding of the Miami Hospitals' earnings and MPT's desire to show growing cash flow, not because the real estate was worth $900 million.

55. As discussed above, SHC System was only able to finance the Tenet Transaction by selling the real estate to MPT and incurring massive corresponding lease obligations. Although MPT paid $900 million to SHC System for the Miami Hospital real estate immediately upon SHC System's purchase of the hospitals, the real estate was worth much less than $900 million.

56. The primary methodology for calculating the fair market value of the real estate used in an operating business is the "Income Capitalization" approach. The Income Capitalization approach values property based on the ability of that property to generate income. As discussed above, KPMG determined that the Miami Hospitals' normalized EBITDA for 2020 was approximately $83 million (even before accounting for the "black box" analysis). Because the Miami Hospitals were not paying rent, this EBITDA number was effectively the same as EBITDAR.

57. The fair market rent for a property, based on the income capitalization approach, is determined by dividing the EBITDAR by a rent coverage ratio—the ratio of EBITDAR to rent. A market participant in Miami, given the age of the Miami Hospitals and the need for capital expenditures, would require a rent coverage ratio of 2.0–2.5, meaning that the base fair market rent for the Miami Hospitals was $33.2–$41.5 million (*i.e.*, $83 million in 2020 EBITDAR/2.0, 2.5). SHC System, however, paid nearly twice that in rent.

58. This $33.2–$41.5 million range is the range of rent a fair market participant would pay annually to lease the real estate so that it could operate the Miami Hospital business. Dividing this fair rental rate by a capitalization rate yields the fair market value of the property. The

capitalization rate seeks to capture, *inter alia*, the investment risk and expected return on a business. Typical capitalization rates for mid-tier properties like the Miami Hospitals are between 6.5–7.5%. Those capitalization rates combined with the fair rent range for the Miami Hospitals yields a value range for the real estate of $440 to $640 million ($33.2M, $41.5M/6.5%, 7.5%).

59. A secondary methodology for assessing the fair market value of real estate is the sales comparison approach. In over 180 hospital transactions in the United States, between 2018-2022, the average sales price for hospital facilities per bed was $300,000 to $350,000 and the price per square foot was $250 to $275. The combined bed count at the Miami Hospitals was approximately 1,775 and the combined square footage was approximately 1.8 million. These inputs yield a valuation range of $450 to $621 million.

60. Perverse incentives and lack of information led MPT to pay $900 million for the real estate although it was worth far less. First, MPT is a real estate investment firm whose business model is based on showing investors growing cash flow from its real estate portfolio. Through the Tenet deal, SHC System gave MPT its commitment to make excessive lease payments years into the future. The rent SHC System agreed to pay was derived from a "Lease Base" amount of $900 million times a "Lease Rate" of 6.5%, with a factor for annual increases. The discounted present value of the cash flow from the lease obligation to MPT was between $536 and $682 million, depending on the discount rate applied. These values are calculated by discounting the contractual rent stream owed to MPT on the Miami hospitals over the remaining lease term through 2041 at rates between Steward's pre-tax cost of debt and its cost of equity (approximately 9.3%–12.8%). The Lease Base amount was based on the price MPT paid SHC System for the real estate, and as discussed, the price MPT paid for the real estate was far in excess of what the real estate was worth.

Thus, MPT received from SHC System not only the real estate, but also SHC System's commitment to make excessive lease payments to occupy the Miami Hospitals' real estate.

61. On top of this, in connection with agreeing to make lease payments on the Miami Hospitals, SHC System agreed to extend the terms of its leases on the many other hospitals SHC System leased from MPT. The lease payments on many of these other properties were also excessive for the same reason the payments were excessive on the Miami Hospitals: the price MPT paid for the real estate was based on SHC System's overly optimistic future earnings projections, which led to excessive purchase prices, which led to excessive lease obligations.

62. As a result, MPT simply accepted SHC System's fanciful projections of the future operations of the business at face value rather than conduct a fair appraisal of the real estate. In fact, MPT did not hire outside consultants to assess SHC System's projections, and it does not appear that MPT did its own projections. Indeed, MPT's underwriting states that the projections of the Miami Hospitals' performance after the acquisition were "based on projections provided by Steward." Moreover, it appears that neither SHC System nor its agents informed MPT of the results of KPMG's analyses, including the critical black box analysis demonstrating that the Miami Hospitals' value would be slashed immediately upon their transfer to SHC System.

## V. SHC System was insolvent (or was at least rendered insolvent) when the parties entered the Miami APA and when the Tenet Transaction closed.

63. **Balance sheet insolvency:** At the end of 2020, SHC System's liabilities exceeded its assets by $1.5 billion. Its finances only worsened leading up to the signing of the Miami APA. According to Steward's internal accounting, at the end of May 2021 (the last measurement date before the Miami APA's execution), SHC System's liabilities exceeded its assets by $1.65 billion. According to SHC System's audited financial statements, the company remained insolvent after the Miami Hospital acquisition closed, even if the booking of the acquisition at book value amounts

temporarily decreased SHC System's insolvency, and by the end of 2021, liabilities exceeded assets by nearly $1.89 billion.

64. **Inadequate working capital:** The Tenet Transaction left SHC System with inadequate working capital or, alternatively, SHC System had inadequate working capital before and after the Tenet Transaction and before and after the parties entered the Miami APA.

65. According to SHC System's internal accounting, SHC System had negative net working capital both before and after entering the Miami APA and before and after the Tenet Transaction. If SHC System did not have inadequate working capital prior to the Tenet Transaction, SHC System's taking on of $200 million in additional debt, all the proceeds of which were transferred to Tenet, and taking on excessive leases on the Miami Hospitals, pushed SHC System into an inadequate capital position. After the Tenet Transaction, if not before, it was reasonably foreseeable that SHC System would be unable to pay its debts in the future.

66. **Inability to pay debts as they came due:** The Tenet Transaction rendered SHC System unable to pay its debts as they came due or, alternatively, SHC System was unable to pay its debts as they came due before and after the Tenet Transaction and before and after entering the Miami APA.

67. Steward suffered huge losses in 2020 even though the federal government injected millions of dollars into Steward through programs designed to alleviate the financial impact of the pandemic. In 2020, SHC System received $441.7 million through the federal government's Paycheck Protection Program and Health Care Enhancement Act. SHC System also received approximately $440.1 million in accelerated Medicare payments. Despite this governmental largesse, SHC System suffered a net operating loss of $439 million and had negative net income

of $407 million in 2020, even though it recognized $389.5 million from "Pandemic Relief Fund Revenue."

68. Steward's financial condition deteriorated on a net income basis after the Tenet Transaction closed. According to Steward's internal accounting, it had negative net income of $28.5 million in Q3 2021 and negative net income of $230 million in Q4 2021. Per its internal accounting records, it had negative net income for all of 2021 of $363 million and negative net income of $580 million in 2022.

69. The Tenet Transaction contributed to these horrible financial results. SHC System's internal accounting records indicate that the Miami Hospitals had negative EBITDA of $21.1 million in 2021 and negative EBITDA of $67.2 million in 2022. Moreover, as discussed, SHC System had to undertake excessive lease liabilities and $200 million in additional loans to acquire the Miami Hospitals.

70. SHC System's inability to pay its debts as they came due led to many vendor lawsuits after the Tenet Transaction closed:

a. On April 29, 2022, Spinesmith Holdings LLC sued Steward for $221,290 in unpaid bills for medical equipment dating back to November 15, 2019. Travis County District Court, Texas. Case No. D-1-GN-22-002015.

b. On July 21, 2023, 3d Medical Staffing, LLC sued Steward for $1.7 million in unpaid staffing invoices dating back to August 18, 2021. Salt Lake County District Court, Utah. Case No. 230905414.

c. On August 17, 2023, Integrity Healthcare Locums, LLC sued Steward for $178,631 for unpaid staffing bills dating back to October 8, 2021. Suffolk County Superior Court, Massachusetts. Case No. 2384CV01880.

d. On September 3, 2023, Power Staff Healthcare, LLC sued Steward for $100,748 for unpaid staffing bills dating back to August 2020. Maricopa County Superior Court, Arizona. Case No. CV2023-013490.

e. On September 29, 2023, Hunts Pest Control, Inc. sued Steward for $21,410 for unpaid bills for pest control dating back to July 2020. Salt Lake County District Court, Utah. Case No. 32090731.

f. On October 27, 2023, USOC BioMedical, LLC sued Steward for $323,561 in unpaid medical equipment bills dating back to June 2021. Orange County Superior Court, California. Case No. 30-2023-01360028-CU-CL-CJC.

g. On December 7, 2023, Union Office Interiors sued Steward for $22,142 in unpaid bills for office furniture dating back to November 5, 2021. Dallas County District Court, Texas. Case No. DC-23-20300.

h. On December 12, 2023, Prolink Healthcare, LLC sued Steward for $45 million for unpaid staffing services between late 2021 and early 2022. Suffolk County Superior Court, Massachusetts. Case No. 23-2825.

i. On January 17, 2024, Agilti Health, Inc. sued Steward for $2.8 million for unpaid lease payments for medical equipment dating back to April 21, 2021. U.S. District Court for the Northern District of Texas. Case No. 3:24-cv-65.

j. On January 17, 2024, Integrity Implants, Inc. sued Steward for $152,585 for medical implants dating back to December 1, 2021. Dallas County District Court, Texas. Case No. DC-24-00739.

k. On February 7, 2024, Signet Electronic Systems, LLC sued Steward for $372,470 for unpaid bills for updates to its communications systems dating back to July 2021. Bristol County Superior Court, Massachusetts. Case No. 2473CV00104.

l. On March 6, 2024, VRC Companies, LLC sued Steward for $331,948 for unpaid bills for medical data storage dating back to August 15, 2021. Dallas County District Court, Texas. Case No. DC-24-03632.

## VI. Purchasing the Miami Hospitals caused harm to SHC System even apart from overpaying for the assets.

71. SHC System suffered substantial harm from entering the Tenet Transaction, even apart from paying too much for the Miami Hospitals. First, de la Torre recklessly caused Steward to incur $200 million in additional debt to fund the purchase. De la Torre had initially planned to pay for the acquisition by selling off Steward's operations in Utah. But SHC System could not close its planned sale of its Utah properties, which forced Steward to fund its portion of the Miami Hospitals acquisition price with burdensome additional debt instead.

72. SHC System felt the effects of de la Torre's reckless decision to acquire the Miami Hospitals for $1.1 billion soon after it occurred. SHC System internally justified Tenet's price based on a multiple and an inflated estimate of the EBITDAR the Miami Hospitals would produce. However, there was a vast disparity between the pre-acquisition projections and the actual performance. SHC System projected $202.3 million in EBITDAR for 2022 but realized negative $3.9 million. It projected $254.8 million in EBITDAR for 2023 but realized only $125.4 million.

73. The Miami Hospitals' performance in EBITDA terms was even worse. SHC System calculated that for 2021–2023 the Hospitals had ***negative*** $103.1 million in EBITDA. Thus, from an EBITDA perspective, the Miami Hospitals had ***negative value***. Indeed, Mark Rich, SHC

System's CFO, characterized the Miami Hospitals acquisition as a "[r]avenous drain on liquidity" between "$200 and $300 million."

74. SHC System was insolvent at the time of the Tenet Transaction, and its creditors never realized any benefit from the Miami Hospitals. SHC System was unable to sell the Miami Hospitals for any meaningful return during its bankruptcy. In April 2024, only about two and a half years after SHC System purchased the Miami Hospitals, the Debtors and their professionals marketed and solicited interest in acquiring the hospitals' operations (without the real property, which MPT now owned).

75. Debtors received only four bids, which ranged from a paltry $0 to $10 million. The nominal bids further confirm the data contemporaneous to the sale, as set out in section IV, demonstrating that Tenet did not provide reasonably equivalent value to SHC System in exchange for the Tenet Payment.

76. Ultimately, SHC System did not sell the operations of the Miami Hospitals to any bidder. Instead, when SHC System settled with MPT during the bankruptcy, the Miami Hospitals were transferred to MPT's chosen operator, Healthcare Systems of America-Florida LLC. The only consideration the new operator paid was that it assumed the Debtors' liabilities for each Miami Hospital.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Avoidance and recovery of the Tenet Payment as a constructive fraudulent transfer (11 U.S.C. §§ 544(b), 550(a)(1), and Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 24.008, or other applicable state law)**

77. Plaintiff incorporates the allegations set forth above.

78. On or about August 1, 2021, SHC System directed Citibank to make the Tenet Payment to Tenet on its behalf.

79. All of the funds used to make the Tenet Payment were SHC System's property. In the alternative, the $208,957,339.60 transferred into the escrow account by SHC System (the "**Tenet Sub-portion**"), which was transferred to Tenet as part of the Tenet Payment, was SHC System's property.

80. SHC System was insolvent before and after the Tenet Payment. The fair value of SHC System's liabilities exceeded the fair value of its assets. In addition, as a result of the Tenet Transaction or, alternatively, before and after the Tenet Transaction, SHC System had unreasonably small capital to continue its business and believed and intended it would incur debts it could not pay as they came due.

81. SHC System did not receive reasonably equivalent value for the Tenet Payment (or even the Tenet Sub-portion) because the Miami Hospitals (including both the real estate and the operations) were worth far less than the Tenet Payment. Also, SHC System did not receive any value from discharging any obligation to make the Tenet Payment under the Miami APA because that agreement is likewise avoidable as a fraudulent transfer. SHC System was insolvent at the time the agreement was entered. The Miami APA provided no value to SHC System because the Miami Hospitals were worth far less than the purchase price in the Miami APA.

82. The Trustee may avoid any transfer of SHC System in property voidable under applicable non-bankruptcy law by any creditor holding an unsecured, allowable claim. SHC System had many creditors with unsecured, allowable claims at the time of and after the execution of the Miami APA and the Tenet Payment. These creditors include Medline Industries, LP, the IRS, and PBGC.

83. The Tenet Payment should be avoided as a constructive fraudulent transfer under section 544(b) of the Code and Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006, and 24.008, or

other applicable laws. Alternatively, the Tenet Sub-portion should be avoided as a constructive fraudulent transfer under these same statutes and laws.

84. The Tenet Payment should be recovered from Tenet under section 550(a)(1) of the Code in the amount of $1,107,545,336.36, or, in the alternative, the Tenet Sub-portion should be recovered from Tenet in the amount of $208,957,339.60.

**SECOND CAUSE OF ACTION**

**Disallowance of the Tenet Claims (11 U.S.C. § 502(d))**

85. Plaintiff incorporates by reference the allegations set forth above.

86. Tenet has asserted (a) an unsecured non-priority claim in the amount of $93,764,098.50 against multiple Debtors, including SHC System; and (b) an administrative expense claim against SHC System for $318,204.00 (the "**Tenet Claims**").

87. As alleged above, the Tenet Payment constitutes an avoidable transfer under section 544 of the Code, which is recoverable under section 550 of the Code.

88. Accordingly, under section 502(d) of the Code, the Tenet Claims must be disallowed unless and until Tenet pays to the Trustee an amount equal to the Tenet Payment.

**PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment against Tenet:

i. Entering judgment in Plaintiff's favor against Tenet.

ii. Avoiding the Tenet Payment and awarding recovery (or other appropriate relief) in the amount of that transfer against Tenet, or, in the alternative, awarding recovery of the Tenet Sub-portion.

iii. Disallowing the Tenet Claims unless and until Tenet pays to the Trustee an amount equal to the Tenet Payment.

iv. Granting such other relief as the Court deems just and proper.

Dated: August 20, 2026
Austin, Texas

Respectfully submitted,

By: /s/ *William T. Reid IV*

William T. Reid IV (Tex. Bar No. 00788817)
(S.D. Tex. Bar No. 17074)
*Attorney-in-Charge*
Jeremy Wells (Tex. Bar No. 24098805)
(S.D. Tex. Bar No. 3081661)
Dylan Jones (Tex. Bar No. 24126834) (*pro hac vice*)
Taylor Lewis (Tex. Bar No. 24138317) (*pro hac vice*)
Julia Gokhberg (Tex. Bar No. 24144450) (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
wreid@reidcollins.com
jwells@reidcollins.com
djones@reidcollins.com
tlewis@reidcollins.com
jgokhberg@reidcollins.com

Eric D. Madden (Tex. Bar No. 24013079)
(S.D. Tex. Bar No. 29231)
J. Benjamin King (Tex. Bar No. 24046217)
(S.D. Tex. Bar No. 605914)
Richard Howell (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1445 Ross Avenue, Suite 2900
Dallas, Texas 75202
Tel: (214) 420-8900
emadden@reidcollins.com
bking@reidcollins.com
rhowell@reidcollins.com

Jeffrey E. Gross (*pro hac vice*)
Yonah Jaffe (*pro hac vice*)
**REID COLLINS & TSAI LLP**
420 Lexington Avenue, Suite 2515
New York, NY 10170
Tel.: (212) 344-5200
jgross@reidcollins.com
yjaffe@reidcollins.com

*Counsel to Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust*

**CERTIFICATE OF SERVICE**

I certify that on August 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *William T. Reid IV*
William T. Reid IV