**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:**<br><br>**STEWARD HEALTH CARE SYSTEM LLC, et al.,**<br><br>**Debtors.**[1] | **Chapter 11**<br><br>**Case No. 24-90213 (CML)**<br><br>**(Jointly Administered)** |
| **MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**TENET HEALTHCARE CORPORATION,**<br><br>**Defendant.** | **Adv. Pro. No. 26-03094 (CML)** |

**TENET HEALTHCARE CORPORATION'S**
**MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot agree, you must file a response and send a copy to the moving party. You must file and serve your response within 32 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the Court may consider evidence at the hearing and may decide the motion at the hearing. Represented parties should act through their attorney.**

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these Chapter 11 Cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 3

LEGAL STANDARD ............................................................................................... 10

ARGUMENT ............................................................................................................ 12

I. The Trustee Fails to Allege the Contemporaneous Value of the Assets, as the Court Required ........................................................................ 12

II. The Second Amended Complaint Fails to Plead a Lack of Reasonably Equivalent Value ......................................................................... 14

A. The Hospitals' Book Value Is Irrelevant ............................................ 14

B. The Trustee's Multiple-of-Earnings Valuations Are Irrelevant to the Value of the Assets at the Time of Sale ......................................... 15

C. The Earnings Figure the Trustee Uses Is Irrelevant to the Value of the Assets .................................................................................. 16

D. The Trustee's Real Estate Valuation Numbers Are Baseless ................. 18

III. The Trustee Recycles Theories and Allegations That this Court Rejected ......... 20

IV. The Trustee's Attempts to Plead Around the $900 Million MPT Payment Fail ................................................................................................. 22

A. The Real Property Tenet Conveyed Never Entered Steward's Estate ......................................................................................... 23

B. The Above-Market Rent Allegations Do Not Change the Analysis Because the Trustee Never Pleads the Increment .................................. 23

V. The Relief Sought by the Trustee Is Incompatible with the Allegations in the Second Amended Complaint ............................................................ 24

VI. The Trustee's Financial Impairment Allegations Fail ....................................... 25

A. The Trustee Is Judicially Estopped from Pleading Insolvency ............... 26

B. The Trustee Fails to Plead That the APA Transaction Left Steward with Unreasonably Small Assets. ............................................ 29

C. The Trustee Fails to Plead That Steward Intended to Incur Debts Beyond Its Ability to Pay. ..... 30

VII. The Disallowance Claim Should Be Dismissed ..... 31

VIII. Dismissal Should Be with Prejudice ..... 31

CONCLUSION ..... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Almazan*,
2011 WL 841349 (Bankr. S.D. Tex. Mar. 7, 2011) ....................31

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008)....................11, 17, 22

*ASARCO LLC v. Americas Mining Corp.*,
404 B.R. 150 (S.D. Tex. 2009)....................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................3, 10

*In re ATP Oil & Gas Corp.*,
711 F. App'x 216 (5th Cir. 2017)....................10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................10, 18, 29

*Brewster v. Dretke*,
587 F.3d 764 (5th Cir. 2009)....................32

*Campbell v. Tex. Tea Reclamation, LLC*,
2021 WL 2211690 (S.D. Tex. May 6, 2021) ....................10, 14

*Cyrix Corp. v. Intel Corp.*,
803 F. Supp. 1200 (E.D. Tex. 1992) ....................15

*In re Cyrus II P'ship*,
413 B.R. 609 (Bankr. S.D. Tex. 2008) ....................11

*Gentry v. Encompass Health Rehab. Hosp.*,
157 F.4th 758 (5th Cir. 2025)....................31

*Janvey v. Golf Channel, Inc.*,
487 S.W.3d 560 (Tex. 2016) .................... *passim*

*In re Life Partners Holdings, Inc.*,
926 F.3d 103 (5th Cir. 2019)....................11, 31

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
798 F.3d 265 (5th Cir. 2015).................... 28

*Ltd. v. Jackel Int'l Ltd.*,
502 F. Supp. 3d 1106 (W.D. La. 2020) ....................28

*In re Maple Heights Invs., LLC*,
2025 WL 610859 (Bankr. N.D. Tex. Feb. 21, 2025) ....................11

*Meyers v. Textron, Inc.*,
540 F. App'x 408 (5th Cir. 2013)....................4

*In re Moore*,
608 F.3d 253 (5th Cir. 2010)....................11

*In re Neighbors Legacy Holdings, Inc.*,
645 B.R. 864 (Bankr. S.D. Tex. 2022)....................10

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ....................28

*Nix v. Major League Baseball*,
62 F.4th 920 (5th Cir. 2023)....................32

*In re Palm Beach Fin. Partners, L.P.*,
598 B.R. 885 (Bankr. S.D. Fla. 2019)....................29

*PDVSA Petroleo S.A. v. Trigeant, Ltd.*,
2012 WL 3249531 (S.D. Tex. Aug. 7, 2012)....................25

*In re Pioneer Home Builders*,
147 B.R. 889 (Bankr. W.D. Tex. 1992) ....................29

*Scot. Heritable Tr., PLC v. Peat Marwick Main & Co.*,
81 F.3d 606 (5th Cir. 1996)....................14

*In re Senior Care Ctrs., LLC*,
2023 WL 6519756 (Bankr. N.D. Tex. Mar. 24, 2023)....................24

*Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*,
2023 WL 5321484 (Del. Ch. Aug. 18, 2023)....................4, 6, 17, 26

*In re Super. Crewboats, Inc.*,
374 F.3d 330 (5th Cir. 2004)....................28

*Tenet Healthcare Corp. v. Steward Health Care Sys. LLC*,
2023 WL 3496815 (Del. Ch. May 15, 2023) ....................6

*In re TransCare Corp.*,
81 F.4th 37 (2d Cir. 2023)....................14

*In re WCC Holding Corp.*,
171 B.R. 972 (Bankr. N.D. Tex. 1994) ....................................................................30

**Statutes**

11 U.S.C. § 550 ....................................................................................................25

11 U.S.C. § 544 ....................................................................................................10, 11, 25

Tex. Bus. & Com. Code § 24.005 ....................................................................11, 13, 29, 30, 31

Tex. Bus. & Com. Code § 24.006 ....................................................................11, 26, 29

## INTRODUCTION

In August of 2021, Tenet sold Steward certain assets connected to five Miami-area hospitals for $1.1 billion. Steward funded $209 million of the purchase price with secured debt, and MPT paid the remaining $900 million. 2d Am. Compl. ¶¶ 33–35. In exchange, MPT received the real estate, and Steward received net working capital, accounts receivable, inventories, equipment, leasehold improvements, and goodwill, among other assets. *Id.* ¶ 38; Ex. 1, APA § 2.1.

This Court dismissed the Trustee's last complaint because it failed to plead objective, contemporaneous value for the real property, for net working capital, for equipment or leasehold improvements, or for receivables. This was fatal because "'whether an exchange was made for reasonably equivalent value is evaluated objectively at the time of the transfer.'" Dkt. No. 157 ("Op.") at 5 (quoting *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 574 (Tex. 2016)). The Court then granted leave to "make new or better allegations." *Id.* at 7.

The Second Amended Complaint fails to cure this defect. The Trustee pleads multiple inconsistent figures for the value of the real estate (up to $640 million, 2d Am. Compl. ¶¶ 58–59), and a figure for the value of the net working capital ($129 million, *id.* ¶ 48). For the value of the equipment, the leasehold improvements, the inventory, and the goodwill—a substantial part of the specific assets Tenet delivered to Steward—the Trustee pleads *nothing*. There are no allegations that could support the conclusion that, if those assets were actually valued, Steward did not receive reasonably equivalent value.

Instead, after initially pleading that Tenet delivered up to 70% of the purchase price in real estate and net working capital alone, *id*. ¶¶ 48, 58, the Trustee abandons those figures and switches to pleading (a) the assets' book value, (b) multiples based on subjective projections of

earnings, and (c) post-sale allegations the Court has already explicitly rejected as not relevant to contemporaneous value at the time of the transfer.

First, the Trustee cites, then quickly abandons, a $683 million book value that was reported in a Tenet 10-Q. *Id.* ¶¶ 36–37. Book value, which reflects historical cost less what has been written off against it, has no relevance to the fair market value of operating assets at the time of the transfer.

Then, the Trustee reverts to the same subjective methodology the Court rejected in the last complaint: applying a multiple to projections of Steward's earnings. *Id.* ¶¶ 40–48. The Court has already articulated the problem with this approach: "Steward, however, did not purchase a projection. Under the APA it acquired real property, net working capital, accounts receivable, inventories, equipment, leasehold improvements, and goodwill, among other assets." Op. at 5. The Trustee disagrees, pleading, "SHC System purchased an operating business from Tenet, not a collection of physical assets and book accounts." 2d Am. Compl. ¶ 38. Not only has the Trustee ignored this Court's directive, but also, the earnings figures that the Trustee uses are purely subjective. The first of the Trustee's earning numbers is based on "adjustments to [Tenet's] reported [2020] EBITDA . . . so that the number could be predictive of future earnings." *Id.* ¶ 40. The second is based on a further adjustment to account for Steward's own payor contracts: "KPMG projected that SHC System would have generated $22.9 million to $43.9 million ***less*** in 2020 EBITDA from operating the Miami Hospitals than Tenet had generated because of the difference in reimbursement rates." *Id.* ¶ 47. After making these two subjective adjustments for Steward's performance, the Trustee values the assets that Tenet transferred for less than any of the various real estate estimates he pleads in the Second Amended Complaint itself. *Id.* ¶¶ 48, 57–58.

The Trustee relies on the second, twice-adjusted projection to ask the Court to value the assets Tenet delivered based on ***Steward's*** reimbursement rates in its own payor contracts, which Tenet could not know (and Tenet did not convey to Steward as part of the APA). Such purely subjective valuation efforts are directly precluded by *Janvey*, 487 S.W.3d at 582, and this Court's prior ruling. The objective standard for reasonably equivalent value requires the Court to assess what was transferred and its value at the time of the exchange—not what the purchaser later could or could not do with those assets. *See id.*

Finally, the Trustee repleads two additional theories this Court has already explicitly rejected: post-closing performance and 2024 bankruptcy bids. The Court addressed each and explained why neither speaks to value at the time of the transfer. Op. at 5–6.

Three complaints and more than a year in, the Trustee has pleaded his best case. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified). This pleading does not reach that line, and a fourth attempt will not, either. The claims against Tenet should be dismissed with prejudice.

## <u>STATEMENT OF FACTS</u>[2]

In late 2020, Tenet and Steward began months-long negotiations for the potential sale of Tenet's five Miami-area hospitals—Coral Gables Hospital, Florida Medical Center, Hialeah Hospital, North Shore Medical Center, and Palmetto General Hospital (together, with other

[2] Except where they are contradicted by other allegations or the Asset Purchase Agreement, Exhibit 1, Tenet assumes, but does not concede, the truth of the factual allegations in the Second Amended Complaint for purposes of this motion.

related assets and facilities,[3] the "Miami Hospitals")—to Steward. *See* 2d Am. Compl. ¶¶ 1, 24.

Between the beginning of negotiations and signing of the deal in June 2021, Florida's DPP program was approved at the state and federal level, adding tens of millions of incremental annual revenue to the Miami Hospitals.[4]

On June 16, 2021, Steward signed an Asset Purchase Agreement ("APA") to purchase all five Miami Hospitals for $1.1 billion. *Id.* ¶¶ 31–32. Each APA Buyer agreed and represented in the APA that the Miami transaction would not render it insolvent "either because its financial condition is such that the sum of its debts is greater than the fair market value of its assets or because the fair saleable value of its assets is less than the amount required to pay its probable liability on its existing debts as they mature." Ex. 1, APA § 4.3.[5]

The APA permitted Steward to assign the right to purchase the real estate to MPT without further involvement or approval from Tenet. *Id.* § 10.5.[6] Under the APA, MPT had the right to

---

[3] *See* Ex. 1, APA, Schedule C, which includes, emergency departments, cancer centers, imaging centers, rehabilitation facilities, surgery centers, radiology center, physician practices, etc.

[4] *See Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, 2023 WL 5321484, at *4–5 (Del. Ch. Aug. 18, 2023) ("At the start of negotiations, the DPP was a possibility rather than a probability . . . in late April 2021, the DPP received state approval, and on May 6, 2021, it received CMS approval.").

[5] As the Court concluded in its motion-to-dismiss decision, the Court can and should consider the APA in ruling on Tenet's Motion to Dismiss the Second Amended Complaint because the APA "is referred to in the complaint and is central to the plaintiff's claim." Op. at 4; *see also Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (In ruling on a motion to dismiss, the court "may take into account documents incorporated into the complaint by reference or integral to the claim."). The Second Amended Complaint "pleads the terms of the transaction the APA memorializes, relies on the purchase price it fixes, and depends on the assignment provision permitting Steward to convey the right to purchase the real property to MPT." Op. at 4.

[6] Section 10.5 of the APA states, in relevant part, "Sellers hereby consent to Buyers entering into a limited assignment and assumption agreement with MPT. Sellers hereby consent to MPT, pursuant to such limited assignment and assumption agreement, purchasing all or a portion of the Owned Real Property (to be agreed upon by Buyers and MPT) and the related Real Property

acquire the Owned Real Property directly and was "liable hereunder for the obligation to pay the consideration for such Owned Real Property to be acquired by MPT," and Schedule D identifies MPT, rather than any Steward Buyer, as the acquiring party for every parcel at all five hospitals. *Id*. § 10.5 & Sched. D. Steward exercised this option, and MPT paid Steward "$900 million for the real estate" and $25 million in "transaction fees" on July 31, 2021. 2d Am. Compl. ¶¶ 33–34, 60.

Upon closing on August 1, 2021, Steward funded $209 million of the purchase price. *Id.* ¶¶ 34, 78–79. MPT acquired the real property associated with the Miami Hospitals. *Id.* ¶¶ 33, 55. Steward acquired the remaining assets, which included $100 million of Target Net Working Capital (Ex. 1, APA at 12), leasehold improvements (*id.* § 2.1(b)), all tangible personal property, including equipment, furnishings, and supplies (*id.* § 2.1(e)), and goodwill (*id.* § 2.1(q)), among other tangible and intangible assets.

According to the Second Amended Complaint, following the Miami transaction, Steward continued to be managed by Steward CEO Ralph De la Torre, who "stubborn[ly] . . . ignored" information contrary to his growth plans and had allowed Steward to become insolvent, 2d Am. Compl. ¶¶ 19–24, 63–66 and immediately burdened the Miami Hospitals with unsustainable rent payments owed to MPT. *See, e.g.*, *id.* ¶¶ 55, 61.

Pursuant to Section 2.5(e) of the APA, Steward and Tenet "agree[d] upon an allocation of the Purchase Price among the various classes of Purchased Assets for tax reporting" and agreed that "Form 8594 [with the IRS] . . . shall be prepared and filed consistently with such agreed upon allocation." Ex. 1, APA § 2.5(e). Form 8594 requires parties to affirm to the IRS the fair market

---

Ancillary Assets and indemnification rights and remedies, in accordance with the other terms and provisions of this Agreement."

value of the various classes of purchased assets in certain transactions. Tenet and Steward filed Form 8594s with the IRS pursuant to that obligation, prepared based on the calculations of Steward's own independent accounting firm, BDO.

A few months after the transaction, Steward began misappropriating and refusing to pay for more than $90 million of Tenet's property and services. *See* 2d Am. Compl. ¶ 86; *Tenet Healthcare Corp. v. Steward Health Care Sys. LLC*, 2023 WL 3496815, at *2 (Del. Ch. May 15, 2023) (confirming an arbitration award by an independent accounting firm validating the transferred net working capital resulting in an award of over $23 million owed by Steward to Tenet); *Steward*, 2023 WL 5321484, at *1 (granting Tenet summary judgment against Steward on over $27 million of DPP funds).

Tenet won every substantive piece of litigation between it and Steward in numerous forums. But Steward went to extraordinary lengths to avoid paying what it owed. Steward refused to pay for the Net Working Capital it received at closing until the Delaware Supreme Court affirmed Tenet's arbitration award.[7] It also lobbied to receive, and refused to remit, over $27 million of DPP funds despite a court ruling that those were excluded assets under the APA.[8] After winning summary judgment on the DPP dispute in Delaware Chancery Court, Tenet moved for partial final judgment so that it could collect its property. Steward opposed, based on the argument that "Steward is not on the verge of bankruptcy" and that "bankruptcy wasn't considered, it isn't being considered." Dkt. No. 89-3, Tr. of Oral Arg. at 35:23–24, 39:16–17,

---

[7] *Tenet*, 2023 WL 3496815, at *2 (confirming arbitration award following Steward's unsuccessful appeal).

[8] *Steward*, 2023 WL 5321484, at *1 (granting Tenet summary judgment against Steward on over $27 million of DPP funds).

*Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, No. 2022-0289-SG (Del. Ch. Oct. 12, 2023).

More specifically, on October 19, 2023, Steward submitted an affidavit of its CFO to the Delaware Chancery Court, stating that "Steward does not currently intend to take any action in the next six months (or otherwise) involving liquidation, receivership or bankruptcy." Dkt. No. 89-4, Aff. of M. Rich ¶ 3, *Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, No. 2022-0289-SG (Del. Ch. Oct. 20, 2023), Dkt. No. 207. In direct reliance on that affidavit, the court declined to grant Tenet's motion, and Steward remains in possession of Tenet's judicially confirmed property today.[9]

About six and a half months after swearing that it would not file bankruptcy "in the next six months (or otherwise)," Steward filed for bankruptcy on May 6, 2024. *Id.* At the first day hearing, Steward's lawyers told this Court that "Florida is . . . the most profitable portion of the hospital portfolio for the company. It's worth a great deal of money, certainly well more than . . . the value of the ABL and FILO." First Day Hr'g Tr. at 29:17–24, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 7, 2024).

When it filed for bankruptcy protection with this Court, Steward still represented that it received reasonably equivalent value. Steward filed a term sheet signed by its Chief Restructuring Officer, John Castellano of AlixPartners, certifying an applicable lease basis valuation of the Miami Hospitals' real estate Tenet transferred at a total of over $1.12 billion, with an adjusted lease basis valuation of over $1.18 billion. DIP Term Sheet, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 6, 2024), Dkt. No. 46-3 at 25.

[9] In fact, by the Second Amended Complaint, the Trustee seeks to disallow Tenet's claim to recover that same property. 2d Am. Compl. ¶ 86.

During the bankruptcy proceedings, Tenet worked with the Debtors to resolve disputes, preserving hospital operations and patient care.[10] Steward turned around and sued Tenet one day after the confirmation hearing. Dkt. No. 1. Immediately before filing the Complaint, the Debtors admitted to performing no analysis to determine whether they received reasonably equivalent value at the time of the Miami transaction. At the Debtors' confirmation hearing, Alan Carr, independent manager and member of the Debtors' Transformation Committee ostensibly overseeing the "investigation" that led to the Complaint, testified that "no evaluation has been done, to [his] knowledge, of the Miami hospitals as of 2021" and that he did not know "what the value of those hospitals actually were [*sic*] in 2021." Hr'g Tr. at 96:11–19, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. July 14, 2025). However, he testified that he had already "approved to file the complaint which incorporates several of the claims in my Declaration." *Id.* at 125:19–20.

The July 15, 2025, Complaint contained no allegations whatsoever of the value of the assets Tenet transferred to Steward on August 1, 2021. *See id.* This is not surprising in light of Mr. Carr's admission the day before that the Debtors did not know what the value of the Miami Hospitals actually was in 2021.

In September 2025, after the Court granted substitution of the Trustee as Plaintiff, replacing Steward, and days before Tenet's motion to dismiss was due, Plaintiff indicated the Trustee intended to change counsel, withdraw the original complaint, and file an amended complaint. *See* Dkt. No. 53.

[10] *See* Stipulation & Agreed Order, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. July 15, 2025), Dkt. No. 5523.

On November 21, 2025, the Trustee filed the Amended Complaint, asserting that the APA qualified as a constructive fraudulent transfer because the Miami Hospitals missed Steward's own post-sale projections, a subset of the assets of the Miami Hospitals did not sell for cash during Steward's bankruptcy sale, and the sale price was based on a multiple of an inflated projection. Dkt. No. 73 ¶¶ 260–269, 461–469. The Trustee further sought to disallow Tenet's claims against Steward. *Id.* ¶¶ 474–77. Tenet moved to dismiss both claims. Dkt. No. 89. Tenet emphasized, among other arguments, that the Trustee did not plead "what the[] assets [Tenet transferred] were worth on the closing date" and that the constructive fraudulent transfer claim therefore failed. *Id*. at 13.

The Court agreed and dismissed the Trustee's claims against Tenet. As to the constructive fraudulent transfer claim, the Court explained that the Trustee failed to state a claim for relief because the Trustee did not allege the value of the assets that Tenet transferred in August 2021 as required to plead the absence of reasonably equivalent value. Op. at 5. The Court rejected the Trustee's allegations, reasoning that projections did not bear on the value that Tenet transferred via the APA in August 2021 and that the 2024 bids for the Miami Hospitals' operations during Steward's bankruptcy proceedings show "little or nothing" on the value of the Miami Hospitals in 2021. *Id.* at 5–6. The Court granted the Trustee leave to file a second amended complaint. *Id.* at 6–7.

The Trustee filed the Second Amended Complaint on August 20, 2026, which, like the First Amended Complaint, fails to actually plead the value of the transferred assets as of the closing, rests its constructive fraudulent transfer claim on projected earnings, and repeats allegations that the Court has already rejected as insufficient. Tenet therefore moves to dismiss the Second Amended Complaint with prejudice. The Trustee has failed as a matter of law to state

a claim entitling it to unwind a transaction that was rigorously negotiated by top-tier counsel and financial advisors, documented at length, and appropriately valued including by third-party secured lenders who advanced the funds to purchase the transferred assets after conducting their own analysis of the value of the assets. The Trustee's failure to assert any claim despite the Court's explicit pleading instructions shows that any further amendment would be futile and the Trustee's claims against Tenet should be dismissed with prejudice.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

Courts routinely dismiss claims for constructive fraudulent transfer that merely contain bald assertions of the elements of the claim. *See, e.g.*, *In re Neighbors Legacy Holdings, Inc.*, 645 B.R. 864, 895 (Bankr. S.D. Tex. 2022); *Campbell v. Tex. Tea Reclamation, LLC*, 2021 WL 2211690, at *6 (S.D. Tex. May 6, 2021); *see also In re ATP Oil & Gas Corp.*, 711 F. App'x 216, 223 (5th Cir. 2017) (affirming dismissal of TUFTA section 24.005(a)(2) claim where plaintiff failed to plead specific facts regarding defendant's financial condition at the time of the transfer, despite access to the debtor's financial books and records).

Section 544(b)(1) of the Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an [allowed] unsecured claim." 11 U.S.C. § 544(b)(1). "If an actual, unsecured creditor can, on the date of the bankruptcy, reach property that the debtor has transferred to a third party, the trustee may use § 544(b) to step into the shoes of that creditor and 'avoid' the debtor's transfer . . .

the extent of those rights [to avoid] depends entirely on applicable state law." *In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010). "These claims are unique because they exist only to the extent of applicable state law." *In re Cyrus II P'ship*, 413 B.R. 609, 614 (Bankr. S.D. Tex. 2008) (Isgur, J.); *see also ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 156 (S.D. Tex. 2009) ("Trustees . . . use § 544(b) as a conduit to assert state-law-based fraudulent-transfer claims in bankruptcy.").

To establish a claim under section 544(b) of the Bankruptcy Code, a plaintiff "must prove the threshold requirements stated in Bankruptcy Code § 544: (1) there are actual, unsecured creditors that would have standing to avoid the challenged transfer; and (2) the challenged transfer involved an interest of the debtor in property, i.e., the debtor transferred property in which it had an interest." *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008). A plaintiff that satisfies these threshold requirements must then show that the transfer is avoidable under applicable state law—here, sections 24.005(a)(2) and 24.006 of TUFTA. The elements of a constructive fraudulent transfer under section 24.005(a)(2) or 24.006(a) of TUFTA are: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) a lack of reasonably equivalent value for the transfer; and (5) "the transferor was 'financially vulnerable' or insolvent at the time of the transaction." *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 120 (5th Cir. 2019); *In re Maple Heights Invs., LLC*, 2025 WL 610859, at *22 (Bankr. N.D. Tex. Feb. 21, 2025) ("Under TUFTA, constructive fraudulent transfers are those made by a debtor in exchange for less than 'reasonably equivalent value' when the debtor was, at the time of or as a result of the transfer, either: (1) insolvent, (2) unable to pay its debts as they became due, or (3) left with unreasonably small capital for the debtor's business.").

The Texas Supreme Court has made clear that TUFTA's reasonably equivalent value inquiry is "evaluated objectively at the time of the transfer, not in retrospect." *Janvey*, 487 S.W.3d at 574. More specifically, the Texas Supreme Court has clearly stated that value must be "determined objectively at the time of the transfer and in relation to the individual exchange at hand rather than viewed in the context of the debtor's entire enterprise, viewed subjectively from the debtor's perspective, or based on a retrospective evaluation of the impact it had on the debtor's estate." *Id.* at 582.

That rule forecloses valuing the consideration by reference to the purchaser's subjective ability to use the transferred assets because "[v]aluing consideration based on how the debtor decides to use it improperly applies a post hoc evaluation of the transaction." *Id*. at 581–82.

## <u>ARGUMENT</u>

### I. The Trustee Fails to Allege the Contemporaneous Value of the Assets, as the Court Required

Dismissing the Trustee's last Complaint, the Court explained that it "pleads . . . nothing of its own . . . for equipment or leasehold improvements, or for receivables," and that "[t]here are no allegations of what any of it was worth in August 2021." Op. at 5. The holding followed: "a claim that a debtor paid more than assets were worth requires allegations about what the assets were worth." *Id.* The Second Amended Complaint pleads the real estate was worth up to $640 million, 2d Am. Compl. ¶¶ 56–59, and that Steward received over $129 million of net working capital, *id.* ¶ 48. It pleads no value for a substantial portion of the assets delivered to Steward including the equipment, the leasehold improvements, the inventory, the receivables, or the goodwill.

These categories of assets represent a significant portion of the value Tenet transferred to Steward at closing. For example, the equipment in modern hospitals includes MRI and PET

scanners, advanced CT imaging suites, x-ray machinery, robotic surgery systems, radiosurgery systems, picture archiving and communication systems, and highly automated pharmacy dispensing networks, just to name a few items. The Second Amended Complaint values this equipment, along with the leasehold improvements, inventory, and goodwill at ***five*** Miami-area hospitals and various other ancillary locations including cancer centers, various physician practices, emergency department, imaging centers, radiology centers, surgery center and rehabilitation facility, at exactly $0.00.

This failure is not for lack of information. Under Section 8.20 of the APA, Tenet and Steward agreed to cooperate to permit Steward and its lenders to obtain "customary appraisals" and to prepare "'borrowing base' certificates . . . for the purpose of enabling the Buyers to utilize the value of such Purchased Assets in the calculation of the 'borrowing base' under the Credit Facilities." Ex. 1, APA § 8.20. As the Trustee alleged, Steward financed the entirety of its $209 million payment to Tenet "by taking on additional debt," so those materials should be available to the Trustee. *See* 2d Am. Compl. ¶ 34. Presumably, because the lender evaluated the collateral and provided additional secured debt to fund the entire $209 million, it determined that the fair market value of the non-real estate assets exceeded Steward's purchase price. Additionally, the Trustee is in possession of Steward's tax filings and its own tax consultants' fair-market-value opinions on each category of assets Tenet delivered. The Trustee chose not to plead what any of those documents say.

Regardless, the flaw in the First Amended Complaint is not cured by pleading a number for two categories of assets and silence for the rest. A constructive fraudulent transfer claim compares what the debtor gave with what the debtor received. Tex. Bus. & Com. Code § 24.005(a)(2). A plaintiff who pleads the full amount paid but only pleads part of what was

delivered has not pleaded the comparison; he has pleaded one side of it. Courts dismiss constructive fraudulent transfer claims on exactly that record. *See, e.g.*, *Campbell*, 2021 WL 2211690, at *6 (dismissing claim under Tex. Bus. & Com. Code §§ 24.005(a)(2) and 24.006 where the plaintiff failed to plead specific facts supporting the absence of reasonably equivalent value).

## II. The Second Amended Complaint Fails to Plead a Lack of Reasonably Equivalent Value

What the Trustee offers to support a lack of reasonably equivalent value contravenes the Court's holding, applies the wrong methodology to this transaction, and does not survive its own arithmetic. The Court held that Steward did not purchase a projection but rather specific assets and that reasonably equivalent value is evaluated objectively at the time of the transfer. Op. at 5. The Second Amended Complaint responds by offering a book value it acknowledges is not relevant, projections based on how Steward may profit from the assets, and post-sale numbers that the Court has already rejected.

### A. The Hospitals' Book Value Is Irrelevant

The Second Amended Complaint leads with a $683 million figure drawn from a Tenet 10-Q, then acknowledges that the figure "may be subject to a caveat—including whether Tenet's book valuation differs from a fair market value, or whether the book value nets out certain liabilities that were not passed along to SHC System." 2d Am. Compl. ¶¶ 36–37.

The caveat undermines the whole point because TUFTA measures fair market value, not depreciated book value. "Neither book value nor net book value is the same as fair market value." *Scot. Heritable Tr., PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 608 n.1 (5th Cir. 1996). Moreover, a reported book value wouldn't include all the assets Tenet delivered, such as goodwill. *In re TransCare Corp.*, 81 F.4th 37, 52 (2d Cir. 2023) ("Book value tends to undervalue a business

as a going concern because it does not fully account for intangible value attributable to the operations."); *Cyrix Corp. v. Intel Corp.*, 803 F. Supp. 1200, 1206 n.5 (E.D. Tex. 1992).[11]

### B. The Trustee's Multiple-of-Earnings Valuations Are Irrelevant to the Value of the Assets at the Time of Sale

The Trustee pleads that "SHC System purchased an operating business from Tenet, not a collection of physical assets and book accounts," and builds his "valuation" on that premise. 2d Am. Compl. ¶ 38. The premise is wrong, as the APA demonstrates. The parties structured the transaction as an asset purchase, identified the Purchased Assets by category and schedule, and excluded whole categories of assets essential to the operating business from the sale. Ex. 1, APA §§ 2.1, 2.2.

The Trustee pleads that Steward could not match Tenet's earnings because Steward's insurance contracts "were substantially worse than Tenet's." 2d Am. Compl. ¶ 54. But Tenet's contracts, which are a necessary component of any operational hospital, were never part of the sale. The APA excludes from the Purchased Assets any Contracts that "are multi-hospital Contracts as to which the Healthcare Business and one or more of Tenet or its Affiliates' other acute care hospitals participate that is not a Seller Facility" or that "are system-wide Contracts of Tenet or its Affiliates which are accessible to the Healthcare Business by virtue of the Healthcare Business being owned by an Affiliate of Tenet." Ex. 1, APA § 2.2(f).

The Trustee's allegations, which emphasize that Steward would be operating on its own, inferior contracts, acknowledge that Steward could not have operated the hospitals solely with

---

[11] In these cases, Steward debtors told the Court that book value does not establish fair market value. *In re Steward Health Care System, LLC*, No. 24-90213, Schedule of Assets & Liabs. for Steward Sebastian River Med. Ctr., Inc., Dkt. No. 1467 at 4, 6 (Bankr. S.D. Tex. July 10, 2024) (stating that the schedules and statements reflect net book value and "nothing contained in the Schedules and Statements is indicative of . . . the fair market value of the Debtors' Stewardship Health (the Debtors' valued managed-care business), hospitals, or other assets"); *id.*, Statement of Fin. Affairs for Steward Sebastian River Med. Ctr., Inc., Dkt. No. 1469 at 4, 6 (same).

the assets Tenet conveyed. *See* 2d Am. Compl. ¶¶ 44–47. This acknowledgement demonstrates Steward had ***not*** "purchased an operating business from Tenet," and instead, had purchased "a collection of physical assets and book accounts." It also demonstrates why the Trustee's multiple-of-earnings methodology is irrelevant. A buyer's inability to replicate operating contracts that were never sold to it is not a deficiency in the value of what ***was*** sold. Under *Janvey*, value is measured by what was transferred, objectively, at the time of exchange, regardless of whether the purchaser, such as Steward here, could profitably use those assets. 487 S.W.3d at 582.

### C. The Earnings Figure the Trustee Uses Is Irrelevant to the Value of the Assets

Even if a multiple of earnings could be used to value the assets Tenet transferred to Steward (which it cannot), the Trustee's numbers are arbitrary and unconnected to the APA. The APA's financial statements report the Miami Hospitals' EBITDA as $117,157,363 for 2019, $134,543,076 for 2020, and $34,884,569 for the quarter ended March 2021. Ex. 1, APA Sched. 3.4. The Second Amended Complaint abandons those actuals for subjective figures. It first projects $82.69 million of annual EBITDA "so that the number could be predictive of future earnings." 2d Am. Compl. ¶ 40. It then reduces that further based on what the Trustee describes as a "black box" projection by KPMG to determine the specific amount "SHC System could expect from operating the Miami Hospitals." *Id.* ¶ 46. The result of these subjective adjustments is the Trustee's assertion that the operations would create $49.29 million of annual EBITDA in Steward's hands. *Id.* ¶¶ 39, 46–47.

The Trustee does not plead that the contractual figures are false. He pleads no fraud claim and no breach of the representations and warranties, and he does not allege that Tenet misstated the hospitals' historical results. Instead, he argues that "adjustments to [Tenet's 2020] reported EBITDA were necessary so that the number could be predictive of future earnings." *Id.* ¶ 40.

Notably, the first adjustment he makes is to remove "$60 million in one-time COVID grant money from the federal government." *Id.* ¶ 41 n.2. The Trustee's choice to base his number on earnings during a once-per-century pandemic, stripped of federal pandemic relief funding, demonstrates exactly why the law requires the use of an objective metric to evaluate reasonably equivalent value.[12]

However, the Trustee further reduces Tenet's 2020 earnings because "KPMG ***projected*** that SHC System would have generated $22.9 million to $43.9 million less in 2020 EBITDA from operating the Miami Hospitals than Tenet had generated because of the difference in reimbursement rates." *Id.* ¶ 47. He then pleads that "antitrust law places restrictions on providers' ability to share information regarding" those rates. *Id.* ¶ 46.[13]

The Second Amended Complaint thus rests its central valuation input on a rate comparison the Trustee cannot verify, based on reimbursement rates that Tenet could not know at the time of the sale, contained in contracts Tenet did not convey to Steward. Allegations of that kind cannot

---

[12] The 2019 statements in the APA report EBITDA of $117,157,363 with no grant income at all, and the pleading ignores those figures. Applying the Trustee's own 7.4x multiple to the Trustee's own preferred methodology and the contract's pre-pandemic actuals produces $867 million. In evaluating reasonably equivalent value, net working capital and the other transferred assets must also be considered. The APA, as this Court has already observed, "fixes a target net working capital of $100 million and provides a mechanism to adjust the purchase price according to the working capital delivered." Op. at 5. Add that $100 million of net working capital, and the value would be 88% of the purchase price, and well within the range of reasonably equivalent value required by *ASARCO*. *See ASARCO*, 396 B.R. at 364 ("ASARCO received 85% to 90% of the value of the SPCC stock").

[13] KPMG's subjective adjustments to Tenet's 2020 EBITDA also fail to account for the 2021 passage of the Directed Payment Program ("DPP"), which added tens of millions of annual incremental revenue to the Miami hospital operations. *See Steward*, 2023 WL 5321484, at *4–5 ("At the start of negotiations, the DPP was a possibility rather than a probability . . . in late April 2021, the DPP received state approval, and on May 6, 2021, it received CMS approval.").

satisfy Rule 8. *See Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions.").

At bottom, the Trustee attempts to establish a lack of reasonably equivalent value by arguing the assets Tenet conveyed were worth less to Steward than they were to Tenet. This approach is foreclosed by the Court's prior Order and by *Janvey*, where the Supreme Court of Texas was asked "does objectively valuable consideration become valueless based on the true nature of the debtor's business," and answered with a resounding no. *Janvey*, 487 S.W.3d at 577.

Each of the Trustee's multiple-of-earnings valuations are based on subjective projections of post-sale performance consisting of modified financial data from a single year in which he acknowledges "Tenet's business (like the business of many health care providers, and others) had been negatively impacted by the COVID pandemic." 2d Am. Compl. ¶ 40. They bear absolutely no relationship to the value of the "real property, net working capital, accounts receivable, inventories, equipment, leasehold improvements, and goodwill, among other assets" that Tenet conveyed to Steward in 2021. Op. at 5.

**D. The Trustee's Real Estate Valuation Numbers Are Baseless**

In an attempt to neutralize the Trustee's allegation that Steward sold the real estate for $900 million, 2d Am. Compl. ¶ 55, the Trustee alleges that the real estate was only worth between $440 million to $640 million. *Id.* ¶¶ 58–59. As a preliminary matter, these figures further undermine the Trustee's multiple-of-earnings approach, which value the Miami Hospitals "(including the business and the real estate)" at $364.75 million, and everything Steward received at $394 million. *Id.* ¶¶ 47–48. On the face of the pleading, the real estate alone, without equipment, inventories, leasehold improvements, or goodwill, exceeds that total by as much as $246 million.

But the Trustee's real estate valuations are themselves irrelevant to the assets Tenet conveyed. The first method the Trustee uses is an income capitalization approach, which is derived from KPMG's downward-adjusted estimate of Tenet's 2020 EBITDA. *Id.* ¶¶ 57–58. This subjective valuation method based on Steward's projections fails for all the reasons the Trustee's multiple-of-earnings valuations fail.

The second methodology is just as flawed. The Trustee pleads an average sales price per bed and per square foot, based on "over 180 hospital transactions in the United States." *Id.* ¶ 59. In other words, this methodology has nothing to do with the assets Tenet conveyed, as required by *Janvey*. *Janvey*, 487 S.W.3d at 582. National averages are not illustrative of the value of Miami real estate at the time of the closing of the transaction. For example, the federal government says the median value of an owner-occupied home is $332,700 nationally and $463,000 in Miami-Dade County, a premium of nearly forty percent.[14] Moreover, the real property Tenet conveyed comprises multiple parcels at each of five campuses, including valuable[15] medical office buildings, parking garages, and ancillary facilities (including cancer centers, rehabilitation facility, imaging centers, surgery center, physician practices, medical office buildings, etc.) that national average per-bed and per-square-foot metrics would not include. Ex. 1, APA Sched. D.

[14] U.S. Census Bureau, QuickFacts: United States; Miami-Dade County, Florida (2020–2024 Am. Cmty. Surv. 5-Year Estimates) *available at* https://www.census.gov/quickfacts/fact/table/miamidadecountyflorida,US.

[15] For example, in 2014, Tenet paid $48 million for just one of the medical office buildings conveyed to Steward under the APA. Brian Bandell, *Tenet Pays $48 Million for Building Near Palmetto General Hospital*, South Florida Business Journal (Jan. 2, 2014), bizjournals.com/southflorida/news/2014/01/02/tenet-pays-48m-for-building-near.html.

But even if the Court were to accept the Trustee's allegation that the real estate was worth as much as $640 million, and that "the actual amount of Net Working Capital delivered to SHC System was $129,282,415," for a subtotal of $769 million, the Second Amended Complaint still must be dismissed, because it fails to plead that the remaining assets Tenet delivered to Steward in the form of equipment, inventories, leasehold improvements, and goodwill would not bring the total above the threshold for reasonably equivalent value. 2d Am. Compl. ¶¶ 48, 58.

## III. The Trustee Recycles Theories and Allegations That this Court Rejected

The Second Amended Complaint reasserts several theories that this Court has already rejected as failing to plead the absence of reasonably equivalent value. Op. at 7. As the Court explained, the Trustee's allegations of post-sale performance shortfalls, the bankruptcy sale of the Miami Hospitals, and subjective valuations of the Miami Hospitals cannot establish a lack of reasonably equivalent value. This remains the case because none of these allegations establish what the assets that Tenet transferred were worth in August 2021. *Id.* at 5.

***First***, the Trustee pleads that "there was a vast disparity between the pre-acquisition projections and the actual performance" of the Miami Hospitals in the years immediately after the parties executed the APA. 2d Am. Compl. ¶ 72. In support, the Trustee asserts (a) "SHC System projected $202.3 million in EBITDAR for 2022 but realized negative $3.9 million," (b) "[i]t projected $254.8 million in EBITDAR for 2023 but realized only $125.4 million," and (c) "SHC System calculated that for 2021–2023 the Hospitals had *negative* $103.1 million in EBITDA." *Id.* ¶¶ 72–73. The Court already considered and rejected these allegations as irrelevant: "Under *Janvey*, those facts do not speak to the question TUFTA asks. Value is measured at the exchange, 'without the wisdom hindsight often brings.' 487 S.W.3d at 582. A transaction is not converted into a fraudulent transfer because the acquired business later performed poorly." Op. at 6.

The Court further explained that "[t]he gap between the alleged transfer and the performance is also covered by intervening events the Amended Complaint itself pleads. For example, Steward conveyed the real property to MPT and took back long-term leases the Trustee alleges were overpriced." *Id.* Again, the Trustee repleaded these allegations. 2d Am. Compl. ¶¶ 55–62. The Trustee also pleads that Ralph De la Torre ignored contrary information, was "stubborn[]," and poorly managed its finances while having "actual and de facto control over SHC System." *Id.* ¶¶ 3, 22, 24, 63–66. As the Court ruled, these allegations further preclude reasonably inferring that Steward failed to receive reasonably equivalent value. Op. at 6. In sum, the Trustee's repleading of projection shortfalls that this Court already discarded shows that his claim is baseless and should be dismissed with prejudice.

***Second***, the Trustee recycles his bankruptcy sale allegations that this Court has also already rejected. The Trustee pleads that during the bankruptcy sale in 2024, "Debtors received only four bids [for the Miami Hospitals], which ranged from a paltry $0 to $10 million. The nominal bids further confirm . . . that Tenet did not provide reasonably equivalent value to SHC System in exchange for the Tenet Payment." 2d Am. Compl. ¶ 75. The Trustee added that MPT purchased the hospitals in exchange for "assum[ing] the Debtors' liabilities for each Miami Hospital." *Id.* ¶ 76. As the Court ruled, these 2024 allegations "say[] little or nothing about their value in 2021." Op. at 6. Among the flaws in these allegations, by 2024, "the real property had been conveyed away, the operations were encumbered by leases the Trustee alleges were above market, and the business had been managed for three years in the manner the Amended Complaint describes at length." *Id.* In short, contrary to the Trustee's allegations, "[i]t is not a reasonable inference that Tenet assets sold in 2021 were the assets sold in the bankruptcy cases in 2024." *Id.*

***Third***, as detailed above and contrary to the Court's instructions, the Trustee's new multiple-of-earnings valuations continue to rely on subjective projections, alleging that the Miami Hospitals were worth less to Steward than Tenet because "SHC System's private insurance contracts were substantially worse than Tenet's." 2d Am. Compl. ¶ 54; *see also id.* ¶¶ 44–53.

The Trustee has not and cannot plead the objective contemporaneous value of the assets that Tenet transferred because such allegations would confirm that Steward received reasonably equivalent value in an arm's-length transaction. The Trustee's constructive fraudulent transfer claim should be dismissed with prejudice.

## IV. The Trustee's Attempts to Plead Around the $900 Million MPT Payment Fail

The Trustee cannot plead around the fact that MPT, and not Steward, paid $900 million of the purchase price to acquire the real estate. *Id.* ¶¶ 33–35. The APA makes clear that Steward never came out of pocket for any of that $900 million, never received the real estate, and never suffered a loss for any deficiency in the value of the real estate. Ex. 1, APA § 10.5. And the Trustee acknowledges this by including an "alternative" theory in the Second Amended Complaint that only the $209 million Steward actually funded was Steward's property. 2d Am. Compl. ¶ 79.

The Second Amended Complaint pleads that MPT paid Steward $900 million for the Miami Hospital real estate, that Steward received $129,282,415 in net working capital, and that Steward paid Tenet a $1.1 billion purchase price. *Id.* ¶¶ 33–35, 48. Those allegations describe an exchange in which Steward received the substantial majority of what it paid on day one (even when only considering two categories of assets that Tenet conveyed, not including the inventory, equipment, leasehold improvements, or goodwill). *See ASARCO*, 396 B.R. at 364.

### A. The Real Property Tenet Conveyed Never Entered Steward's Estate

The Trustee's real-estate valuation measures property Steward never owned. The APA gave MPT the right to acquire the Owned Real Property directly, and made MPT, not Steward, liable for the consideration for it. Under Section 10.5, MPT "shall only (i) have the right to acquire (A) the Owned Real Property agreed upon between Buyers and MPT . . . and (ii) be liable hereunder for the consideration for such Owned Real Property to be acquired by MPT." Ex. 1, APA § 10.5. Schedule D implements that structure parcel by parcel: for every parcel of Owned Real Property at all five hospitals, the schedule identifies MPT, not any Steward Buyer, as the acquiring party. *Id*., Sched. D. What Steward received for its payment, then, was the operating assets Tenet delivered plus $900 million in cash from MPT. The Trustee's $440 million to $640 million real-estate valuation does not measure the value that Steward actually received (and allegedly lost); it measures property that passed to MPT under the agreement's own terms.

Setting aside the Trustee's valuation of property Steward never held, what remains of the Trustee's theory is that Steward paid $1.1 billion, took back $900 million in cash and $129 million in working capital, and received a substantial set of categories of tangible and intangible operating assets the Trustee declines to value at all.

### B. The Above-Market Rent Allegations Do Not Change the Analysis Because the Trustee Never Pleads the Increment

The Trustee's answer to the $900 million MPT payment is that the leases Steward took back from MPT were above market. *Id.* ¶¶ 55–62. The answer fails on the pleading because the Trustee never alleges how much of the $900 million is attributable to above-market rent. Value in this setting is measured across the transaction as a whole. "Courts have recognized that, in analyzing value in this context, one must look at a transaction or series of transactions as an integrated whole and analyze the net economic benefit to the debtor from the viewpoint of value

received by the debtor at the time of the transfer." *In re Senior Care Ctrs., LLC*, 2023 WL 6519756, at *12 (Bankr. N.D. Tex. Mar. 24, 2023).

Even assuming that this rent analysis derived from Steward's subjective projected performance was relevant to the claims at issue, without the increment, that analysis cannot even be performed. The Trustee does not plead what the rent would have been at market, or what portion of the $900 million the difference represents.[16] The Court cannot weigh a net economic benefit against an unpled number, and Tenet cannot be required to guess at it.

The Trustee also does not seek to unwind the leases or recover anything from MPT. He asks to avoid the payment Tenet received, not the sale-leaseback with MPT, and the estate already settled its claims against MPT in these cases. The structure of the Trustee's claim would charge Tenet with what Steward "gave up" to MPT but cannot offset that against what MPT gave (or owed) back to Steward due to that global settlement.

## V. The Relief Sought by the Trustee Is Incompatible with the Allegations in the Second Amended Complaint

The Trustee's requested remedy has no basis in the Second Amended Complaint, further illustrating that it lacks merit. The Trustee seeks to recover the "Tenet Payment . . . in the amount of $1,107,545,336.36, or, in the alternative, the Tenet Sub-portion . . . in the amount of $208,957,339.60." 2d Am. Compl. ¶ 84, Prayer for Relief. Neither of these requests has any connection to the Trustee's allegations. The Trustee asserts that Steward received the following from the APA: $640 million for the value of the Miami Hospitals' real estate, *id.* ¶¶ 33, 58, $129 million of net working capital, *id.* ¶ 48, unpled amounts of inventory, equipment, leasehold improvements, *id.* ¶ 38, and the value of goodwill on operations that the Trustee alleges would

[16] Even the Trustee's assertion that rent was above-market is derived from KPMG's subjective projections of EBITDA. 2d Am. Compl. ¶ 57.

generate at least $49 million of EBITDA per year for Steward. *Id.* ¶ 47. The Trustee pleads that Steward received more than $769 million from the Miami transaction, so he cannot recover $1.1 billion from Tenet.

The alternative request fares no better. He alleges that "[a]ll of the funds used to make the Tenet Payment were SHC System's property," and then pleads in the alternative that only "the $208,957,339.60 transferred into the escrow account by SHC System . . . was SHC System's property." *Id.* ¶ 79. Section 544(b) reaches only "any transfer of an interest of the debtor in property," 11 U.S.C. § 544(b)(1), and § 550(a)(1) permits recovery only from the initial transferee of such a transfer. On the alternative the Trustee himself pleads, the ceiling is $208,957,339.60, and the value he concedes Steward received, $129,282,415 in net working capital plus the inventory, equipment, leasehold improvements, and goodwill he declines to value, exceeds it on the face of the complaint. 2d Am. Compl. ¶¶ 38, 47–48.

**VI. The Trustee's Financial Impairment Allegations Fail**

The Trustee's financial impairment allegations also fail to satisfy the requirements to plead a constructive fraudulent transfer claim under the Texas Uniform Fraudulent Transfer Act. "To establish a claim for constructive fraud under Sections 24.005(a)(2) and 24.006(a)," a plaintiff must prove that "(i) the debtor was insolvent at the time of the transfer or as a result of the transfer; (ii) the debtor was left with unreasonably small capital after the transfer; or (iii) at the time of the transfer, the debtor intended to incur debts beyond its ability to pay." *PDVSA Petroleo S.A. v. Trigeant, Ltd.*, 2012 WL 3249531, at *12 (S.D. Tex. Aug. 7, 2012). The Trustee's allegations fail on each of these scores.

### A. The Trustee Is Judicially Estopped from Pleading Insolvency

From the time Tenet and Steward signed the Asset Purchase Agreement,[17] through three years of pre-petition litigation, and even well into these bankruptcy cases, Steward consistently represented to Tenet and to various courts that it was not insolvent and had sufficient capital following the Miami transaction. The Delaware Court of Chancery accepted those representations to Tenet's detriment. The Trustee should not be permitted to rely on contrary allegations to assert a claim against Tenet pursuant to TUFTA § 24.006.

As the Second Amended Complaint acknowledges, Tenet has over $90 million in fully liquidated claims against Steward. *See* 2d Am. Compl. ¶ 86. Those claims are the result of nearly three years of pre-petition litigation, every substantive piece of which Tenet won. The fulcrum of the parties' disputes was around DPP funds that were Tenet's property, but which Steward lobbied for and received instead of Tenet and then refused to remit to Tenet as required under the APA. *See Steward*, 2023 WL 5321484, at *9–13. After Tenet won the DPP dispute on summary judgment, Tenet moved for partial final judgment, which would allow Tenet to collect its property from Steward.

In opposition, Steward argued that there was no near-term risk that it would become insolvent. At the October 12, 2023 hearing on that motion, Steward represented to the Delaware Chancery Court that "Steward is not on the verge of bankruptcy" and argued that "bankruptcy wasn't considered, it isn't being considered." Dkt. No. 89-3, Tr. of Oral Arg. at 35:23–24, 39:16–17, *Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, No. 2022-0289-SG (Del. Ch. Oct. 12, 2023).

[17] KPMG represented to Tenet days before the APA closed that Steward was solvent. *See also* Ex. 1, APA § 4.3(b) (each Buyer represented that, immediately after giving effect to the transactions contemplated by the APA, "no Buyer" would "be insolvent").

The Delaware Chancery Court took Steward at its word. The court stated that if Steward submitted an affidavit stating that it was not contemplating filing for bankruptcy in the near term, then the court would not find "the kind of just reason that would outweigh the efficiency loss" of multiple appeals that may follow a partial final judgment. *Id.* at 69:6–13. On October 19, 2023, Steward submitted an affidavit of its CFO to the Delaware Chancery Court, stating that "Steward does not currently intend to take any action in the next six months (or otherwise) involving liquidation, receivership or bankruptcy." Dkt. No. 89-4, Aff. of M. Rich ¶ 3, *Steward Health Care Sys. LLC v. Tenet Bus. Servs. Corp.*, No. 2022-0289-SG (Del. Ch. Oct. 20, 2023), Dkt. No. 207. The Delaware Chancery Court then declined to grant Tenet's motion for partial final judgment, which resulted in Tenet being unable to collect its property pre-petition.

Then, after filing for chapter 11 bankruptcy in May 2024, Steward continued making consistent representations. For example, at the first day hearing and in its associated filings, Steward repeatedly asserted that its liquidity issues began in 2023, long after the Miami transaction closed in August of 2021. *See, e.g.*, Decl. of J. Castellano in Supp. of Debtors' Ch. 11 Pets. ¶ 58, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 6, 2024) Dkt. No. 38 (industry and operational challenges "manifested throughout 2023 when the Company suffered severe liquidity issues" and the "situation grew more dire throughout 2023"); First Day Hr'g Demonstrative at 11, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 7, 2024) Dkt. No. 72 ("Starting in 2023, Steward's strained liquidity caused disruptions in vendor relationship, ultimately affecting the Company's operations and ability to drive revenue."); First Day Hr'g Tr. at 28:2–3, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 7, 2024) Dkt. No. 146 ("2023 when the company's liquidity really became strained we went through a lot of transactions to get here.").

According to the Second Amended Complaint, however, Steward was insolvent before the August 2021 Miami transaction. 2d Am. Compl. ¶¶ 63, 80 (stating that "[a]t the end of 2020, SHC System's liabilities exceeded its assets by $1.5 billion" and that Steward "was insolvent before . . . the Tenet Payment"). Steward should be estopped from asserting these allegations against Tenet because it represented the opposite to the Delaware Chancery Court and thereby successfully prevented Tenet from collecting tens of millions of dollars of Tenet's property prepetition. *See U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 275 (5th Cir. 2015) ("Where the [judicial estoppel] defense appears on the face of the pleadings and in judicially noticeable facts, it may be considered in a motion to dismiss."); *In re Super. Crewboats, Inc.*, 374 F.3d 330, 335–36 (5th Cir. 2004) (directing the district court to dismiss the plaintiffs' claims as judicially estopped); *Luv n' care, Ltd. v. Jackel Int'l Ltd.*, 502 F. Supp. 3d 1106, 1108 (W.D. La. 2020) (On a motion to dismiss, a "court can accept the occurrences and positions taken in a prior action for judicial estoppel purposes.") (citation modified).

To apply judicial estoppel, courts consider whether "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *GSDMIdea City, L.L.C.*, 798 F.3d at 272.

Each element is satisfied here. Here, Steward affirmatively represented its solvency to the Delaware Chancery Court to avoid remitting Tenet's DPP payments, only for the Trustee now to assert the opposite position to, among other things, disallow Tenet's claim for the same DPP payments. Having benefited from Steward's position in the prior litigation, the Trustee should not be permitted to disavow that position to advance a contrary theory in this proceeding. *See New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (holding that "courts have uniformly

recognized that" the "purpose" of judicial estoppel "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment"). The Delaware Chancery Court relied on those representations to deny Tenet's motion for partial final judgment. And Steward did not act inadvertently. Because the Trustee is judicially estopped from claiming insolvency as to Tenet, his claim pursuant to TUFTA § 24.006 should be dismissed.

### B. The Trustee Fails to Plead That the APA Transaction Left Steward with Unreasonably Small Assets

The Trustee's constructive fraudulent transfer claim pursuant to Tex. Bus. & Com. Code § 24.005(a)(2)(A) should also be dismissed because it does not plead facts that "the disputed transfers *cause[d]* the unreasonably small capital condition." *In re Pioneer Home Builders*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992). "Where a debtor already has unreasonably small capital, that the debtor subsequently engaged in transfers which worsened, but did not cause, its financial infirmities, will not subject those transfers to avoidance as fraudulent conveyances." *Id.*; *see also In re Palm Beach Fin. Partners, L.P.*, 598 B.R. 885, 896–97 (Bankr. S.D. Fla. 2019) (similar). Steward pleads both that the "Tenet Transaction left SHC System with inadequate working capital or, alternatively, SHC System had inadequate working capital before and after the Tenet Transaction and before and after the parties entered the Miami APA." 2d Am. Compl. ¶ 64. While the Trustee pleads in the alternative that the APA caused Steward to have unreasonably small assets, this pleading is merely a conclusory assertion lacking plausible supporting allegations and therefore fails. *Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). The Trustee pleads that "[a]ccording to SHC System's internal accounting, SHC System had negative net working capital both before and after entering the Miami APA and before and after the Tenet Transaction." 2d Am. Compl. ¶ 65. That

allegation is sufficient to preclude the Trustee from satisfying the pleading requirements of Tex. Bus. & Com. Code § 24.005(a)(2)(A), warranting dismissal.

### C. The Trustee Fails to Plead That Steward Intended to Incur Debts Beyond Its Ability to Pay.

Steward's constructive fraudulent transfer claim pursuant to Tex. Bus. & Com. Code § 24.005(a)(2)(B) should be dismissed because it does not allege that "on the date of the challenged transfer, [Steward] intended to incur or believed [or reasonably should have believed] that it would incur, debts beyond its ability to pay." *In re WCC Holding Corp.*, 171 B.R. 972, 986 (Bankr. N.D. Tex. 1994). Instead, the Trustee asserts that the "Tenet Transaction rendered SHC System unable to pay its debts as they came due or, alternatively, SHC System was unable to pay its debts as they came due before and after the Tenet Transaction and before and after entering the Miami APA." 2d Am. Compl. ¶ 66. That conclusory allegation misses the mark because it does not plausibly plead that Steward "***intended to incur, or believed or reasonably should have believed***" that it would incur debts beyond Steward's "ability to pay as they become due." Tex. Bus. & Com. Code § 24.005(a)(2)(B) (emphasis added).

The Trustee's other allegations fare no better. The Trustee pleads that in 2020, Steward had a net operating loss and that Steward had negative incomes in 2020, the third and fourth quarters of 2021, and for all of 2021 and 2022. 2d Am. Compl. ¶¶ 67–68.[18] The Trustee also points to the Miami Hospitals allegedly having negative EBITDAs in 2021 and 2022 and Steward being sued between 2022 and 2024 for unpaid bills dating back to 2019. *Id.* ¶¶ 69–70. None of these allegations plausibly pleaded that on *August 1, 2021*, Steward "intended to incur, or believed

[18] The Trustee in fact pleads that Steward's net income *improved* by $44 million between 2020 (negative net income of $407 million) and 2021 (negative net income of $363 million). 2d Am. Compl. ¶¶ 67–68.

or reasonably should have believed that" it "would incur, debts beyond" its "ability to pay as they became due." Tex. Bus. & Com. Code § 24.005(a)(2)(B); *see In re Almazan*, 2011 WL 841349, at *3–4 (Bankr. S.D. Tex. Mar. 7, 2011) (dismissing TUFTA § 24.005(a)(2) claim because plaintiff did not plead "financial condition at the time of the alleged transfer"). Nor could the Trustee make such an allegation: the Trustee pleads that Steward "sold the real estate to MPT for $900 million," that was worth at most, $640 million, 2d Am. Compl. ¶¶ 33, 58, netting Steward $260 million and thereby increasing, rather than decreasing, Steward's ability to pay its debts as they became due.

## VII. The Disallowance Claim Should Be Dismissed

The Trustee's disallowance claim should be dismissed because the constructive fraudulent transfer claim fails. As this Court explained, the Trustee's disallowance claim "is, as he acknowledges, derivative of the avoidance claim" and therefore, "where the avoidance claim is dismissed, the disallowance claim is dismissed with it." Op. at 6–7; *see also In re Life Partners Holdings, Inc.*, 926 F.3d at 122 (concluding that a disallowance claim is "remedial" and therefore the disallowance claim was "derivative of and dependent on" whether plaintiff pleaded a fraudulent transfer claim). Because the Trustee has not pleaded a constructive fraudulent transfer claim for the reasons stated *supra*, §§ I–VI, his disallowance claim should be dismissed "on that basis." Op. at 7.

## VIII. Dismissal Should Be with Prejudice

The Court should dismiss the Second Amended Complaint with prejudice because the Court gave the Trustee guidance on how to plead "better allegations," Op. at 7, but he did not remedy the flaws that the Court identified in his First Amended Complaint. *See Gentry v. Encompass Health Rehab. Hosp.*, 157 F.4th 758, 765–66 (5th Cir. 2025) (upholding dismissal of second amended complaint with prejudice because plaintiff did not "remedy her case's factual

insufficiencies" in response to district court's guidance). Contrary to the Court's guidance, in the Second Amended Complaint, the Trustee continues to omit any allegations of the value of all the assets Tenet transferred and to rely on financial projections, bids that Steward received for the Miami Hospitals during bankruptcy, and subjective valuations of the Miami Hospitals to attempt to plead the absence of reasonably equivalent value. *See* Op. at 5–6; *supra* at I–III. That is because correcting those errors would require the Trustee to acknowledge that Steward received reasonably equivalent value in the APA. *Supra* at I, II.C, II.D, IV. The Trustee's repeated parallel pleading failures show that he has "pleaded his 'best case,'" *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009), and any further amendment "would . . . be[] futile," justifying dismissal with prejudice. *Nix v. Major League Baseball*, 62 F.4th 920, 935 (5th Cir. 2023).

## **CONCLUSION**

The Trustee's theory that businesses must sell assets according to buyers' subjective ability to profit from them, and not according to their objective fair market value, contravenes this Court's July 31, 2026, Opinion, TUFTA, and the Texas Supreme Court's *Janvey* precedent. These governing authorities demand that reasonably equivalent value be measured from an objective perspective at the time of the exchange, and not Steward's or KPMG's projections of Steward's ability to profit from the transferred assets. *See Janvey*, 487 S.W.3d at 582. The Trustee should not be excused from these standards by pleading that Steward's bad contracts, ineffective managers, and above-market MPT lease made the Miami Hospitals less valuable to Steward than they were to Tenet. That's all the Second Amended Complaint pleads.

The Trustee's theory has implications beyond this litigation. If this complaint proceeds to discovery, Texas sellers will need to evaluate and account for the risk that buyers will leverage constructive fraudulent transfer claims as insurance on transactions so long as the buyer runs the assets into the ground after purchase.

The Trustee's claims should be dismissed with prejudice. After three attempts to plead constructive fraudulent transfer and disallowance claims, and the Trustee's inability to plead what the Court instructed, "it is clear that the defects in the complaint are incurable." Op. at 7.

Dated: September 18, 2026
Houston, Texas

*/s/ Anna G. Rotman, P.C.*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Anna G. Rotman, P.C. (TX Bar No. 24046761)
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: anna.rotman@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: jsussberg@kirkland.com

- and -

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Richard U.S. Howell, P.C. (admitted *pro hac vice*)
Christopher S. Koenig (admitted *pro hac vice*)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: rhowell@kirkland.com
chris.koenig@kirkland.com

*Counsel to Defendant Tenet Healthcare Corporation*

**CERTIFICATE OF SERVICE**

I certify that on September 18, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the U.S. Bankruptcy Court for the Southern District of Texas.

*/s/ Anna G. Rotman, P.C.*