**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| **STEWARD HEALTH CARE SYSTEM LLC, et al.,** | § | **Case No. 24-90213 (CML)** |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| **MARK KRONFELD, AS TRUSTEE OF THE SHC CREDITOR LITIGATION TRUST,** | § | **Adv. Pro. No. 26-03094 (CML)** |
| **Plaintiff,** | § | |
| **vs.** | § | |
| **TENET HEALTHCARE CORPORATION,** | § | |
| **Defendant.** | § | |

**THE TRUSTEE'S OPPOSITION TO TENET HEALTHCARE CORPORATION'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

[1] A complete list of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these Chapter 11 Cases is 1900 N. Pearl Street, Suite 2400, Dallas, Texas 75201.

**TABLE OF CONTENTS**


INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 4

LEGAL STANDARD ..... 8

ARGUMENT ..... 8

I. The Amended Complaint Sufficiently Alleges That SHC System Did Not Receive Reasonably Equivalent Value in the Tenet Transaction. ..... 9

A. Applying the Widely Accepted Comparable Public Company Method, the Fair Market Value of the Miami Hospitals Was, at Most, $611.9 million. ..... 10

1. Facts supporting a conservative application of the Comparable Public Company Method demonstrate that the Miami Hospitals were worth no more than $611.9 million at the time of the Tenet Transaction. ..... 12

2. A rate-adjusted application of the Comparable Companies Method determines that the Miami Hospitals were worth less than $400 million as of the Tenet Transaction. ..... 14

3. The Amended Complaint plausibly alleges that the real estate alone constituted less than $900 million in value. ..... 18

B. Tenet's Own Valuation in Its Securities Filing Further Supports a Plausible Inference That SHC System Did Not Receive Reasonably Equivalent Value Through the Tenet Transaction. ..... 20

C. Allegations Regarding the Post-Transaction Performance of the Miami Hospitals Contextualize and Confirm the Trustee's Valuation Allegations. ..... 22

D. Tenet's Counterfactual Reimagining of the Tenet Transaction Does Not Negate the Trustee's Allegations of a Lack of Reasonably Equivalent Value. ..... 23

II. SHC System Was Financially Impaired as of the Tenet Transaction. ..... 26

A. The Amended Complaint Plausibly Alleges Insolvency, Which Tenet Largely Concedes. ..... 26

1. The Court should reject Tenet's judicial estoppel argument relating to the Delaware proceedings. ..... 27

2. The Court should also reject Tenet's estoppel argument based on statements in the bankruptcy proceedings. ..... 28

B. The Amended Complaint Plausibly Alleges That the Tenet Transaction Left SHC System With Unreasonably Small Assets. ..... 29

C. The Amended Complaint Plausibly Alleges That SHC System Intended to Incur Debts Beyond its Ability to Pay as of the Tenet Transaction. ..... 30

CONCLUSION ..... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Adelphia Commc'ns Corp.*,
512 B.R. 447 (Bankr. S.D.N.Y. 2014) ....................22

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ....................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................8

*Aurzada v. Unqork, Inc. (In re Animo Servs., LLC)*,
No. 23-30035-MVL7, 2026 WL 700426 (Bankr. N.D. Tex. Mar. 11, 2026) ....................4, 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................8

*Blanco v. Bayview Loan Servicing LLC (In re Blanco)*,
633 B.R. 714 (Bankr. S.D. Tex. 2021) ....................26

*In re Blixseth*,
514 B.R. 871 (D. Mont. 2014) ....................29

*Bowman v. El Paso CGP Co., L.L.C.*,
431 S.W.3d 781 (Tex. App. 2014) ....................9

*Challenger Gaming Sols., Inc. v. Earp*,
402 S.W.3d 290 (Tex. App. 2013) ....................9

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010) ....................13

*Cherokee Water Co. v. Gregg Cnty. Appraisal Dist.*,
773 S.W.2d 949 (Tex. App. 1989) ....................18

*Cyrix Corp. v. Intel Corp.*,
803 F. Supp. 1200 (E.D. Tex. 1992) ....................21

*Day v. Celadon Trucking Servs., Inc.*,
827 F.3d 817 (8th Cir. 2016) ....................12

*In re Emerge Energy Servs. LP*,
No. 19-11563 (KBO), 2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) ....................13

*In re Erstmark Cap. Corp.*,
73 F. App'x 79 (5th Cir. 2003) ....................21

*In re FBI Wind Down, Inc.*,
557 B.R. 310 (Bankr. D. Del. 2016) ....................11

*Gabarick v. Laurin Mar. (Am.) Inc.*,
753 F.3d 550 (5th Cir. 2014) ....................26

*GlobeRanger Corp. v. Software AG*,
27 F. Supp. 3d 723 (N.D. Tex. 2014) ....................26

*In re Hinsley*,
201 F.3d 638 (5th Cir. 2000) ....................16

*Hoffman v. AmericaHomeKey, Inc.*,
No. 3:12-CV-3806-B, 2014 WL 7272596 (N.D. Tex. Dec. 22, 2014) ....................20, 21

*In re IFS Fin. Corp.*,
417 B.R. 419 (Bankr. S.D. Tex. 2009) ....................16

*In re IIG Glob. Trade Fin. Fund Ltd*.,
666 B.R. 38 (Bankr. S.D.N.Y. 2024) ....................24

*Janvey v. Golf Channel, Inc.*,
487 S.W.3d 560 (Tex. 2016) .................... *passim*

*Kartzman v. Latoc, Inc. (In re Mall at the Galaxy, Inc.)*,
Adv. Pro. No. 12-1769 VFP, 2019 WL 1522703 (Bankr. D.N.J. Apr. 4, 2019) ....................29

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
798 F.3d 265 (5th Cir. 2015) ....................26

*In re Loyalty Ventures, Inc.*,
No. 23-90111, 2026 WL 801210 (Bankr. S.D. Tex. Jan. 22, 2026) ....................24

*Magaraci v. Espinosa*,
No. 03-14-00515-CV, 2016 WL 858989 (Tex. App. Mar. 4, 2016) ....................30

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018) ....................24, 25

*In re Miller*,
347 B.R. 48 (Bankr. S.D. Tex. 2006) ....................27

*In re Mirant Corp.*,
334 B.R. 800 (Bankr. N.D. Tex. 2005) ....................10, 13

*In re Mirant Corp.*,
No. 03-046590 DML, 2010 WL 8708772 (Bankr. N.D. Tex. Apr. 22, 2010) ....................10, 13

*In re Moore*,
608 F.3d 253 (5th Cir. 2010) ....................23

*In re Nellson Nutraceutical, Inc.*,
356 B.R. 364 (Bankr. D. Del. 2006) ....................10

*NGM Ins. Co. v. Bexar Cnty., Texas*,
211 F. Supp. 3d 923 (W.D. Tex. 2016) ....................27

*In re Ocean Tower LP*,
No. 11-70776, 2014 WL 6686542 (Bankr. S.D. Tex. Nov. 25, 2014) ....................9

*In re Pace*,
456 B.R. 253 (Bankr. W.D. Tex. 2011) ....................16

*Reed v. City of Arlington*,
650 F.3d 571 (5th Cir. 2011) ....................28

*Scot. Heritable Tr., PLC v. Peat Marwick Main & Co.,*
81 F.3d 606 (5th Cir. 1996) ....................21

*S.E.C. v. Res. Dev. Int'l, LLC*,
487 F.3d 295 (5th Cir. 2007) ....................9

*Sears Roebuck & Co. v. Dallas Cent. Appraisal Dist.*,
53 S.W.3d 382 (Tex. App. 2000) ....................20

*In re Steward Health Care Sys. LLC*,
No. 24-90213 (Bankr. S.D. Tex. May 7, 2024), Dkt. No. 86 ....................28

*Steward Health Care Sys., LLC v. Tenet Bus. Servs. Corp.*,
2023 WL 5321484 (Del. Ch. Aug. 18, 2023) ....................14

*T.L. Swint Indus., Inc. v. Premiere Sales Grp., Inc.*,
16 F. Supp. 2d 937 (N.D. Ill. 1998) ....................11

*Tow v. Speer*,
No. CIV.A. H-11-3700, 2015 WL 1058080 (S.D. Tex. Mar. 10, 2015) ....................16

*In re Triplett*,
No. 19-42570, 2023 WL 2750899 (Bankr. E.D. Tex. Mar. 31, 2023) ....................16

*In re Tronox Inc.*,
503 B.R. 239 (Bankr. S.D.N.Y. 2013) ....................10, 13

*VFB LLC v. Campbell Soup Co.*,
482 F.3d 624 (3d Cir. 2007) ....................22

*Wells Fargo Bank, N.A. v. Oparaji (In re Oparaji)*,
698 F.3d 231 (5th Cir. 2012) ....................26

**Statutes**

11 U.S.C. §§ 101–1532 ....................10, 24

11 U.S.C. § 544(b) ....................23, 27

Tex. Bus. & Com. Code Ann. §§ 24.001–.013 .................... *passim*

**Rules**

Fed. R. Bankr. P. 7008 ....................8

Fed. R. Civ. P. 8 ....................8

Fed. R. Civ. P. 8(a)(2) ....................8

**Other Authorities**

*Working Capital: Formula, Components, and Limitations*, Investopedia (Feb. 21,
2026), https://www.investopedia.com/terms/w/workingcapital.asp ....................19

# INTRODUCTION

On August 2, 2021, SHC System[2] paid Tenet $1.1 billion for the Miami Hospitals, which at the time had a fair market value of no more than $611.9 million. SHC System financed the purchase price through a combination of debt and a sale-leaseback arrangement with MPT. As a result of the sale-leaseback, SHC System was saddled with extraordinary, above-market lease obligations and crippling debt, which thrust the already insolvent company closer to bankruptcy. Through this action, the Trustee seeks to avoid the $1.1 billion payment to Tenet as a constructive fraudulent transfer and recover the payment for the benefit of SHC System's creditors.

In its July 31, 2026, Order on Tenet's first motion to dismiss (the "MTD Order"), the Court identified a single deficiency in the Trustee's prior pleading (the "Prior Complaint"): it did not sufficiently allege facts showing what the assets SHC System acquired from Tenet were actually worth as of August 2021, and allegations of moribund post-closing performance could not fill the gap. *See* MTD Order at 5–6. The Amended Complaint, by contrast, specifically pleads what the Miami Hospitals (the real estate, net working capital, and every other asset and liability conveyed) were worth on the date of the Tenet Transaction. The Amended Complaint cites contemporaneous facts and widely accepted valuation methodologies, not projections or hindsight. That is more than sufficient to defeat Tenet's renewed motion to dismiss (Dkt. No. 171, the "Motion").

***First***, the Amended Complaint pleads facts that support a detailed fair market valuation of the Miami Hospitals as an operating business using the widely accepted "Comparable Public Company Method." The valuation alleged uses normalized, historical EBITDA that SHC System's own financial advisor, KPMG, calculated contemporaneously with the transaction. This approach

[2] Unless otherwise noted, capitalized terms have the meanings assigned in the Amended Complaint filed on August 20, 2026, Dkt. No. 164 (the "Amended Complaint").

yields a value of no more than $611.9 million, and this approach alone sufficiently pleads that SHC System did not receive reasonably equivalent value in the Tenet Transaction. Am. Compl. ¶¶ 38–43. ***Second***, the Amended Complaint pleads that the Miami Hospitals were worth even less—under $400 million—after removing the effect of Tenet's above-market commercial insurance reimbursement rates, which Tenet did not convey to SHC System and which KPMG warned [redacted]. *Id.* ¶¶ 44–54. This approach measures value from the perspective of SHC System's creditors—as is required—rather than by reference to earnings attributable to Tenet's retained contracts. ***Third***, the Amended Complaint pleads Tenet's own contemporaneous valuation: in a 10-Q dated July 30, 2021, three days before the closing of the transaction, Tenet reported that the Miami Hospitals, including real estate and operations, were worth $683 million, which was $417 million less than the $1.1 billion SHC System paid for them. *Id.* ¶ 36. Each of these factual bases compel a plausible inference that SHC System did not receive reasonably equivalent value for the $1.1 billion it paid for the Miami Hospitals business, and the Trustee has easily met its pleading burden.

Tenet wants the Court to instead look outside the pleading. Specifically, it argues that the MTD Order required the Trustee to assign a separate value to each category of purchased assets—equipment, leasehold improvements, inventory, and so on—as if Tenet had held a garage sale. *See, e.g.*, Mot. at 1, 12–14. But SHC System did not buy the component parts of the Miami Hospitals business to assemble them into a business. SHC System bought an operating business whose assets and liabilities are together worth what their owner can earn using them. While the MTD Order notes that no values were alleged for such individual items, it required only that the assets transferred to SHC System be valued. Neither the MTD Order nor established case law requires that those assets be valued item by item rather than as part of the integrated business in which they

were conveyed and used. In short, the Amended Complaint values the business SHC System bought, including all its operating assets and liabilities. And Tenet's insistence that the Trustee should have pleaded the contents of tax allocations, lender collateral analysis, or other materials outside the pleadings, *see* Mot. at 13, only asks the Court to weigh evidence it has already declined to consider at this stage. *See* MTD Order at 4.

Moreover, contrary to the Motion, the Trustee's valuation is ***not*** based on Steward's subjective projections. The Amended Complaint provides a detailed and specific valuation of the Miami Hospitals derived from the contemporaneous assessment of the Miami Hospitals' earnings prepared by SHC System's paid financial professionals—KPMG—at the time of the Tenet Transaction. Like any buyer would have, Steward had to normalize Tenet's prior reported performance as a threshold step for a valuation. KPMG took the Miami Hospitals' 2020 earnings, as presented by Tenet, and normalized them to account for a one-off payment by the federal government (requiring a downward adjustment from reported earnings) and negative impacts from the COVID pandemic (requiring an upward adjustment). *See* Am. Compl. ¶ 40. Whereas the Prior Complaint alleged a lack of reasonably equivalent value based in part on SHC System's pie-in-the-sky future projections that were not met (the focus of the Court's comments regarding projections),[3] the Amended Complaint grounds its valuation in KPMG's ***contemporaneous*** determination of the Miami Hospitals' normalized EBITDA before the acquisition. Applying that contemporaneously normalized EBITDA, along with reasonable valuation multiples consistent with the widely accepted Comparable Public Company Method of valuation, yields a value for the Miami Hospitals of no more than $611.9 million. Am. Compl. ¶¶ 41–43.

[3] *See* MTD Order at 5.

Rather than show that those facts are implausible, Tenet quarrels with the Trustee's inputs, arguing that the Trustee should have used many of the same inputs foreclosed by the MTD Order. For instance, Tenet argues that the Trustee should have used old 2019 EBITDA rather than KPMG's ***contemporaneous*** and professionally calculated amount for 2020 (the last full year before the acquisition closed). Tenet's other subjective quibbles include that EBITDA should have accounted for then-uncertain and unpaid "Florida Directed Payment Program" ("DPP") revenue and that the Trustee should have used Miami-Dade rather than national real estate data. Tenet, previewing what its expert may try to do, also suggests adding the top-of-the-range real estate value the Trustee alleges to one component (net working capital) of the Miami Hospitals' balance sheet. But the Comparable Public Company Method pleaded in the Amended Complaint subsumes both of these financial metrics, and Tenet's unilateral view on how to assess them inappropriately substitutes Tenet's preferred valuation approach for the Trustee's well-pleaded facts. Tenet's counter-analysis is not the stuff of a motion to dismiss.

At bottom, a pleading's sufficiency about whether value is "reasonably equivalent" is a "fact-intensive determination that typically requires testing through the discovery process." *Aurzada v. Unqork, Inc. (In re Animo Servs., LLC)*, No. 23-30035-MVL7, 2026 WL 700426, at *11 (Bankr. N.D. Tex. Mar. 11, 2026). Tenet is welcome to retain an expert to opine that its inputs and methodologies are most appropriate. But the time and place for that is discovery, summary judgment, and trial, not a motion to dismiss. For these reasons, and as further discussed herein, the Court should deny the Motion.

## STATEMENT OF FACTS

On June 16, 2021, Ralph de la Torre caused SHC System to sign the Miami APA and thereby committed SHC System to purchase the Miami Hospitals—the operations, the facilities, the accounting books, everything that related to operating the business and was not specifically

excluded—for $1.1 billion. *See* Am. Compl. ¶ 27. There was no bidding war for the Miami Hospitals. *Id.* ¶ 28. De la Torre and SHC System had no concern that another buyer would take the opportunity. *Id.*

The facts known by SHC System's agents, including de la Torre, demonstrated that the Miami Hospitals were worth far less than $1.1 billion. SHC System retained professional financial advisors from KPMG to calculate the Miami Hospitals' normalized, contemporaneous EBITDA to account for the effects of the COVID crisis. *Id.* ¶ 40. KPMG determined that the Miami Hospitals' normalized 2020 EBITDA was $82.69 million. *Id.* KPMG also analyzed the difference in insurance reimbursement rates between SHC System and Tenet. *Id.* ¶¶ 46–47. KPMG determined that SHC System's rates were much lower than Tenet's, meaning SHC System would earn far less revenue from performing the same procedures than Tenet had performed in the prior year. *Id.* Like any acquirer that does a quality-of-earnings or similar analysis, KPMG's work was necessary to normalize the pre-merger performance metrics. KPMG determined that, once the rate differential was taken into account, the normalized EBITDA for the Miami Hospitals, assuming they were operated by SHC System dropped to $49.29 million (or lower). *Id.* KPMG's analysis did not depend on any subjective forecast of SHC System's future plans; it re-calculated the Miami Hospitals' actual 2020 results at the reimbursement rates in SHC System's then-existing payor contracts, based on the raw data reported by Tenet and SHC System. *Id.* KPMG personnel candidly noted in internal documents that [redacted] *Id.* ¶ 49.

De la Torre turned a blind eye to the information provided by SHC System's paid financial advisors. Instead, SHC System internally "relied" on its fanciful forecasts of the Miami Hospitals' future performance. *Id.* ¶ 29. The forecasts proved horribly wrong when the Miami Hospitals

performed far worse than de la Torre and SHC System's unrealistic projections. By some metrics, the Miami Hospitals lost money. *Id.* ¶¶ 72–73. The purchase of the Miami Hospitals was a disastrous transaction for SHC System and its creditors. Indeed, De la Torre's recklessness with regard to the Tenet Transaction is central to the separate proceeding against him, also before this Court.[4]

But with respect to claims here against Tenet, the Miami Hospitals were clearly worth far less than $1.1 billion based on the contemporaneous facts known as of the closing date. The Amended Complaint pleads how the facts fit into the widely accepted Comparable Public Company Method of valuing a business. *Id.* ¶ 38. Valuations using this methodology capture the value of the operations of the business as well as the assets and liabilities used in operating the business. *Id.* ¶ 38. Using the normalized EBITDA amount calculated by KPMG and reasonable multiples of EBITDA drawn from the real-world trading values of other comparable companies (and ignoring the overstatement of value caused by Tenet's extremely high insurance reimbursement rates), the Miami Hospitals were worth at most $611.9 million. That amount includes their operations and assets and liabilities, which encompasses net working capital, which is a function of ***current*** assets and current liabilities. *Id.* ¶¶ 39–43. This valuation is consistent with the $683 million value for the business Tenet presented in its SEC filings (*id.* ¶ 36), as well as the $605.3 million value indicated in the financial statements Tenet appended to the APA. *See infra* at 12 n.6. These facts strongly support the inference that the value SHC System received for the Miami Hospitals was not reasonably equivalent to the $1.1 billion it paid.

In fact, the Miami Hospitals were worth much less than that because Tenet's high-end insurance reimbursement rates overstated the value of the Miami Hospitals to almost all potential

[4] *Kronfeld v. De la Torre,* Adv. Pro. 25-03593 (Bankr. S.D. Tex.).

operators of the assets. *Id.* ¶¶ 44–54. Tenet's reimbursement rates were not just higher than SHC System's—they were among the highest in the Florida market and far above average. *Id.* ¶¶ 49–54. Adjusting KPMG's normalized EBITDA to reflect SHC System's reimbursement rates (that is, reimbursement rates a buyer without Tenet's retained payor contracts could actually obtain)—which is how a reasonable creditor of SHC System would assess what the transaction added to the estate—the Miami Hospitals were worth only $394 million (after crediting the net working capital Tenet delivered in excess of the APA's target). *Id.* ¶¶ 47–48.

The Tenet Transaction closed on August 2, 2021. SHC System financed the $1.1 billion payment to Tenet by taking on more debt from lenders and pursuant to an agreement with MPT. *Id.* ¶¶ 33–35. MPT contributed $900 million into an account controlled by SHC System, and SHC System made the full $1.1 billion payment to Tenet. *Id*. Under the APA, SHC System and certain subsidiaries were the buyers of the business and the related real property, although they allowed MPT to exercise their purchase right to acquire the real property. The real estate was worth far less than $900 million (*id.* ¶¶ 55–59), but MPT was willing to contribute that much because, in addition to receiving the real estate, it received SHC System's commitment to pay above-market rent keyed to the $900 million lease base. *Id.* ¶¶ 57, 60. MPT also relied on SHC System's overinflated projections of future performance. *Id.* ¶¶ 60–62.

Thus, because de la Torre refused to heed the analyses of SHC System's professional advisors, SHC System drastically overpaid for the Miami Hospitals. According to Tenet's own accounting, Tenet ***gained over $400 million*** on the sale. *Id.* ¶ 36. Meanwhile, SHC System was insolvent at the time of the acquisition, and as a result of the transaction (if not before), SHC System had inadequate working capital to conduct its business and was unable to pay its debts as they came due. *Id.* ¶¶ 63–70. SHC System should have forgone the transaction with Tenet entirely

to preserve its resources for the benefit of its creditors. By this action, the Trustee seeks to bring back, for the benefit of SHC System's creditors, the value SHC System transferred away.

## LEGAL STANDARD

Federal Rule 8(a)(2), as incorporated by Bankruptcy Rule 7008, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint need only contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although conclusory allegations are not enough, the plaintiff need only plead "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. As the MTD Order notes, "improbability is not implausibility. A complaint that satisfies Rule 8 'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" MTD Order at 3 (citations omitted).

## ARGUMENT

The Trustee has brought a claim for a constructive fraudulent transfer under Sections 24.005(a)(2) and 24.006 of the Texas Uniform Fraudulent Transfer Act ("TUFTA"). To state such a claim, the Trustee must plausibly allege that SHC System did not "receiv[e] . . . reasonably equivalent value in exchange for the transfer." TUFTA § 24.005(a)(2), § 24.006. The Trustee must also allege that SHC System was financially impaired at the time of the transfer, which requires allegations of one of three statutory conditions. Specifically, SHC System was financially impaired if it:

> was insolvent at that time or . . . became insolvent as a result of the transfer or obligation (TUFTA § 24.006);
>
> was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction (TUFTA § 24.005(a)(2)(A)); or

intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due (TUFTA § 24.005(a)(2)(B)).

The Trustee has sufficiently pleaded facts supporting the lack of reasonably equivalent value and each of the three financial-impairment requirements, although any one of them suffices. In its Motion, Tenet merely invites error by asking the Court to disregard well-pleaded allegations, draw inferences in its favor, and weigh facts outside the pleadings. The Motion should be denied.

## I. The Amended Complaint Sufficiently Alleges That SHC System Did Not Receive Reasonably Equivalent Value in the Tenet Transaction.

The animating purpose of TUFTA—and all fraudulent transfer statutes—is to protect creditors by preventing debtors from placing assets beyond creditors' reach. *Challenger Gaming Sols., Inc. v. Earp*, 402 S.W.3d 290, 293 (Tex. App. 2013). Reasonably equivalent value must "be determined in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors." *Bowman v. El Paso CGP Co., L.L.C.*, 431 S.W.3d 781, 788 (Tex. App. 2014) (quoting § 3 Value, Unif. Fraudulent Transfer Act, cmt. 2). Thus, "[w]hether a debtor obtained reasonably equivalent value in a particular transaction is determined from a reasonable creditor's perspective at the time of the exchange, without regard to the subjective needs or perspectives of the debtor or transferee and without the wisdom hindsight often brings." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 582 (Tex. 2016). And "[c]onsideration having no utility from a creditor's viewpoint does not satisfy the statutory definition [of value]." *S.E.C. v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (quoting UFTA § 3 cmt. 2).

The inquiry into whether value provided is "reasonably equivalent" is "'a fact-intensive determination that typically requires testing through the discovery process.'" *Aurzada*, 2026 WL 700426, at *11 (quoting *In re Walter,* 462 B.R. 698, 709 (Bankr. N.D. La. 2011)) (denying motion to dismiss). *See also In re Ocean Tower LP*, No. 11-70776, 2014 WL 6686542, at *6 (Bankr. S.D.

Tex. Nov. 25, 2014) (noting that inquiry into reasonably equivalent value is "fact-intensive" and denying motion to dismiss; considering claim under Bankruptcy Code and TUFTA); *In re Mirant Corp.*, No. 03-046590 DML, 2010 WL 8708772, at *31 (Bankr. N.D. Tex. Apr. 22, 2010) (quoting *Matter of Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125 (5th Cir. 1993)) (holding that the question of the value the debtor received in a challenged transaction is "'inherently fact-laden, turning, as it often does, on the case-specific circumstances surrounding the debtor's decision to enter into the particular transaction'"; denying motion to dismiss). Here, Tenet asks the Court to simply disregard the Trustee's extensive allegations regarding valuation of the Miami Hospitals in favor of its own, preferred set of facts. The Court should decline the invitation.

### A. Applying the Widely Accepted Comparable Public Company Method, the Fair Market Value of the Miami Hospitals Was, at Most, $611.9 million.

SHC System "purchased an operating business from Tenet, not a collection of physical assets and book accounts." Am. Compl. ¶ 38. Accordingly, the Amended Complaint sets out a valuation of the Miami Hospitals using the Comparable Public Company Method, which looks to the value of reasonably similar publicly traded companies to determine an appropriate EBITDA multiple on which the valuation is based. And contrary to Tenet's suggestion otherwise, *see* Mot. at 18, this methodology captures "all components of the business that are necessary to operate it, including the real property, net working capital, accounts receivable, inventories, equipment, leasehold improvements, and good will." *See* Am. Compl. ¶ 38.

Courts have routinely recognized and accepted business valuations using this methodology. *See In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 370 (Bankr. D. Del. 2006) (holding that the Comparable Public Company Method is used in standard valuation practice); *In re Tronox Inc.*, 503 B.R. 239, 318–19 (Bankr. S.D.N.Y. 2013) (relying on Comparable Public Company Method in valuing company); *In re Mirant Corp.*, 334 B.R. 800, 816 (Bankr. N.D. Tex. 2005) ("The court

has found in numerous opinions support for valuation of a chapter 11 debtor through the use of the DCF Method and the Comparable Method.") (collecting cases).[5] Tenet does not dispute that the Comparable Public Company Method is an accepted method for valuing a business. Instead, Tenet argues, without support, that the method cannot be used because the Tenet Transaction was documented via an asset purchase agreement. *See* Mot. at 15; *see, e.g., In re FBI Wind Down, Inc.*, 557 B.R. 310, 314 (Bankr. D. Del. 2016) (noting that sale of operating business was done pursuant to an asset purchase agreement); *T.L. Swint Indus., Inc. v. Premiere Sales Grp., Inc.*, 16 F. Supp. 2d 937, 938 (N.D. Ill. 1998) (same).

Tenet's characterization of the transaction as the sale of component parts contradicts both the APA and the Trustee's pleading. The APA confirms that SHC System acquired a "Healthcare Business," which included "[c]ollectively, all of [Tenet's] businesses related to or used in connection with, the ownership, operation and development of the [Miami Hospitals] and all services provided by or pursuant to Contracts with [Tenet] at the [Miami Hospitals]." Mot., Ex. 1 at 6. Notably, per the APA, SHC System also acquired ***Tenet's liabilities*** relating to the operation of the Healthcare Business, including trade payables, accounts payable, and patient credit balances. *Id.* at 18. Unremarkably, the APA had separate lists of included and excluded assets, which excluded assets that belonged to the overall Tenet system and its unassignable contracts. Mot. at 15.

But the APA does not, as Tenet suggests, list out and price each of the assumed assets and liabilities. The closest it comes to doing this is in the March 2021 balance sheet attached to the APA. That balance sheet is, according to the APA, the "unaudited balance sheet[] … with respect

[5] *See also* James M. Lukenda & Alexandra Mahnken, *Valuation Fundamentals in Bankruptcy: Overview*, Practical Law, https://us.practicallaw.thomsonreuters.com/w-032-0175 (last visited Oct. 19, 2026) (describing the comparable company method).

to the Healthcare Business." But that balance sheet is not a price sheet for the component parts of an asset purchase, and it does not counter the inference supported by the facts in the Amended Complaint.[6] Because SHC System was buying a business, it should be valued as such, which is what the Comparable Public Company Method does. And courts have made clear that it is the substance of the transaction that matters, as opposed to the labels in a contract. *See Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 827 (8th Cir. 2016).

As explained below, each of the two computations of the value of the Miami Hospitals in the Amended Complaint is sufficient factual basis to support the Trustee's allegations that SHC System did not receive reasonably equivalent value. Each is based on the analysis that SHC System's financial experts at KPMG performed contemporaneously with the Tenet Transaction and applies the widely accepted Comparable Public Company Method. The first, more conservative computation demonstrates that the Miami Hospitals were worth, at most, ***$611.9 million*** based on Tenet's historical operations. Am. Compl. ¶¶ 38–43. The second, more accurate computation demonstrates that the Miami Hospitals were worth less than ***$400 million*** after accounting for Tenet's above-market insurance reimbursement rates. *Id.* ¶ 47. But under either computation, the Amended Complaint plainly supports a plausible inference that SHC System did not receive reasonably equivalent value for the $1.1 billion purchase price.

**1. Facts supporting a conservative application of the Comparable Public Company Method demonstrate that the Miami Hospitals were worth no more than $611.9 million at the time of the Tenet Transaction.**

As discussed above, the well-accepted Comparable Public Company Method for valuation focuses on the business's earnings, typically measured by EBITDA. *See* Am. Compl. ¶ 39; *see*

[6] According to that balance sheet, the assets associated with the Healthcare Business (including goodwill) were worth $827.6 million (*id.* at pdf 263) and the liabilities were $222.3 million (*id.* at pdf 266), leaving a net value of ***$605.3 million***—consistent with both the $683 million valuation in Tenet's July 2021 10-Q and the no greater than $611.9 million valuation in the Trustee's analysis in the Amended Complaint.

*also Tronox*, 503 B.R. at 317–19; *Mirant*, 334 B.R. at 816–17. SHC System hired KPMG to ascertain the Miami Hospitals' EBITDA. *See* Am. Compl. ¶ 40. KPMG normalized Tenet's historical data to tether it more closely to the economic reality of the present conditions facing the company. Courts have recognized this is a standard part of the valuation process. *See, e.g.*, *In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308, at *9 (Bankr. D. Del. Dec. 5, 2019) (describing need to normalize EBITDA to perform comparable companies analysis); *see also In re Chemtura Corp.*, 439 B.R. 561, 582 (Bankr. S.D.N.Y. 2010) (finding appropriate the normalization of projected cash flows in a discounted cash flow analysis).[7]

It was essential—or, at a minimum, a plausible approach, which is all that is required here—to normalize Tenet's prior earnings given the impact of COVID on the business in 2020 and the one-time $60 million COVID grant that Tenet received for the Miami Hospitals. Am. Compl. ¶ 40 & n.2. KPMG, SHC System's experienced financial advisor, considered Tenet's reported 2020 earnings for the Miami Hospitals after accounting for the one-time grant and then adjusted the earnings upward to account for the pandemic's effects, calculating normalized EBITDA of $82.69 million.[8] *Id.* Tenet is welcome to present an alternative analysis at trial, but it cannot obtain dismissal of the Amended Complaint on a pleading motion by questioning the weight of inferences supported by the contemporaneous analysis of SHC System's professional advisors. Nor is Tenet's

---

[7] The Motion repeatedly claims that the MTD Order and the Texas Supreme Court's and Fifth Circuit's decisions in *Janvey* foreclosed any consideration of a prediction of the earnings the assets would deliver. *See, e.g.,* Mot. at 2, 3. Neither *Janvey* nor this Court so held, and business operations (or, really, any property) have value based on what a buyer can do with the property. In fact, another widely approved method for valuing a business is the discounted cash flow ("DCF") method. *See, e.g., ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278, 357 (S.D. Tex. 2008). The DCF is expressly dependent upon predicting the business's cash flow in the future, then discounting those future predicted flows back to a present value amount. *See Mirant,* 334 B.R. at 817 ("The DCF Method bases valuation on the subject's projections of EBITDA for a period of years. The projected EBITDA is then discounted back to present value….").

[8] Tenet suggests that the Trustee just made up this number. *See* Mot. at 16. But as alleged, this is the EBITDA amount calculated by SHC System's paid, expert financial advisor contemporaneously with the transaction. *See* Am. Compl. ¶ 40.

heavy-handed preview of its trial strategy compelling, such as when it insists that the Trustee should have focused on the Miami Hospitals' historical 2019 EBITDA as opposed to 2020. *See* Mot. at 17 n.12. Tenet's reliance on hindsight is also unpersuasive as when it insists that the Miami Hospitals' valuation as of the closing should include government funding pursuant to the DPP, ***which had not yet occurred at the time of the transaction***. *See* Mot. at 17 n.13.[9]

The Trustee's valuation applies an EBITDA multiple of 7.4x based on the Miami Hospitals' major competitors and Tenet's own enterprise value—a multiple at the low end of the competitor range that is generous given the Miami Hospitals' below-average margins. Am. Compl. ¶¶ 41–42. Applying the 7.4x multiple to KPMG's normalized 2020 EBITDA yields a fair market value of the Miami Hospitals of $611.9 million as of the Tenet Transaction. Am. Compl. ¶¶ 40–43. Tenet does not, and cannot, argue that $611.9 million is reasonably equivalent value compared to the $1.1 billion purchase price.

#### 2. A rate-adjusted application of the Comparable Companies Method determines that the Miami Hospitals were worth less than $400 million as of the Tenet Transaction.

Because Tenet's insurance reimbursement rates were abnormally high compared to the market, the Miami Hospitals were in fact worth far less than $611.9 million. *See* Am. Compl. ¶¶ 44–54. KPMG concluded, through a direct comparison of Tenet's and SHC System's insurance reimbursement rates, that Tenet's were much higher than SHC System's. *Id.* ¶¶ 44–49. Publicly available data demonstrates that Tenet's rates were among the highest in Florida and much higher than those of the average hospital operator. *Id.* ¶¶ 50–54.

---

[9] Tenet notes that the Delaware Chancery Court wrote in *Steward Health Care Sys., LLC v. Tenet Bus. Servs. Corp.*, 2023 WL 5321484 (Del. Ch. Aug. 18, 2023), that the DPP received state and CMS approval by May 6, 2021. *Id.* at *5. But Tenet neglects to cite the very next sentence in that opinion: "The final puzzle piece was local approval and implementation." *Id.* Thus, as alleged, payments via the DPP were still uncertain, and they definitely were not historical, as they had not yet occurred.

SHC System hired KPMG to analyze the rate differential based on Tenet's and SHC System's data, as is customary where antitrust law restricts the exchange of competitively sensitive rate information between parties negotiating a hospital acquisition.[10] *Id.* ¶ 46. By this "black box" analysis, KPMG was provided with data from Tenet and SHC System regarding their insurance reimbursement rates, and KPMG could provide a summary-level analysis of the impact of the rate differential on the Miami Hospitals' earnings. *Id.* KPMG determined that SHC System's rates were substantially lower than Tenet's and that the $82.69 million EBITDA number described above would be $22.9–43.9 million less under SHC System's insurer reimbursement rates. *Id.* ¶ 47.[11] Adjusting the EBITDA number downward by the midpoint of KPMG's estimate of the differential in reimbursement yields an EBITDA of $49.29 million and a value for the Miami Hospitals of only $364.75 million. After accounting for excess net working capital delivered beyond what SHC System bargained for in the APA, the valuation would be only $394 million. *Id.* ¶¶ 47–48. [redacted] *Id.* ¶ 49. Ralph de la Torre chose to ignore KPMG's analysis and proceeded with a transaction that he knew was worth far less to SHC System than $1.1 billion. *Id.*

The rate adjustments were critical because Tenet's rates were extraordinarily high. *Id.* ¶ 50. In 2019, Tenet's commercial reimbursement rates in Florida were 347% of Medicare, compared to a statewide average of 327%. *Id.* ¶ 51. In 2020, Tenet's commercial reimbursement rates in Florida were 376% of Medicare while the average was 310%—a more than 20%

[10] *See* FTC, Bureau of Competition: "Avoiding antitrust pitfalls during pre-merger negotiations and due diligence" (March 20, 2018) (https://www.ftc.gov/enforcement/competition-matters/2018/03/avoiding-antitrust-pitfalls-during-pre-merger-negotiations-due-diligence).

[11] Tenet calls KPMG's rate analysis "subjective." Mot. at 22. That argument is projection—the psychological kind, not the financial kind. The alleged rate differential is a fact: when the deal closed, SHC System's rates were far worse than Tenet's, so the business was worth less in SHC System's hands—and to SHC System's creditors—than Tenet's historical numbers suggest.

advantage. *Id.* ¶ 52. In 2021, Tenet's commercial reimbursement rates in Florida were 444% of Medicare while the average was 317%—a more than ***40% advantage***. *Id.* In each of these years, plus 2022, Tenet's reimbursement rates were among the highest in Florida (*id.* ¶¶ 51–53) and, based on KPMG's analysis, far higher than SHC System's (*id.* ¶¶ 46–47). Thus, the Amended Complaint amply pleads facts that support the Trustee's adjustments, and it would invite error to require valuing the Miami Hospitals, ***in a pleading***, based on Tenet's atypical rates. The alleged facts amply support the inference that a valuation based on Tenet's historical earnings would overstate the value of the business from the perspective of an SHC System creditor. *Id.* ¶ 54.

Applicable law requires considering the effect of the insurance rate differential. "Whether a debtor obtained reasonably equivalent value in a particular transaction is determined from ***a reasonable creditor's perspective*** at the time of the exchange, without regard to the subjective needs or perspectives of the debtor or transferee and without the wisdom hindsight often brings." *Janvey*, 487 S.W.3d at 582 (emphasis added). "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to unsecured creditors." *In re Triplett*, No. 19-42570, 2023 WL 2750899, at *8 (Bankr. E.D. Tex. Mar. 31, 2023) (quoting *In re Hinsley,* 201 F.3d 638, 643 (5th Cir. 2000)). *See also Tow v. Speer*, No. CIV.A. H-11-3700, 2015 WL 1058080, at *12 (S.D. Tex. Mar. 10, 2015) ("The issue is whether, from the creditor's standpoint, the debtor's estate lost value."). When courts consider whether there was reasonably equivalent value, they "examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return." *In re Pace*, 456 B.R. 253, 270 (Bankr. W.D. Tex. 2011) (quotation omitted); *see also In re IFS Fin. Corp.*, 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009) ("Courts must consider all aspects of a transaction and both direct and indirect burdens to the debtor when determining value.").

From the perspective of a reasonable SHC System creditor (as required by *Janvey*), SHC System lost value in the Tenet Transaction because the Miami Hospitals were worth far less than what SHC System paid for them, and the value of the Miami Hospitals is inextricably dependent on SHC System's insurance reimbursement rates. The question of how much value SHC System lost because of the Tenet Transaction cannot be answered without considering those rates. Thus, the correct approach under the TUFTA—and the only approach that will determine the loss of value to SHC System's creditors—is to assess the value of the Miami Hospitals using SHC System's insurance reimbursement rates.

What Tenet suggests—valuing the Miami Hospitals' earnings under Tenet's reimbursement rates and thus ***from Tenet's perspective***—is impermissible under *Janvey*. *See* 487 S.W.3d at 582. The Amended Complaint alleges not just that the assets conveyed were worth less to SHC System than they were to Tenet. Rather, the Amended Complaint alleges that the assets were worth less to almost any buyer because Tenet's insurance contracts were far better than those of almost any potential buyer. At trial, the jury may find, when presented with expert testimony regarding the insurance rates achievable by SHC System as well as by an ordinary hospital operator, that the Miami Hospitals were worth $394 million (based on SHC System's rates) or a different amount, but certainly less than they were worth based on Tenet's above-market rates.

Tenet cannot ask this Court to weigh all the facts and circumstances about valuation on a motion to dismiss, nor can it attack the Trustee's pleading based simply on the fact that the APA excluded its system-wide payor contracts from the assets sold. *See* Mot. at 15–16 (citing APA § 2.2(f)). Tenet argues that its contracts "were never part of the sale." *Id.* Exactly so: because Tenet did not convey its uniquely favorable payor contracts, the finder of fact's task will be to ascertain the objective value of what ***was*** sold without those contracts. Any valuation that capitalizes

earnings generated by Tenet's retained contracts assigns value to what Tenet kept. Thus, the Trustee's rate adjustment correctly removes from the valuation the earnings attributable to contracts that SHC System never received and that almost no other market participant could have matched. Am. Compl. ¶¶ 50–54. The Trustee's rate adjustment is proper even though Tenet likely did not know SHC System's rates, *see* Mot. at 3, 17; the ***objective*** reasonably-equivalent-value inquiry does not turn on the transferee's knowledge or perspective. *See Janvey*, 487 S.W.3d at 582.

**3. The Amended Complaint plausibly alleges that the real estate alone constituted less than $900 million in value.**

MPT paid SHC System $900 million for the real estate ***and*** SHC System's promise to pay MPT (above-market) rent, and the Amended Complaint alleges that the real estate alone was worth $440–640 million. *See* Am. Compl. ¶¶ 58–59.[12] Even through this lens, there was no reasonably equivalent value.

The Amended Complaint values the real estate alone through the "income capitalization" and "sales comparison" methodologies. *See* Am. Compl. ¶¶ 56, 59. The Amended Complaint alleges that these are accepted methodologies for calculating real estate value (*see id.*), and Tenet does not claim otherwise.[13] Tenet's only complaint about the Trustee's application of the income capitalization approach is that it relies, in part, on KPMG's EBITDA calculations (*see* Mot. at 19), but that criticism fails for the reasons discussed above. *See* Section I.A.1, *supra*.

---

[12] Tenet argues that the Trustee's valuation of the real estate is belied by his valuation of the Miami Hospitals as a whole, including the business, at $364.7 million. *See* Mot. at 18. But there is no discrepancy. The $364.7 million figure is based on the Miami Hospitals' EBITDA after adjustment for SHC System's insurance contract rates, which decreased the value of the Miami Hospitals (real estate, business and all) below the standalone real estate value. In other words, the rate differential turned the business into a losing operation such that SHC System would be better off just selling the real estate than retaining it and operating the business.

[13] Courts recognize these accepted methodologies. *See Cherokee Water Co. v. Gregg Cnty. Appraisal Dist.*, 773 S.W.2d 949, 955 (Tex. App. 1989), *writ granted* (Mar. 28, 1990), *aff'd*, 801 S.W.2d 872 (Tex. 1990) ("Real estate appraisal methods are generally characterized as (1) market data (comparable sales approach), (2) income (capitalization of income), or (3) replacement cost (replacement cost less depreciation).").

Tenet's factual challenges to the Trustee's sales comparison analysis belong in an expert report, not a motion to dismiss. Tenet claims that (1) the Trustee should not have used national data for some inputs because median home values are higher in Miami-Dade County than the national average and (2) the Trustee's analysis does not account for " ancillary facilities" that SHC System bought along with the hospital real estate. *See* Mot. at 19. Tenet's arguments improperly try to raise factual disputes by relying on outside-the-pleading evidence to establish facts regarding the value of the real estate (*see* Mot. at 19 nn. 14–15 and accompanying text). This Court forbid such reliance on outside-the-pleading material. *See* MTD Op. at 4.

Finally, Tenet asks the Court to ignore the Trustee's allegations about the business valuation in favor of its own novel methodology. Tenet asks the Court to take the top of the Trustee's range of real estate values ($640 million)[14] and to add to it the net working capital delivered ($129 million). *See* Mot. at 20. But nothing in the Amended Complaint suggests that this is a valid approach to calculating value, and Tenet cites no court holding that it is. Net working capital is a balance sheet calculation for ***current*** assets minus ***current*** liabilities.[15] It says nothing about what the business sold is worth as a whole. In addition, a calculation of net working capital provides no information regarding the business's ability to generate earnings, which is what matters to a buyer. SHC System bought an operating business, and a proper methodology for valuing such a business is the Comparable Companies Method, which subsumes net working capital and assesses ***all*** operating assets on the balance sheet. Perhaps Tenet can present a valuation of the Miami Hospitals

[14] The Amended Complaint alleges two ranges of value for the real estate based on the widely accepted income capitalization ($440–640 million) and sales comparison ($450–621 million) approaches. *See* Am. Compl. ¶¶ 58–59. Tenet cannot explain why the Court should use the top of the range when the Court, on a motion to dismiss, must draw every reasonable inference in the Trustee's favor.

[15] *See* Jason Fernando, *Working Capital: Formula, Components, and Limitations*, Investopedia (Feb. 21, 2026), https://www.investopedia.com/terms/w/workingcapital.asp ("Working capital, also known as net working capital (NWC), is the amount of money a company has available to operate after deducting its current liabilities from its current assets.").

at trial that adds a balance sheet calculation to a value for the real estate alone (it is unlikely this approach would pass a *Daubert* challenge), but because the Amended Complaint plausibly alleges a value of the Miami Hospitals that is far lower than the amount SHC System paid, the Court must deny the Motion.

### B. Tenet's Own Valuation in Its Securities Filing Further Supports a Plausible Inference That SHC System Did Not Receive Reasonably Equivalent Value Through the Tenet Transaction.

Tenet issued a 10-Q dated July 30, 2021—a mere three days before the Tenet Transaction closed—stating that the Miami Hospitals, including real estate and operations, were then worth $683 million. Am. Compl. ¶ 36. This is over $400 million less than the $1.1 billion SHC System paid. This allegation alone—without even considering the Trustee's well-pleaded facts regarding valuation—raises at least the reasonable inference that SHC System did not receive reasonably equivalent value in the Tenet Transaction.

Tenet argues that its public statement regarding the value of the Miami Hospitals is entirely irrelevant because the 10-Q states book value. Mot. at 14–15. But even if the 10-Q only states book value, book value can support the plausibility of allegations about fair market value. *See Hoffman v. AmericaHomeKey, Inc.,* No. 3:12-CV-3806-B, 2014 WL 7272596, at *13 (N.D. Tex. Dec. 22, 2014) (holding that an asset's book value may be probative of market value, and whether book value is reflective of market value is an issue "of fact about which reasonable minds could differ."); *Sears Roebuck & Co. v. Dallas Cent. Appraisal Dist.,* 53 S.W.3d 382, 391 (Tex. App. 2000) ("[B]ook value of inventory may be probative of market value by either serving as some indication of market value or by being equivalent to market value."). Tenet cannot reject these allegations on a pleading motion because "[w]hether the book value of inventory is in fact indicative of or equivalent to its market value is an issue to be determined by the trier of fact on a case by case

basis." *Hoffman*, 2014 WL 7272596 at *13.[16] In fact, the value Tenet reported in its 10-Q is consistent with the detailed fair market valuation described in paragraphs 38 to 43 of the Amended Complaint. That analysis yielded a valuation of no more than $611.9 million, which is roughly consistent with the $683 million stated in the 10-Q. For this additional reason, the Amended Complaint alleges facts that support reliance on the value reported in Tenet's 10-Q. The Court should leave for later proceedings a battle of the experts on fair market value, based on a full evidentiary record.

The cases Tenet cites do not require a different conclusion. *Scot. Heritable Tr., PLC v. Peat Marwick Main & Co.* is an accounting malpractice case that does not address how assets may be valued for purposes of reasonably equivalent value (or for any other purpose). Indeed, the case does not say that book value is irrelevant to fair market value; it says only that the two are not the same thing. 81 F.3d 606, 608 n.1 (5th Cir. 1996). Similarly, *Cyrix Corp. v. Intel Corp.* acknowledged the difference between book value and fair market value in a footnote but did not conclude that book value is irrelevant to fair market value. *See,* 803 F. Supp. 1200, 1206 n.5 (E.D. Tex. 1992).

Lastly, Tenet's critique that the Trustee's citation to the 10-Q overlooks goodwill misses the mark. Mot. at 14. The 10-Q expressly includes $191 million of goodwill in the assets delivered to SHC System. *See* Tenet Healthcare Corp., Form 10-Q (June 30, 2021) at 11 (Ex. 1). Tenet speculates that book value ***might*** undervalue a business if it does not include goodwill, *see* Mot. at 14–15 (citing *In re TransCare Corp.,* 81 F.4th 37 (2d Cir. 2023)), but it also might not—for

[16] Courts have also relied on book values in assessing solvency, particularly where other evidence indicates that the book values at issue are relevant to market values. *See In re Erstmark Cap. Corp.,* 73 F. App'x 79 (5th Cir. 2003) (affirming bankruptcy court's finding of insolvency despite defendants' argument that court improperly relied on balance sheets contained in federal tax returns; balance sheets reporting book values were competent evidence from which inferences regarding the debtor's insolvency could be drawn where bankruptcy court also relied on corroborating evidence).

example (as here), where the earnings of the business do not justify the purchase price. And whether or not the 10-Q standing alone would have met the Trustee's pleading burden, taken together with the consistent conclusions of the fair market valuation detailed in the Amended Complaint, the 10-Q certainly further supports a reasonable inference of a lack of reasonably equivalent value.

### C. Allegations Regarding the Post-Transaction Performance of the Miami Hospitals Contextualize and Confirm the Trustee's Valuation Allegations.

After the extensive allegations regarding a fair-market valuation and Tenet's own valuation of the Miami Hospitals, the Amended Complaint also set out allegations about the post-sale performance of the business and the bankruptcy sale. Those later allegations offer even more confirmation of what the contemporaneous valuations show: SHC System drastically overpaid. *Id.* ¶¶ 71–76. Courts can consider post-acquisition performance, even though such allegations may not by themselves be sufficient. *See VFB LLC v. Campbell Soup Co*., 482 F.3d 624, 631 (3d Cir. 2007) ("A company's actual subsequent performance is something to consider when determining ex post the reasonableness of a valuation … but is not, by definition, the basis of a substitute benchmark."); *see also In re Adelphia Commc'ns Corp.,* 512 B.R. 447, 495 (Bankr. S.D.N.Y. 2014) (considering value for purposes of solvency analysis; "[t]hough courts must determine solvency free of impermissible hindsight, courts may consider information 'originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date,' which assures that the valuation is based in reality."). Thus, while the Court's prior ruling found that the post-sale performance could not alone support a finding of lack of reasonably equivalent value, the Court should reject Tenet's suggestion that the allegations should be disregarded entirely. *See* Mot. at 20–22.

### D. Tenet's Counterfactual Reimagining of the Tenet Transaction Does Not Negate the Trustee's Allegations of a Lack of Reasonably Equivalent Value.

Tenet improperly argues that the Court should disregard both the allegations in the Amended Complaint and the APA and treat MPT as the "real" buyer of the real estate. *See* Mot. at 22–23.[17] But the Trustee's allegations are clear and well-supported. The APA defines SHC System (and other Steward entities) as "Buyers" (Mot., Ex. 1 at 1, 13), it explicitly required SHC System to pay the purchase price (*id.* at 13), and it required delivery of the Miami Hospitals to SHC System (*id.* at 13). Section 10.5 and Schedule D do not change this. They simply implemented the Buyers' right to assign their right to purchase the real property to MPT—as this Court has already recognized. MTD Order at 1 ("The APA permitted Steward to assign the right to purchase associated real property. Steward did so by assigning that right to [MPT]."). An assignee's exercise of the buyer's purchase right does not make the assignor any less the buyer, and it does not change who paid Tenet. SHC System paid the entire $1.1 billion purchase price through an escrow it controlled, using money SHC System raised, and that payment satisfied SHC System's obligation to pay under the APA. Am. Compl. ¶ 35.

How SHC System ***financed*** the purchase price does not support rejecting the allegations that SHC System paid it. As alleged in the Amended Complaint, SHC System financed the purchase price through $208.9 million in debt and $925 million obtained from MPT through a sale-leaseback transaction. *Id.* ¶ 34. Tenet's argument that SHC System's chosen method of

[17] Tenet argues that the Amended Complaint improperly seeks to recover the entire $1.1 billion SHC System transferred to Tenet (or, in the alternative, the $209 million portion SHC System funded from non-MPT sources) without netting out any value received from Tenet. Mot. at 24–25. Tenet cites no authority for this argument, and there is none. Under 11 U.S.C. § 544(b), the Trustee may assert the state-law cause of action of one creditor to avoid an entire transfer, regardless of the size of the creditor's claim against the debtor. *See In re Moore*, 608 F.3d 253, 260 (5th Cir. 2010). TUFTA § 24.008(a) allows the Trustee to avoid the transfer to Tenet without any reduction for value received from Tenet. If Tenet believes it has an affirmative defense that reduces the Trustee's recovery, it may plead that defense in its answer.

financing the deal warrants recharacterizing the transfer has been foreclosed by the Supreme Court. In *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,* 583 U.S. 366 (2018), the Supreme Court held that, once the plaintiff identifies a transfer as defined under the Bankruptcy Code, "the court has no reason to examine the relevance of component parts when considering a limit to the avoiding power." *Id.* at 381–82. The flip-side is also true: a defendant may not expand the scope of the transfer the trustee identifies to encompass other, related transfers. *See In re Loyalty Ventures, Inc.,* No. 23-90111, 2026 WL 801210, at *7 (Bankr. S.D. Tex. Jan. 22, 2026) ("[W]hat Defendants seek by looking beyond the alleged transfers in the Complaint is exactly what the Supreme Court in *Merit Management* said courts should not do."); *In re IIG Glob. Trade Fin. Fund Ltd*., 666 B.R. 38, 67 (Bankr. S.D.N.Y. 2024) ("[Defendants] acknowledge that the alleged transfers to TFT would not be subject to section 546(e), but they want me to let the Defendants re-define the transactions in order to try to bring them within the scope of section 546(e). That is exactly what the Supreme Court said in *Merit Management* that I should not do.").

Thus, now that the Trustee has identified a transfer it seeks to avoid (SHC System's $1.1 billion payment to Tenet for the Miami Hospitals), recharacterizing the transfer is not allowed on a pleading motion or even later in the proceedings. The $1.1 billion payment is on one side of the ledger, and it far outweighs the well-pleaded allegations that SHC System received, at most, an asset worth $611 million. *Merit* does not allow Tenet to expand that transfer to encompass other transfers and then argue that the Trustee's reasonably equivalent value allegations did not sufficiently allege the value of those other transfers.

Nevertheless, even though the Trustee had no obligation to plead facts that establish the value of the real estate alone, his pleading did in fact establish a value, which only further supports his allegations of the overarching transfer he has attacked. The Amended Complaint alleges that

the Miami Hospitals, including the real estate (and net working capital), were worth $394 million given Tenet's out-of-market insurance rates (*see* Am. Compl. ¶ 47), and that the real estate was worth $440–$640 million (*id.* ¶¶ 58–59), with a midpoint of $540 million.[18] The operations alone were thus worth less than nothing to SHC System ($394 million *less* $540 million)—and certainly far less than the $209 million SHC System indisputably contributed to the purchase price. Ignoring the effect of the insurance rate differential on earnings, the hospitals, including the real estate (and net working capital), were worth $611.9 million (Am. Compl. ¶ 43). Thus, even applying the more generous valuation, the business operations alone were worth $71.9 million ($611.9 million *less* $540 million)—again, far less than the $209 million SHC System indisputably contributed.

Moreover, Tenet's argument ignores the economic reality of the sale-leaseback arrangement with MPT. Neither the Amended Complaint nor the APA supports Tenet's suggestion that MPT simply paid $900 million as if it were a fee simple transfer. Like any financing, MPT's capital came with corresponding obligations. SHC System agreed to pay above-market lease obligations over the term of the lease—at about twice the market rate—in return for MPT's $900 million investment. Am. Compl. ¶¶ 57–60. Over the term of the leases, those obligations would run up to MPT's $900 million investment. And at the end of the term, MPT would retain ownership of the real estate, and SHC System had to hope that MPT would extend the lease in perpetuity. In other words, even if the Court were to ignore *Merit* and look to the component parts of the overall deal, there is no plausible way to support Tenet's desired competing inference that the Tenet Transaction delivered reasonably equivalent value to SHC System.

[18] Tenet inexplicably claims that the Amended Complaint leaves Tenet to "guess" the value the operations alone, even though it only requires simple subtraction to determine that number.

## II. SHC System Was Financially Impaired as of the Tenet Transaction.

### A. The Amended Complaint Plausibly Alleges Insolvency, Which Tenet Largely Concedes.

The Amended Complaint alleges balance sheet insolvency in detail. Am. Compl. ¶ 63. Tenet does not even bother arguing that the Trustee has inadequately alleged insolvency. Instead, it argues the Trustee should be judicially estopped from making the allegations.

The legal standards for the imposition of judicial estoppel (very little of which Tenet cites) do not allow the imposition of judicial estoppel here. Courts "exercise great caution" before applying judicial estoppel. *Blanco v. Bayview Loan Servicing LLC (In re Blanco)*, 633 B.R. 714, 736 (Bankr. S.D. Tex. 2021). A defendant must establish judicial estoppel by demonstrating that "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 272 (5th Cir. 2015). The plain inconsistency must amount to "intentional self-contradiction" as a way of "obtaining unfair advantage." *Wells Fargo Bank, N.A. v. Oparaji (In re Oparaji)*, 698 F.3d 231, 235 (5th Cir. 2012) (quoting *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008)). Importantly, "semantic inconsistency" is not the test. Rather, the "legal[] possib[ility]" of a party to maintain its two positions is what matters. *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 743 (N.D. Tex. 2014).

Judicial estoppel may only apply if the party to be estopped "convinced the court to accept that previous position" and rely on it. *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014) (quoting *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003)). Indeed, a defendant cannot invoke judicial estoppel by claiming merely that the plaintiff tried to persuade

a court through the prior assertion—the test requires "actual acceptance by a court." *NGM Ins. Co. v. Bexar Cnty., Texas*, 211 F. Supp. 3d 923, 933–34 (W.D. Tex. 2016).

**1. The Court should reject Tenet's judicial estoppel argument relating to the Delaware proceedings.**

Tenet claims that SHC System represented to the Delaware Chancery Court in October 2023 that "Steward is not on the verge of bankruptcy," that "bankruptcy wasn't considered, it isn't being considered," and that "Steward does not currently intend to take any action in the next six months (or otherwise) involving liquidation, receivership or bankruptcy." Mot. at 26–27. Tenet further claims that the Delaware Chancery Court relied on those representations in ruling against Tenet, and that the Trustee therefore must be judicially estopped. The Court should reject this argument.

***First***, these pre-petition statements cannot be attributed to the Trustee for purposes of judicial estoppel because they ***were not made by the Trustee***. While "judicial estoppel might apply to Debtor," the Trustee is not SHC System, and the Trustee made no statements to the Delaware Chancery Court. Thus, the Trustee is not judicially estopped because there is no "'contrary position' that the Trustee may have taken." *In re Miller*, 347 B.R. 48, 54 (Bankr. S.D. Tex. 2006).

Moreover, while the Trustee may be asserting SHC System's rights in some contexts, here, the Trustee's right to bring TUFTA claims against Tenet arises out of the creditors' legal rights, not SHC System's. *See* 11 U.S.C. § 544(b) (allowing Trustee to assert creditor claims). Neither the Trustee nor SHC System's creditors enjoy an identity of interest with SHC System that could support application of judicial estoppel to preclude the Trustee's creditor-based fraudulent transfer claim based on something SHC System's representatives said.

***Second,*** these statements do not reflect legal positions plainly inconsistent with those asserted in the Amended Complaint. Statements by SHC System's agents in ***October 2023***

regarding the company's lack of plans for bankruptcy at that time are not inconsistent with allegations that SHC System was insolvent two years earlier, in ***August 2021***. Moreover, the statements to the Delaware Chancery Court concerned bankruptcy, not insolvency. Tenet simply has not identified the plain inconsistency necessary to impose judicial estoppel.

**2. The Court should also reject Tenet's estoppel argument based on statements in the bankruptcy proceedings.**

Tenet does not come close to establishing judicial estoppel based on statements about SHC System's 2023 liquidity at the beginning of the bankruptcy proceedings in "first-day" materials regarding the company. Mot. at 27.

***First,*** as argued above, Tenet cannot establish the first element of judicial estoppel because the Trustee did not make any of the statements in those materials, and the Trustee's claims arise from creditor claims. Moreover, the statements at issue here are all post-petition. Upon the bankruptcy petition date, all causes of action became property of the estate, and they did so "free and clear of [judicial estoppel] that arose exclusively from [the debtor]'s post-petition actions." *Reed v. City of Arlington*, 650 F.3d 571, 575 (5th Cir. 2011). That is, the estate receives (and the Trustee is now vested with the authority to pursue) causes of action subject only to pre-petition defenses. *Id*.

***Second,*** SHC System's position in the first-day materials about 2023 and the Trustee's allegations here about August 2021 are not plainly inconsistent.

***Third,*** Tenet has not explained how this Court ***accepted*** and ***relied upon*** SHC System's representations about exactly when its liquidity issues worsened. That was not a disputed issue at the time. *See, e.g.*, *In re Steward Health Care Sys. LLC*, No. 24-90213 (Bankr. S.D. Tex. May 7, 2024), Dkt. No. 86 (reviewing first-day materials to conclude that granting the requested interim relief was 1) "necessary to avoid immediate and irreparable harm," and 2) "in the best interests of

the Debtors" and stakeholders). Tenet has pointed to no statement of the Court suggesting that whether SHC System was insolvent in August 2021 was before the Court.

### B. The Amended Complaint Plausibly Alleges That the Tenet Transaction Left SHC System With Unreasonably Small Assets.

Tenet misconstrues the relevant statute when it argues that the Trustee must allege that the challenged transfer is the one that broke the proverbial camel's back and led to unreasonably small assets. Mot. at 29. TUFTA § 24.005(a)(2)(A) does not require such an allegation. Rather, it provides that a transfer is fraudulent if the debtor did not receive reasonably equivalent value in the exchange and the debtor:

> was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

The Trustee can invoke the statute by alleging that the debtor "was engaged" in a business for which its remaining assets were unreasonably small. Under Tenet's reading, once a debtor is undercapitalized, every later transferee gets a free pass. But transfers that make a debtor's already inadequate capital position even worse harm creditors just the same.

Tenet cites non-controlling cases, and other courts have expressly rejected Tenet's position. *See In re Blixseth*, 514 B.R. 871, 883 (D. Mont. 2014) (under plain language reading of the statute, expressly rejecting view that the "Adequate Capital Test" under 11 U.S.C. § 548(a)(1)(B)(ii)(II) requires the plaintiff to establish causation), *aff'd in part, rev'd in part on other grounds,* 679 F. App'x 611 (9th Cir. 2017); *Kartzman v. Latoc, Inc. (In re Mall at the Galaxy, Inc.)*, Adv. Pro. No. 12-1769 VFP, 2019 WL 1522703, at *24 (Bankr. D.N.J. Apr. 4, 2019) (same; citing *Blixseth*), *aff'd in part, rev'd in part on other grounds and remanded sub nom., In re Mall at the Galaxy,* No. 2:19-CV-10340, 2020 WL 1847667 (D.N.J. Apr. 9, 2020). Further, a Texas court granted summary judgment in the claimant's favor on a TUFTA § 24.005(a)(2) claim even though the evidence

specifically established that the debtor's assets were unreasonably small "at all times," not just because of the transfer at issue. *See Magaraci v. Espinosa*, No. 03-14-00515-CV, 2016 WL 858989, at *6 (Tex. App. Mar. 4, 2016).

In any event, even if it is necessary to allege that the Tenet Transaction caused the lack of adequate working capital, the Amended Complaint does so:

> According to SHC System's internal accounting, SHC System had negative net working capital both before and after entering the Miami APA and before and after the Tenet Transaction. If SHC System did not have inadequate working capital prior to the Tenet Transaction, SHC System's taking on of $200 million in additional debt, all the proceeds of which were transferred to Tenet, and taking on excessive leases on the Miami Hospitals, pushed SHC System into an inadequate capital position.

Am. Compl. ¶ 65. Thus, the Trustee has met his burden to plead that SHC System had unreasonably small assets at the relevant time. *See* MTD Order at 3.

### C. The Amended Complaint Plausibly Alleges That SHC System Intended to Incur Debts Beyond its Ability to Pay as of the Tenet Transaction.

The Court should reject Tenet's argument that the Trustee did not sufficiently plead financial impairment under TUFTA § 24.005(a)(2)(B). *See* Mot. at 30–31. The Amended Complaint alleges that SHC System suffered a net operating ***loss*** of ***$441.7 million in 2020***. Am. Compl. ¶ 67. SHC System had negative net income of $28.5 million in Q3 2021 (the quarter when the Tenet Transaction occurred) and negative net income of $230 million in the next quarter. *Id.* ¶ 68. SHC System also had negative net income of $363 million through 2021 and negative net income of $580 million in 2022. *Id.* Its EBITDA was already negative in 2021 and declined further

in 2022. *Id.* ¶ 69. At the time, SHC System faced multiple lawsuits for failing to pay its debts, which arose both before and soon after the Tenet Transaction. *Id.* ¶ 70.[19]

These allegations readily support the plausible inference that SHC System, through its agents, intended to incur, or believed or reasonably should have believed it would incur, debts beyond its ability to pay after the Tenet Transaction.

## CONCLUSION

For the reasons stated above, the Court should deny the Motion with respect to the Trustee's constructive fraudulent transfer claim. And because the Court should not dismiss that claim, the Court should likewise deny the Motion with respect to the Trustee's disallowance claim, which is premised on the constructive fraudulent transfer claim being dismissed. *See* Mot. at 31.

Moreover, the Trustee's opposition addresses several new arguments that Tenet first asserted only after the filing of the Amended Complaint, which Tenet could have raised in its prior motion to dismiss: (1) that SHC System was not the buyer of the assets, (2) that the Trustee had to have valued the business apart from the real estate, and (3) that the Trustee could not seek to recover the full amount of the transfers to Tenet. As set out above, none of these arguments warrant dismissal of the Amended Complaint. Nevertheless, if the Court grants the Motion, the Trustee requests that any dismissal be without prejudice so that the Trustee may move for leave to amend within twenty-one days of such a ruling.[20]

[19] Tenet's argument that SHC System improved its ability to pay debts because MPT bought the real estate from SHC System for $900 million when the real estate was only worth, at most, $640 million is cheeky but ignores the fact that all of the $900 million was paid to Tenet.

[20] The Trustee is not aware of any rule limiting the length of this opposition brief. In any event, as Tenet noted in its Unopposed Motion for Briefing its Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 170, ¶6), Tenet agreed not to object to the Trustee filing a brief 33 pages in length.

Dated: October 20, 2026
Austin, Texas

Respectfully submitted,

By: /s/ *William T. Reid IV*
William T. Reid IV (Tex. Bar No. 00788817)
(S.D. Tex. Bar No. 17074)
*Attorney-in-Charge*
Jeremy Wells (Tex. Bar No. 24098805)
(S.D. Tex. Bar No. 3081661)
Dylan Jones (Tex. Bar No. 24126834) (*pro hac vice*)
Taylor Lewis (Tex. Bar No. 24138317) (*pro hac vice*)
Julia Gokhberg (Tex. Bar No. 24144450) (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1301 S. Capital of Texas Hwy.
Building C, Suite 300
Austin, Texas 78746
Tel: (512) 647-6100
wreid@reidcollins.com
jwells@reidcollins.com
djones@reidcollins.com
tlewis@reidcollins.com
jgokhberg@reidcollins.com

Eric D. Madden (Tex. Bar No. 24013079)
(S.D. Tex. Bar No. 29231)
J. Benjamin King (Tex. Bar No. 24046217)
(S.D. Tex. Bar No. 605914)
Richard Howell (*pro hac vice*)
**REID COLLINS & TSAI LLP**
1445 Ross Avenue, Suite 2900
Dallas, Texas 75202
Tel: (214) 420-8900
emadden@reidcollins.com
bking@reidcollins.com
rhowell@reidcollins.com

Jeffrey E. Gross (*pro hac vice*)
Yonah Jaffe (*pro hac vice*)
**REID COLLINS & TSAI LLP**
420 Lexington Avenue, Suite 2515
New York, NY 10170
Tel.: (212) 344-5200
jgross@reidcollins.com
yjaffe@reidcollins.com

*Counsel to Mark Kronfeld, as Trustee of the SHC Creditor Litigation Trust*

**CERTIFICATE OF SERVICE**

I certify that on October 20, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and email to all parties of record.

/s/ *William T. Reid IV*
William T. Reid IV